## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

SUSAN JOHNSON, individually )
and on behalf of her minor son )
B.L., and on behalf of Derrick )
Thompson, deceased; and )
JOCELYNE WELCH, as Personal )
Representative of the Estate of )
Alivia Welch, )
           )
     Plaintiffs, )
           )
        v. )  2:17-cv-00264-JDL
           )
CITY OF BIDDEFORD, et al., )
           )
     Defendants. )

### ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

On December 29, 2012, James Pak, a Biddeford landlord, argued with and threatened his tenants, Susan Johnson and Derrick Thompson, who were renting the apartment adjoining Pak's house. The dispute concerned the number of cars Johnson and Thompson were allowed to park in the property's driveway. Thompson called 9-1-1, and Biddeford Police Officer Edward Dexter arrived at the scene and spoke with Johnson, Thompson, and Thompson's girlfriend, Alivia Welch, and separately with Pak and his wife. Within minutes after Officer Dexter left the residence, Pak entered the apartment and shot Johnson, Thompson, and Welch. Thompson and Welch were killed, and Johnson suffered serious injuries.

Johnson, on her own behalf, and that of her minor son, B.L., and as personal representative of the Estate of Derrick Thompson, and Jocelyne Welch, as personal

representative of the Estate of Alivia Welch, bring these consolidated actions, seeking monetary damages based on the law enforcement response to the altercation. The defendants include the City of Biddeford,[1] the City's Police Chief, Roger P. Beaupre, and two of the City's police officers, Edward Dexter and Jacob Wolterbeek (collectively, "the Defendants").[2] The Defendants move for summary judgment (ECF No. 66), and, for reasons I will explain, I grant their motion.

## I.  BACKGROUND

Viewed in the light most favorable to the Plaintiffs as the nonmoving party, the summary judgment record portrays the following facts.

James and Armit Pak leased out an apartment attached to their home in Biddeford to Susan Johnson and her son, Derrick Thompson. On the evening of December 29, 2012, James Pak argued with Thompson and Johnson outside the apartment regarding the number of cars parked in the property's driveway. During the argument, Pak exhibited threatening behavior and made the shape of a gun with his hand. Johnson instructed her son to call the police. Thompson made the call and told the 9-1-1 dispatcher that his landlord was "freaking out," making death threats,

---

[1]  The Biddeford Police Department was previously named as a defendant, but it is not a legal entity separate from the City of Biddeford. Accordingly, the Biddeford Police Department and City of Biddeford are treated as one party—the City of Biddeford.

[2]  Johnson's complaint previously named the Maine Department of Public Safety and its commissioner, John E. Morris, as defendants. Following my ruling on a motion to dismiss (ECF No. 33), the parties stipulated to the dismissal with prejudice of all claims against the Department of Public Safety and its commissioner.

Johnson's complaint still includes as defendants Jane Doe(s) (one or two unnamed police officer(s) and/or dispatch employee(s)). Though discovery is complete, Johnson has not amended her complaint to include their identities, and the Plaintiffs' Statement of Material Facts makes clear that the Plaintiffs have identified those whom they contend are responsible for constitutional and state law violations. Accordingly, I treat the claims against the Jane Doe defendants as withdrawn, and therefore the complaint is dismissed as to the Jane Doe defendants. *See, e.g.*, *Gonzalez v. Dooling*, 98 F. Supp. 3d 135, 141 n.9 (D. Mass. 2015); *Williams v. City of Bos.*, No. CIV.A. 10-10131-PBS, 2013 WL 1336584, at *12 (D. Mass. Mar. 14, 2013).

and pointing his fingers towards him in the shape of a gun.  After the call, Johnson, Thompson, and Thompson's girlfriend, Alivia Welch, waited inside the apartment for the police to arrive.

Officer Dexter responded to the call and spoke with Johnson, Thompson, and Welch inside the apartment.  Officer Dexter was equipped with a WatchGuard audio recording system, which the parties agree accurately captured Officer Dexter's conversations with Johnson, Thompson, Welch, and, separately, the Paks that evening.  Thompson explained to the officer that Pak was acting erratically, screaming, and had challenged Thompson to hit him, all in connection with a disagreement over the number of cars Johnson and Thompson were permitted to have in the driveway.  Thompson further reported that Pak had threatened him and Johnson by pointing his fingers in the shape of a gun at each of them and saying "bang."  Officer Dexter viewed cellphone videos Johnson had taken depicting portions of the argument between Thompson and Pak.  In the videos, Pak made vulgar comments and appeared agitated.  Officer Dexter asked if they had had similar problems with Pak in the past.  Thompson responded that he had, but Johnson responded that she had not, explaining that she was not at the apartment very often. Meanwhile, a second Biddeford officer, Officer Jacob Wolterbeek, arrived, and he exchanged a few words with Pak outside on the driveway before joining Officer Dexter in the apartment.

Officer Dexter asked Thompson if he felt threatened by Pak.  Thompson responded, "not really."  Officer Dexter asked if Thompson instead felt "harassed,"

and Thompson agreed that he did.  Thompson and Welch added that Pak would often "freak[] out" and was "always yelling."  Johnson wondered if Pak's wife was away, because, as Welch explained, Pak's wife always came up to them to apologize after her husband acted in such a manner but she had not done so this time.  Officer Dexter asked if they had any questions for him, and Johnson, Thompson, and Welch each responded "no."  He then told them he would meet with Pak and would return to their apartment afterward.  The parties' statements of material facts do not specify what Officer Wolterbeek did next, but Officer Dexter's dashcam video shows Officer Wolterbeek leaving the apartment, and it appears that he left the scene and did not participate further.

Officer Dexter knocked on the door of the Paks' residence and was let in by Armit Pak, James Pak's wife.  She told Officer Dexter that her husband, who was also present in the room, was angry with Johnson and Thompson for breaking their lease.  Officer Dexter told the Paks that any landlord-tenant dispute and any potential eviction process were civil issues.  James Pak then stated that Thompson had given him the finger and that he responded by telling Thompson he would shoot him.  Officer Dexter told Pak that he could not make such statements or otherwise threaten to physically hurt Thompson.  Pak responded, "I'm not going to shoot him." Officer Dexter again explained that the dispute over the cars was a civil matter and that the Paks should "do it through the courts."

Officer Dexter then suggested to the Paks that they stay in their home and only go outside when Johnson, Thompson, and Welch were inside their apartment.

James Pak then said, "I ain't got nothing to lose; I came from [an] orphanage."  Officer Dexter responded: "You do have a lot to lose, sir.  You have this house; you have your wife; you have your dog; you have your vehicles."  Pak repeated, "I've got nothing to lose," and again Officer Dexter disagreed.  Pak protested, "he called me 'jap,' he called me names and now I just don't, I don't have any rights?"  Pak's wife told him to calm down.  Pak then said, "you're going to see me in the newspaper."  Officer Dexter responded that he did not want to see Pak in the newspaper.  Pak went on to state that he would be a "big name tomorrow," and that it would be a "bloody mess."  As Officer Dexter began to leave the Pak's residence, he advised Pak to keep his distance from Johnson, Thompson, and Welch.  Pak told Officer Dexter, "no, you don't have to worry about that," though Pak remained agitated.[3]

Officer Dexter then returned to the apartment and told Johnson, Thompson, and Welch to keep their distance from James Pak.  Johnson asked if James Pak was alone, and Officer Dexter stated that Pak was with his wife.  Officer Dexter then relayed the following about Pak:

> He's obviously extremely upset about the second car and whatnot.
> Okay?  Use caution.  You're out there shoveling, he comes out; come
> inside.  I think at this point in time trying to get him to understand
> what's happening and the issues of civil issue between you guys . . . is
> gonna be hard-pressed and you guys are gonna have more than one
> conflict unfortunately.

ECF No. 78 ¶ 47.  Johnson emphasized that Pak generally did not listen or understand.  Officer Dexter then explained his interpretation of the situation:

---

[3]  Officer Dexter did not ask the Paks whether they owned or had access to any firearms, or whether James Pak had been consuming alcohol that evening.  Pak was subsequently tested after the shooting and found to have a blood alcohol content of .15%.

> [T]here's not much I can do about it because it is a civil issue.  So whether you guys are going through the eviction process, the lease disagreement, whatever process that you guys are going through, I can't do much about that . . . But I can do things about the harassment, et cetera, the threatening.

*Id.*

Johnson asked Officer Dexter if he was returning to the Paks' residence, and he said no.  He explained, "I advised [Pak] he can't harass you, he can't threaten you.  Whether it was successful or not I don't know."  Thompson replied, "I'll find out soon enough," and Officer Dexter said "well, just keep your distance."  Johnson then asked if Pak was acting calm in the officer's presence, and Officer Dexter replied that "calm [was] not the best word" to describe Pak's demeanor.  Johnson said she wondered if Pak was "going to be normal."  Officer Dexter reiterated that Pak's wife was with him and added, "but they're frustrated" and "are hung up on the two car thing."  Officer Dexter then left the scene.  He did not issue a summons to Pak or arrest him.

Approximately five minutes later, a priority dispatch call directed Officer Dexter to return to the residence.  Pak had entered the apartment with a gun and shot Johnson, Thompson, and Welch.  Johnson was seriously injured, and Welch and Thompson were dead.  Officer Dexter arrived on the scene one minute after receiving the dispatch call, and he was soon joined by other officers.  Officer Dexter then tended to Johnson and her minor son, B.L., who had heard the shots from another room in the apartment.  Pak was arrested and charged with, and eventually pled guilty to, two counts of homicide.  He was sentenced to life in prison in February 2016.

## II. LEGAL ANALYSIS

Summary judgment is granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   A fact is material if "its existence or nonexistence has the potential to change the outcome of the suit." *Rando v. Leonard*, 826 F.3d 553, 556 (1st Cir. 2016) (quoting *Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 5 (1st Cir. 2010)).   Issues are considered genuine "if the evidence of record permits a rational factfinder to resolve [the issue] in favor of either party . . . ." *Id.* (quoting *Borges*, 605 F.3d at 4).   The facts in the record are construed in the light most favorable to the nonmoving party, and all reasonable inferences are resolved in the nonmoving party's favor.   *See Braga v. Genlyte Group, Inc.*, 420 F.3d 35, 38 (1st Cir. 2005).

The Plaintiffs' complaints contain a mix of federal and state law claims.   I begin with the claims at the center of the case: (A) Plaintiffs' assertions under 42 U.S.C. § 1983 that the Defendants violated their rights under the Constitution and laws of the United States.   I then consider the Plaintiffs' claims under (B) an analogous state statute, the Maine Civil Rights Act, 5 M.R.S.A. § 4682(1-A); (C) 42 U.S.C. § 1985(3) and Maine's civil conspiracy law alleging that certain defendants were part of an unlawful conspiracy; (D) state law for assault and battery; (E) state law for negligence and negligent and intentional infliction of emotional distress, and (F) Maine's wrongful death statute.

## A.      Deprivation of Rights Under 42 U.S.C. § 1983

The complaints assert claims under 42 U.S.C. § 1983 against Officers Dexter and Wolterbeek for violating the Plaintiffs' constitutional rights by failing to protect them from Pak's violence.  The complaints also assert that the City of Biddeford and Police Chief Beaupre failed to adequately supervise and train their officers, causing the alleged deprivation of the Plaintiffs' constitutional rights.  I examine the individual officers' conduct first and then turn to the conduct of the City and its Police Chief.

### 1.   Officers Dexter and Wolterbeek

Johnson and Welch's complaints assert that Officer Dexter and Officer Wolterbeek's actions and inactions deprived the Plaintiffs of their substantive due process rights under the Fourteenth Amendment to the United States Constitution because the officers failed to protect the Plaintiffs from the harm caused by Pak.[4] The Defendants argue that Officers Dexter and Wolterbeek are entitled to qualified immunity on the Plaintiffs' § 1983 claims.  Police officers are entitled to qualified immunity unless "(1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'"  *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).  I begin with the first prong, analyzing whether Officers Dexter and

---

[4] Johnson and Welch's filings assert that their § 1983 claims are based not just on violations of the United States Constitution, but also on violations of analogous rights under the Maine Constitution and of the Maine right to quiet enjoyment of one's residence, citing *Blackhouse v. Doe*, 24 A.3d 72, 80 (Me. 2011) (Alexander, J., dissenting). This assertion fails to recognize that § 1983 provides a right of action for violations of the United States Constitution and of federal law, but not violations of the Maine Constitution or of state law.  *See Holder v. Town of Newton*, 638 F. Supp. 2d 150, 153 n.3 (D.N.H. 2009) (citing *Ortega Cabrera v. Municipality of Bayamon*, 562 F.2d 91, 102 (1st Cir. 1977)).

Wolterbeek violated the Plaintiffs' substantive due process rights under the Fourteenth Amendment.

The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "In order to establish a substantive due process claim, the plaintiff must first show a deprivation of a protected interest in life, liberty, or property." *Rivera v. Rhode Island*, 402 F.3d 27, 33–34 (1st Cir. 2005) (citations omitted). The plaintiff must also show that "the deprivation of this protected right was caused by governmental conduct." *Id.* at 34. This element is "easily met when a government actor causes the injury, such as when police officers act under color of law." *Id.*

By contrast, "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *See DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989). Since the Supreme Court's decision in *DeShaney*, at least eight federal circuits have recognized the "state-created danger" exception, under which a substantive due process violation may occur if the state creates the danger a person faces from a third party but then fails to protect that person. *See Irish v. Maine*, 849 F.3d 521, 526 (1st Cir. 2017). Two federal circuits have explicitly refused to recognize such an exception. *See Beltran v. City of El Paso,* 367 F.3d 299, 307 (5th Cir. 2004); *Vaughn v. City of Athens*, 176 Fed. App'x 974, 976 n.1 (11th Cir. 2006).

The First Circuit has considered the "state-created danger" exception to *DeShaney* in several decisions but has not officially recognized it. *See Irish*, 849 F.3d at 525−26; *Rivera*, 402 F.3d at 35 (collecting cases). In its most recent discussion of the issue in *Irish v. Maine*, the First Circuit noted the "possible existence" of the "state-created danger" exception but chose not to officially recognize it because of a "dearth of facts" in the record. 849 F.3d at 526, 528. Reasoning that further factual development would assist in determining whether the plaintiffs could establish a substantive due process violation under the "state-created danger" exception, the First Circuit vacated the district court's dismissal and remanded the case for discovery. *Id.* at 528–29.[5] Thus, for the purposes of my analysis, I assume that the First Circuit will eventually adopt the "state-created danger" exception.

For the "state-created danger" exception to apply, actions by state officials must have created or greatly increased the risk of danger an individual faced. *See Coyne v. Cronin*, 386 F.3d 280, 287 (1st Cir. 2004) (government must "affirmatively act[] to increase the threat to an individual of third-party private harm"); *Hasenfus v. LaJeunesse,* 175 F.3d 68, 73 (1st Cir. 1999) (government must "create or [] markedly increase a risk"); *Rivera*, 402 F.3d at 35 (government must "create[] or greatly enhance[] the danger faced by the plaintiff from third parties" (citing *Soto v. Flores,* 103 F.3d 1056, 1063–64 (1st Cir. 1997)); *Frances-Colon v. Ramirez,* 107 F.3d 62, 64 (1st Cir. 1997) (government must "affirmatively act[] to increase the threat of

---

[5]  On remand, District Judge John A. Woodcock, Jr. found that the plaintiffs had "established genuine issues of material fact as to whether, due to a danger created or exacerbated by [certain police officers], they suffered violations of their rights to substantive due process." *Irish v. Fowler*, No. 1:15-cv-00503-JAW, 2020 WL 535961, at *51 (D. Me. Feb. 3, 2020) [hereinafter, *Fowler*]. However, Judge Woodcock granted summary judgment to the defendants on qualified immunity grounds. *Id.*; *see also* n.14, *infra*.

harm to the claimant or affirmatively prevent[] the individual from receiving assistance"). The First Circuit has cautioned that, "[i]n a creation of risk situation, where the ultimate harm is caused by a third party, courts must be careful to distinguish between conventional torts and constitutional violations, as well as between state inaction and action." *Soto*, 103 F.3d at 1064. Only an "affirmative act" by state officials will suffice. *Ramos-Piñero v. Puerto Rico*, 453 F.3d 48, 55 & n.9 (1st Cir. 2006). The "state-created danger" exception also contains the "further and onerous requirement" that the state officials' actions "shock the conscience of the court." *Irish*, 849 F.3d at 526 (quoting *Rivera*, 402 F.3d at 35).

Both sides here rely heavily on the First Circuit's most recent discussion of the "state-created danger" exception in *Irish*. According to the complaint in that case, the victim's ex-boyfriend abducted her, repeatedly raped her, and threatened to kill her if she reported the crimes he had committed. 849 F.3d at 524. The victim called the police, and the police told her that they were going to call her ex-boyfriend and inform him of her accusations to get his side of the story. *Id.* She pleaded with the police not to call him, citing her ex-boyfriend's "terrible violence" and her fear for her safety. *Id.* The police called her ex-boyfriend anyway and left a voice message that potentially alerted him to the victim's allegations. *Id.* The next day, after hearing the message, the ex-boyfriend abducted the victim and shot and killed several others. *Id.* at 525. The district court dismissed the case, finding that on those facts the state-created danger exception did not apply, and that, in any event, qualified immunity shielded the individual defendants from suit. *Id.*

The First Circuit vacated the district court's dismissal, instructing that when determining whether the "state-created danger" exception applies, courts must consider not only what action police officers took but also the manner in which they acted. *Id.* at 526. If the officers acted "despite foreseeing" that their actions might harm the plaintiffs, the exception is more likely to apply. *Id.* at 528. Similarly, if the officers "violated accepted norms of police procedure," the exception is more likely to apply. *Id.* By contrast, if the officers abided by accepted norms of police procedure in employing "necessary law enforcement tools," the exception is less likely to apply, even if the officers' affirmative acts greatly increased the risk of danger to the victims. *Id.* at 523–24 & n.1, 528 (quoting *Rivera*, 402 F.3d at 37). The First Circuit found that the disposition of the plaintiff's complaint in *Irish* depended on questions of fact, both as to whether the officers acted despite foreseeing the harm the plaintiff suffered and as to the applicable police procedures and training. *Id.* at 527–28. Thus, the First Circuit concluded that further factual development was necessary to determine whether the plaintiffs could establish a substantive due process violation under the "state-created danger" exception, if such an exception existed at all. *Id.*

The parties analyze the facts of this case to those of *Irish* and, alternatively, distinguish those facts. The Defendants argue that the Plaintiffs cannot make out a substantive due process claim under the "state-created danger" exception because Officers Dexter and Wolterbeek took no affirmative acts that created or greatly increased the risk of danger that Johnson, Thompson, and Welch faced. The Plaintiffs respond that the officers increased the risk of danger to the victims by

interacting with Pak shortly before the shooting; by then leaving the scene while Pak was still making threats; by promising to protect Johnson, Thompson, and Welch but failing to do so; by failing to communicate the severity of Pak's threats and aggressiveness to Johnson, Thompson, and Welch; and by failing to properly investigate Pak's threats. I analyze the parties' arguments mindful that "courts must be careful to distinguish . . . between state inaction and action" when analyzing whether the "state-created danger" exception applies, *Rivera*, 402 F.3d at 36 (quoting *Soto,* 103 F.3d at 1064), and that for liability to arise, the officers' affirmative acts must have greatly increased the risk of danger to the victims, *id.* at 35.

### a. Affirmative Acts

Johnson and Welch identify two affirmative acts by Officer Dexter that, they assert, bring this case within the "state-created danger" exception.

### i. Officer Dexter's Meeting with Pak

First, Johnson and Welch contend that Officer Dexter affirmatively acted by speaking with Pak and by leaving the scene while Pak was still making threats. However, Johnson and Welch cannot show that Officer Dexter's meeting with Pak and the discontinuation of that meeting increased the risk of harm to the victims.[6] It is undisputed that Pak's aggressive and threatening behavior preceded the officers' involvement and prompted Thompson's 9-1-1 call in the first place. Further, there is no evidence that Pak became substantially more aggressive or threatening after

---

[6] Although a police officer's "arrival, minimal investigation, and subsequent departure" can constitute "affirmative acts that emboldened" the perpetrator by diminishing the perpetrator's fear of arrest, I also consider them in the inaction section, *infra*, where the "real complaint is the failure [by the officer] to do anything else—an act of omission." *May v. Franklin Cty. Bd. of Comm'rs*, 59 F. App'x 786, 794 (6th Cir. 2003) (not for publication).

speaking with Officer Dexter.  Even if Officer Dexter's advice to Pak that he should resolve his dispute with his tenants in civil court might have added to Pak's frustration and agitation, that advice cannot reasonably be said to have greatly increased the risk of danger Pak posed to the victims, as required to impose on Officer Dexter a constitutional duty to protect Johnson, Thompson, and Welch.  *See Rivera*, 402 F.3d at 35 (citations omitted); *see also Fowler*, 2020 WL 535961, at *41–42 (finding a "clear issue of fact" as to whether the voice message left by the police in *Irish* "led to" the ex-boyfriend's violence against the plaintiff where the ex-boyfriend heard the message and stated that he would "kill a fucker" soon thereafter, and where the plaintiff had ostensibly faced no risk of immediate danger otherwise).  Because Officer Dexter's meeting with Pak "placed the [victims] in no worse position" than they would have faced if he had "not acted at all," the Plaintiffs cannot establish a due process violation based on Officer Dexter's meeting with Pak.  *DeShaney*, 489 at 201.

Nor can Johnson and Welch show that Officer Dexter violated "accepted norms of police procedure" over the course of his interaction with Pak.  *Irish*, 849 F.3d at 528.  They assert that Officer Dexter violated the deviant behavior policy then embodied in Biddeford Police Department General Order No. 136-96 because he witnessed Pak's threatening behavior, but failed to take Pak into protective custody.[7]

---

[7]  Johnson and Welch also cite 25 M.R.S.A. § 2803-B, which at the time required all Maine law enforcement agencies to adopt written policies regarding procedures for handling persons "exhibiting deviant behavior."  25 M.R.S.A. § 2803-B(1)(C) (repealed 2013).  They assert that 25 M.R.S.A. § 2803-C, which makes it a civil violation with a maximum penalty of $500 for an agency or individual to fail to comply with § 2803-B, means that "action required by [the law enforcement] policy becomes a required enforcement action and therefore a constitutionally protected enforcement action."  ECF No. 79 at 4.  Johnson and Welch do not cite any case law to this effect, and

However, General Order No. 136-96 did not require Officer Dexter to take Pak into protective custody. Though the "Purpose" section of the Order stated that officers "will make an arrest" or effect "protective detention" when encountering deviant behavior, the actual procedures set forth in the Order only provided that officers "shall be empowered" to take a person exhibiting deviant behavior into protective custody and "shall exercise their discretion" under such circumstances. Thus, Johnson and Welch cannot establish that Officer Dexter violated the Order during his interaction with Pak. This result comports with traditional principles of law enforcement: "A well[-]established tradition of police discretion has long coexisted with [even] apparently mandatory arrest statutes." *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 760 (2005).

Johnson and Welch also point to Biddeford Police Department Standard Operating Procedure ("SOP") 02-01, which instructs that on-duty officers "shall at all times take appropriate action" to "protect life and property," "preserve the peace," "prevent crime," "detect and arrest violators of the law," and "enforce Federal, State and local laws and ordinances according to Department policy." ECF No. 69-5 at 186. Johnson and Welch assert that Officer Dexter violated this policy when he spoke with Pak but failed to act after Pak threatened to shoot the victims and leave a "bloody mess" in violation of Maine's criminal threatening and terrorizing statutes, 17-A M.R.S.A. §§ 209−210. However, like the deviant behavior policy discussed above,

---

they have provided no support for the proposition that individual police officers can be held constitutionally liable under a statutory section directing law enforcement agencies to adopt certain policies. The statutory provisions they cite say nothing about the consequences of an individual officer failing to follow the policies that the agency puts forth. *See also Hasenfus*, 175 F.3d at 74 ("[T]he due process clause is not a surrogate for . . . state statutory and administrative remedies.").

SOP-02-01 did not require Officer Dexter to take any specific action during his interaction with Pak.  Rather, SOP-02-01 speaks in general terms as to a police officer's general function.  Moreover, if a police officer's alleged violation of a general duty to enforce the law could support a due process claim under the "state-created danger" exception, the exception would swallow the general rule that police officers do not violate the Due Process clause by failing to protect an individual from private violence.[8]  *See Deshaney*, 489 U.S. at 197; *see also Castle Rock*, 545 U.S. at 768 (holding that there is no general right under the Due Process Clause to have someone else arrested for a crime).[9]

Finally, as *Irish* instructs, a court looks to whether the officers acted despite foreseeing the harm to the victims.  *Irish*, 849 F.3d at 528.  At first glance, the facts of this case seem similar to those of *Irish* because in both instances a police officer contacted an individual who had been accused by others of exhibiting threatening or violent behavior, and the individual subsequently committed acts of violence against his accusers and others.  In *Irish*, however, the victim called the police to report a

---

[8]  Even if Officer Dexter's conduct could be said to have violated SOP-02-01, he would not have committed the sort of specific violation that might support a due process claim under the "state-created danger" exception.  In *Irish*, the First Circuit noted that an examination of police procedures was part of its "developing caselaw" for substantive due process claims.  *Irish*, 849 F.3d at 527–28.  Both *Irish* and the cases on which it relied looked to procedures and training specific to the facts of the case before the court.  *See id.* at 527 (seeking information on police procedures or training, if any, "on how and when to notify the accused of the allegations that have been filed against him"); *Stamps v. Town of Framingham*, 813 F.3d 27, 32–33 (1st Cir. 2016) (examining an officer's violation of specific gun safety protocols); *Marrero-Rodríguez v. Municipality of San Juan*, 677 F.3d 497, 502 (1st Cir. 2012) (examining an officer's violation of specific training protocols).

[9]  For the same reasons, Johnson and Welch's citations to similar provisions in other Biddeford Police Department SOPs do not change the analysis.  *See* SOP-02-03, ECF No. 69-5 at 196 ("Members shall display an affirmative, consistent effort to observe and comply with the directives, rules, policies, procedures, practices and traditions established for the effective, efficient, and safe operations of this Department."); SOP-02-14, ECF No. 69-5 at 216 ("The primary mission and function of the Patrol Division is the protection and preservation of life and property through sound and accepted police practices."); SOP-02-15, ECF No. 69-5 at 227–28 (explaining the circumstances under which officers may make warrantless arrests).

violent crime her ex-boyfriend had already committed against her, putting the police on notice of the ex-boyfriend's potential for violence.  Here, although Johnson, Thompson, and Welch told Officer Dexter that Pak had threatened them and Pak admitted to doing so and made similar threats in Officer Dexter's presence, Johnson and Thompson told Officer Dexter that Pak "always" behaved in an aggressive manner akin to that which he was exhibiting on December 29; they did not report that Pak had ever acted on his threats; Thompson told Officer Dexter that he had had similar problems with Pak before and that, on December 29, Thompson did "not really" feel threatened by Pak; Johnson and Welch indicated that Pak's wife had acted as a moderating presence when Pak had acted aggressively toward them in the past; and Officer Dexter knew that Pak's wife was with him on this occasion.

Viewing the undisputed facts in the light most favorable to the Plaintiffs, they have not presented a triable issue that the affirmative acts of Officers Dexter and Wolterbeek greatly increased the risk of danger Pak posed to the victims.

### ii. Officer Dexter's Alleged Promise to Protect the Victims

The Plaintiffs also contend that Officer Dexter affirmatively promised the victims that he would resolve the situation with Pak and then failed to fulfill that promise.  Specifically, they maintain that the victim's conversation with Officer Dexter amounted to a "request for protection," and that Officer Dexter in effect "promised" such protection when he told them he would deal with Pak's harassment and threats.  ECF No. 79 at 10–11.  Thus, the Plaintiffs argue, in effect, that Officer Dexter increased the risk of harm that the victims faced because having relied on the

protection he promised, they did not take additional steps to protect themselves from Pak.

The summary judgment record does not establish that Officer Dexter made an explicit or implicit promise to Johnson, Thompson, and Welch that he would protect them.[10]  The undisputed facts establish that Officer Dexter, at most, told Johnson, Thompson, and Welch that Pak was "obviously . . . not allowed to cause harassment, threaten, et cetera" and that he would speak to Pak and "see what he has to say about this."  ECF No. 78 ¶ 29.  Officer Dexter told Johnson, Thompson, and Welch he would return after speaking with Pak, which he did.  Upon his return, Officer Dexter told Johnson, Thompson, and Welch that Pak was "extremely upset;" he cautioned them to keep their distance from Pak; and he explained that, in his view, Johnson, Thompson, and Welch had a civil disagreement with the Paks about their lease and that, while he could not do anything about that civil disagreement, he could assist them with harassment or threatening behavior.  Officer Dexter then told Johnson, Thompson, and Welch that he would not return to the Pak's residence following their discussion; that it was unclear whether his warning to Pak not to harass them was successful; and that Pak's demeanor was not calm when he left the Paks' home.

---

[10]  To the extent the Plaintiffs contend that the officers deliberately misled Johnson, Thompson, and Welch, I find that this contention is also not supported by the record.  *See also* Part II.C, *infra*.

Viewed in the light most favorable to the plaintiffs, the undisputed facts do not establish that Officer Dexter explicitly or implicitly promised the victims that he would protect them.[11]

### b. Alleged Failures to Act by the Police

The Plaintiffs also assert that the officers violated the victims' substantive due process rights under the "state-created danger" exception by failing to take certain actions which had the effect of increasing the risk of harm to the victims. Specifically, the Plaintiffs assert that: (1) Officer Dexter failed to defuse the situation with Pak; (2) Officer Dexter failed to warn the victims so they could take additional safety precautions; and (3) Officer Wolterbeek failed to investigate Pak's threats further.

*DeShaney* and its progeny establish that omissions and failures to act by police officers do not give rise to substantive due process violations. *DeShaney* held that state actors do not violate the Due Process Clause by failing to protect an individual from a danger they played no part in creating. *DeShaney*, 489 U.S. at 201. To the extent that Johnson and Welch argue that officers may violate the Due Process Clause where they have created the danger or greatly increased the risk of danger

---

[11] Even if Officer Dexter had made a promise to protect the victims from Pak, an officer's unkept promise to protect a plaintiff from third-party violence generally does not establish a due process violation under the "state-created danger" exception. *Rivera*, 402 F.3d at 37–38. The First Circuit in *Rivera* explained that, even if the unkept promise "rendered [the plaintiff] more vulnerable to the danger posed" by the third party, the officer's conduct was "not materially different" from that at issue in *DeShaney*, "where the state was aware of the risk, by its actions expressed promises of help, and then failed to protect" the victim from the risk. *Id.* at 38; *see also Gray v. Univ. of Colo. Hosp. Auth.*, 672 F.3d 909, 925 (10th Cir. 2012) ("*DeShaney*'s facts stalwartly suggest assurances of protection from the State do not constitute affirmative conduct sufficient to invoke the state-created danger theory of constitutional liability."); *cf. Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1063 (9th Cir. 2006) (finding that an officer's unkept promise to protect the plaintiff was an "additional and aggravating factor" supporting a substantive due process claim under the "state-created danger" exception but refusing to hold that the promise alone would suffice).

only through omission, the First Circuit has indicated that "the absence of an affirmative act by the state" is dispositive of such a claim. *Ramos-Piñero*, 453 F.3d at 55 n.9 (1st Cir. 2006). Indeed, "all the circuits that have adopted the state-created danger theory require an affirmative act or a degree and pattern of inaction that rises to the level of an affirmative act." *Fowler*, 2020 WL 535961, at *42.[12]

The omissions highlighted by Johnson and Welch are, by definition, not affirmative acts. Though we know, with the benefit of hindsight, that Officer Dexter's efforts to defuse the situation were unsuccessful, "[f]ailing to defuse a preexisting danger is not an affirmative act" for purposes of the "state-created danger" exception. *Doe1 v. Bos. Pub. Sch.*, No. 17-cv-11653-ADB, 2019 WL 1005498, at *5 (D. Mass. Mar. 1, 2019) (quoting *Doe v. Berkeley Cty. Sch. Dist.*, 189 F. Supp. 3d 573, 577 (D.S.C. 2016) (collecting cases)). It is possible that if Officer Dexter had directly told the victims that Pak had made statements to him indicating that Pak was volatile and that he presented a serious threat of violence toward them and himself, they might have heeded that information by leaving the property or taking other steps to protect themselves. It is settled, however, that an officer's failure to "take further discretionary steps to ensure [a victim's] safety" is "insufficient to maintain a claim of [a] substantive due process violation" under the "state-created danger" exception.

---

[12] Excerpts from cases that Johnson and Welch have quoted in other parts of their opposition only reinforce the necessity of an affirmative act. *See* ECF No. 79 at 17–18 (quoting, for example, *Hasenfus*, 175 F.3d at 73 ("Where a state official acts so as to create or even markedly increase a risk, due process constraints may exist, even if inaction alone would raise no constitutional concern."); *Frances-Colon v. Ramirez*, 107 F.3d at 63–64 ("A substantive due process interest . . . cannot support a personal injury claim under section 1983 against the provider of a governmental service unless . . . the government employee, in the rare and exceptional case, affirmatively acts to increase the threat of harm to the claimant or affirmatively prevents the individual from receiving assistance . . . .")).

*Irish*, 849 F.3d at 528 (citation omitted).[13]   Further, the omissions relied on by the Plaintiffs do not amount to "repeated, sustained inaction by government officials, in the face of potential acts of violence" which "implicitly but affirmatively encourag[ed] or condon[ed]" Pak's threatening behavior.   *Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 428–429 (2d Cir. 2009).   The undisputed facts show that, far from encouraging Pak's behavior, Officer Dexter tried to deescalate the situation, telling Pak that he could not make threatening statements, that he should seek a civil remedy, and that he should stay away from the victims.

Accordingly, the police officers' failure to defuse the situation and to provide a clearer explanation to the victims of the degree of danger Pak represented to them does not establish a substantive due process violation under the "state-created danger" exception.

### c.   Conclusion as to the "State-Created Danger" Exception

Viewed collectively, the actions and inactions by Officers Dexter and Wolterbeek did not amount to a requisite affirmative act that greatly increased the risk of danger Johnson, Thompson, and Welch faced.   Thus, I determine that their conduct did not give rise to a "state-created danger" that violated the Plaintiffs' substantive due process rights under the Fourteenth Amendment, and I do not reach the "further and onerous requirement" that the state officials' actions "shock the conscience of the court."   *Irish*, 849 F.3d at 526 (quoting *Rivera*, 402 F.3d at 35).

---

[13]   Similarly, to the extent that the Plaintiffs seek to base their § 1983 claim on Officer Dexter's failure to inquire whether Pak possessed any firearms, they have not established that Officer Dexter had a duty to make such an inquiry.   Thus, this omission also cannot establish liability under the "state-created danger" exception.

Accordingly, I grant the Defendants' motion for summary judgment as to the § 1983 claims against Officers Dexter and Wolterbeek.[14]

### 2.  Police Chief Roger Beaupre and the City of Biddeford

Johnson and Welch's complaints assert that Police Chief Roger Beaupre and the City of Biddeford are liable for having failed to adequately supervise and train Officer Dexter, Officer Wolterbeek, and one or more additional unnamed police officer or dispatch employees.[15]  In *Monell v. Department of Social Services*, 436 U.S. 658 (1978), the Supreme Court recognized that municipalities may be found liable for constitutional violations committed by their agents and employees. *See Young v. City of Providence*, 404 F.3d 4, 25 (1st Cir. 2005).  "Assessing liability against the City requires two basic elements: first, that plaintiff's harm was caused by a constitutional violation" committed by agents or employees of the City, and "second, that the City be responsible for that violation, an element which has its own components." *Id.* at 25–26 (citing *Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992)).

Because I have already concluded that neither Officer Dexter nor Officer Wolterbeek violated the Plaintiffs' constitutional rights, as required for the first element of *Monell* liability, Chief Beaupre and the City of Biddeford are entitled to

---

[14]  Because I find that the police officers did not violate the Plaintiffs' constitutional rights, I also do not address whether such rights would be "clearly established" for the purposes of qualified immunity.  However, on remand from the First Circuit in *Irish*, Judge Woodcock concluded that the "state-created danger" exception was not clearly established, explaining that although *Irish* "presuppose[d its] availability," the District Court could "only go so far in reading tea leaves from First Circuit opinions." *Fowler*, 2020 WL 535961, at *49.

[15]  Johnson and Welch's complaints assert claims against Officer Dexter, Officer Wolterbeek, and Police Chief Beaupre both in their individual and official capacities.  An official capacity claim "generally represent[s] only another way of pleading an action against an entity of which an officer is an agent." *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 690 n.55 (1978).  When municipal employees are sued in their official capacity, "their liability under 42 U.S.C. § 1983 is indistinguishable from the county's." *Wood v. Hancock Cty. Sheriff's Dep't*, 354 F.3d 57, 59 n.1 (1st Cir. 2003).  Thus, by addressing the City of Biddeford's liability I also address the official capacity claims.

summary judgment on the Plaintiffs' § 1983 claims.  *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986); *Evans v. Avery*, 100 F.3d 1033, 1039–40 (1st Cir. 1996) (holding that a municipality cannot be held liable under § 1983 for failure to train absent an underlying constitutional violation by one of its officers).

## B.   Deprivation of Rights under Maine Civil Rights Act

Welch's complaint alleges that the Defendants violated the Maine Civil Rights Act, 5 M.R.S.A. § 4682(1-A) by intentionally interfering with the victims' rights under the Maine Constitution, analogous to their rights under the United States Constitution.  They also allege that the Defendants violated their rights under Maine law to quiet enjoyment of their residence.

The Maine Civil Rights Act's protections and immunities are generally "coextensive with those afforded by 42 U.S.C. § 1983."  *Estate of Bennett v. Wainwright*, 548 F.3d 155, 178–79 (1st Cir. 2008).  Thus, because the Maine Civil Rights Act claim arises from the same alleged violations that form the basis for the § 1983 claims, a separate analysis is not required, and summary judgment on that claim is warranted.  *See Berube v. Conley*, 506 F.3d 79, 85 (1st Cir. 2007) ("The disposition of a 42 U.S.C. § 1983 claim also controls a claim under the MCRA." (citing *Dimmitt v. Ockenfels,* 220 F.R.D. 116, 123 (D. Me. 2004))).  In addition, the right to quiet enjoyment is a duty that exists between landlords and tenants, and an action for a breach of that duty lies against a landlord.  *See State v. DeCoster*, 653 A.2d 891, 894 (Me. 1995); *see generally* 41 A.L.R.2d 1414 (2020).  Thus, the Defendants are entitled to summary judgment on this issue as well.

C.      **Unlawful Conspiracy Claims**

Johnson and Welch's complaints allege that the Defendants acted in concert to deny the protections of the United States Constitution to the victims under 42 U.S.C. § 1985(3).  Specifically, they argue that Pak "made his intentions to harm the Plaintiffs clear to Officer Dexter" and that Officer Dexter was "complicit in Pak's actions" by failing to arrest him.  ECF No. 79 at 3.

To prevail on a § 1985(3) claim, a plaintiff must establish four elements: (1) a conspiracy; (2) to deprive the plaintiff of the equal protection of the laws; (3) an overt act in furtherance of the conspiracy; and (4) either an injury to person or property, or a deprivation of a constitutionally protected right.  *Parker v. Landry*, 935 F.3d 9, 17–18 (1st Cir. 2019) (citing *Pérez-Sánchez v. Pub. Bldg. Auth.*, 531 F.3d 104, 107 (1st Cir. 2008)).

Here, the Plaintiffs cannot establish the first required element—the existence of a conspiracy—which is the cornerstone of any civil conspiracy claim.  Summary judgment is "appropriate on a conspiracy claim where the nonmoving party rests merely on conclusory allegations."  *Estate of Bennett*, 548 F.3d at 178.  The Plaintiffs offer no evidence to support a conspiracy beyond the fact that Officer Dexter met with and spoke to Pak on December 29, 2012, and that Pak subsequently attacked the victims.  It is undisputed that Pak had threatened the victims before he ever interacted with Officer Dexter and that the WatchGuard recording accurately captured Officer Dexter's conversation with Pak.  The Plaintiffs have not pointed to any statements demonstrating an agreement between Officer Dexter and Pak giving

24

rise to a conspiracy.  The Plaintiffs' allegations of a conspiracy involving Officer Dexter are no more than conclusory.  *See, e.g.*, *id.*

Furthermore, "[i]t has long been established that a claim under § 1985(3) requires 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action.'"  *Pérez-Sánchez*, 531 F.3d at 107 (quoting *Griffin v. Breckenridge,* 403 U.S. 88, 102 (1971)).  Here, the Plaintiffs have not identified any facts that would prove such discriminatory animus.  I therefore grant the Defendants' motion for summary judgment as to the § 1985 claims.

In addition to the § 1985 claims, Welch's complaint also pleads a claim of civil conspiracy under Maine law.  To prevail on a civil conspiracy claim, a plaintiff must establish five elements, similar to those of a § 1985(3) claim: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful acts; and (5) damages."  *Smith v. Coyne*, No. CV-03-405, 2004 WL 1433638, at *4 (Me. Super. Ct. Apr. 12, 2004) (quoting *Sebago, Inc. v. Pena*, CV-99-226, 1999 WL 35298380, at *4 (Me. Super. Ct. July 8, 1999)).  As in the § 1985 context, the Plaintiffs have not demonstrated any facts making out a civil conspiracy.  In addition, because civil conspiracy is not "an independent tort in Maine," liability ordinarily may not be imposed on this basis alone.  *Fiacco v. Sigma Alpha Epsilon Fraternity*, 484 F. Supp. 2d 158, 176 & n.18 (D. Me. 2007) (citing *Cohen v. Bowdoin*, 288 A.2d 106, 110 (Me. 1972)), *aff'd*, 528 F.3d 94 (1st Cir. 2008).  I therefore grant the Defendants' motion for summary judgment as to the civil conspiracy claim as well.

## D.    Assault and Battery on Susan Johnson

Johnson's complaint alleges that the Defendants' actions and omissions caused Johnson to sustain injuries from gunshot wounds inflicted by Pak, constituting an assault and battery under Maine law.  "An actor is subject to liability to another for battery if (a) he acts intending to cause a harmful or offensive contact with the [body] of the other [person] or a third person, . . ., and (b) a harmful contact with the [body] of the other [person] directly or indirectly results." *Borlawsky v. Town of Windham*, No. cv-99-426, 2004 WL 1433634, at *5 (Me. Super. Ct. Mar. 30, 2004) (quoting Restatement (Second) of Torts § 13 (1965)).  To demonstrate intent, Johnson contends only that Officer Dexter conspired with Pak to intentionally harm Johnson.  As I have explained, there is no evidence establishing a conspiracy between Officer Dexter and Pak.  I therefore grant the Defendants' motion for summary judgment as to the assault and battery claim.

## E.    Negligence; Negligent and Intentional Infliction of Emotional Distress

Johnson's complaint alleges that the Defendants negligently or intentionally inflicted emotional distress on Johnson, Thompson, and B.L., and the Welch complaint alleges that the Defendants breached a duty of care they owed to Welch. In opposing these common law claims, the Defendants contend that they are entitled to summary judgment based on the immunity afforded them by the Maine Tort Claims Act, 14 M.R.S.A. § 8111.  The Act provides:

> Notwithstanding any liability that may have existed at common law, employees of governmental entities shall be absolutely immune from personal civil liability for . . . [p]erforming or failing to perform any discretionary function or duty, whether or not the discretion is abused;

26

and whether or not any statute, charter, ordinance, order, resolution, rule or resolve under which the discretionary function or duty is performed is valid.

14 M.R.S.A. § 8111(1)(C) (West 2020).

In reviewing assertions of discretionary function immunity under the Maine Tort Claims Act, the Law Court generally employs a multi-factor test aimed at determining whether the governmental employee was performing an official function or duty and whether that function or duty was discretionary. *See Lawson v. Willis*, 204 A.3d 133, 136 (Me. 2019); *Carroll v. City of Portland*, 736 A.2d 279, 282–83 (Me. 1999). "A discretionary act requires judgment or choice" unlike a ministerial act which "is mandatory." *Carroll*, 736 A.2d at 283 (emphasis omitted). A police officer's decision about whether to make a warrantless arrest is a discretionary function, *see Leach v. Betters*, 599 A.2d 424, 426 (Me. 1991), as are an officer's decisions about investigating crimes and protecting citizens from harm, *see Palm v. Kennebec Cty. Sheriff's Office*, Civil No. 7-102-B-H, 2008 WL 3978214, at *4 (D. Me. Aug. 21, 2008). Thus, the officers were performing discretionary functions when they decided not to arrest Pak, investigate further, or take additional affirmative steps to protect the victims. Further, it is undisputed that the police officer defendants were performing official duties when they acted on December 29, 2012. Accordingly, they are immune from civil liability under the Maine Tort Claims Act.

The Plaintiffs point out that the immunity afforded by the Act is not absolute and argue that it does not shield the officers from liability if they exceeded the scope of their discretion. Where a "defendant's egregious conduct clearly exceeded, as a matter of law, the scope of any discretion that he could have possessed in his official

27

capacity as a police officer," he is not entitled to immunity under the Maine Tort Claims Act. *Polley v. Atwell*, 581 A.2d 410, 413–14 (Me. 1990) (discussing *MacKerron v. Madison*, 474 A.2d 166 (Me. 1984)). For the reasons I have previously discussed, however, the officers' conduct here did not clearly exceed the scope of their discretion. I therefore grant the Defendants' summary judgment motion as to these counts.[16]

## F.     Wrongful Death Under 18-A M.R.S.A. § 2-804

Johnson's complaint alleges that the Defendants' actions establish liability under Maine's wrongful death statute, 18-A M.R.S.A § 2-804(a). The statute provides that "[w]henever the death of a person shall be caused by a wrongful act, neglect or default . . . , then the person or the corporation that would have been liable if death had not ensued shall be liable for damages as provided in this section, notwithstanding the death of the person injured." 18-A M.R.S.A. § 2-804(a) (repealed 2019). The wrongful death statute, however, "simply provide[s] a means for a claim by a decedent's personal representative." *Jackson v. Town of Waldoboro*, 751 F. Supp. 2d 263, 276 n.13 (D. Me. 2010). "[I]t does not confer any separate cause of action, but depends on an independent cause of action to exist under the law." *Id.* I therefore grant the Defendants' motion for summary judgment as to this claim.

### III. CONCLUSION

The events of December 29, 2012, as depicted by the summary judgment record, were horrifying and tragic. One may reasonably ask whether James Pak's

---

[16] Johnson and Welch bring these claims against all the defendants, not just Officer Dexter and Officer Wolterbeek, but they have not identified a separate basis upon which the other defendants could be held liable. Because "[g]overnmental entities are likewise immune from liability for discretionary functions," *Lawson*, 204 A.3d at 136 (citing 14 M.R.S. § 8104-B(3) (2018)), I grant the Defendants' motion as to all of the remaining Defendants.

crimes might have been prevented if the police had taken additional affirmative steps to protect the victims in response to the 9-1-1 call.  Yet, as the Supreme Court emphasized in *DeShaney*, judges must exercise restraint in cases such as this and remain mindful of their "natural sympathy" and tendency to search for a way to compensate plaintiffs for the grievous harm that they have endured.  *DeShaney*, 489 U.S. at 202–03.  Having carefully examined the voluminous record created by the parties and the applicable statutes and precedents that must inform my judgment in this difficult case, I conclude that the Defendants are not civilly liable for the harm brought about by the heinous crimes of James Pak.  Thus, I grant the Defendants' Motion for Summary Judgment (ECF No. 66) in its entirety.

**SO ORDERED.**

**Dated this 15th day of April, 2020.**


_____/s/ JON D. LEVY_____
**CHIEF U.S. DISTRICT JUDGE**