# United States Court of Appeals
## For the First Circuit

---

No. 20-1474

JOCELYNE WELCH, as personal representative of the Estate of
Alivia Welch,

Plaintiff, Appellant,

SUSAN JOHNSON, individually and on behalf of her minor son B.L.
and on behalf of Derrick Thompson, deceased,

Plaintiff,

v.

CITY OF BIDDEFORD POLICE DEPARTMENT; ROGER P. BEAUPRE,
individually and as Chief of Biddeford Police Department; EDWARD
DEXTER, individually and as an employee of Biddeford Police
Department; JACOB WOLTERBEEK, individually and as an employee of
Biddeford Police Department; CITY OF BIDDEFORD; JANE DOES,

Defendants, Appellees,

MAINE DEPARTMENT OF PUBLIC SAFETY; JOHN E. MORRIS, individually
and as Commissioner of Maine Department of Public Safety,

Defendants.

---

No. 20-1481

SUSAN JOHNSON, individually and on behalf of her minor son B.L.
and on behalf of Derrick Thompson, deceased,

Plaintiff, Appellant,

JOCELYNE WELCH, as personal representative of the Estate of
Alivia Welch,

Plaintiff,

v.

CITY OF BIDDEFORD POLICE DEPARTMENT; ROGER P. BEAUPRE, individually and as Chief of Biddeford Police Department; EDWARD DEXTER, individually and as an employee of Biddeford Police Department; JACOB WOLTERBEEK, individually and as an employee of Biddeford Police Department; CITY OF BIDDEFORD; JANE DOES,

Defendants, Appellees,

MAINE DEPARTMENT OF PUBLIC SAFETY; JOHN E. MORRIS, individually and as Commissioner of Maine Department of Public Safety,

Defendants.

─────────────────

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Jon D. Levy, U.S. District Judge]

─────────────────

Before

Lynch and Kayatta, Circuit Judges,
and Laplante,[*] District Judge.

─────────────────

Kristine C. Hanly, with whom Sarah A. Churchill and Nichols & Churchill, P.A. were on brief, for appellant Jocelyne Welch, as personal representative of the Estate of Alivia Welch.
Kristine C. Hanly, with whom Hanly Law, LLC was on brief, for appellant Susan Johnson, individually and on behalf of her minor son B.L. and on behalf of Derrick Thompson, deceased.
Joseph A. Padolsky, with whom Douglas I. Louison and Louison, Costello, Condon & Pfaff, LLP were on brief, for appellees.

─────────────────

August 27, 2021

─────────────────

─────────────────

[*] Of the District of New Hampshire, sitting by designation.

**LYNCH**, **Circuit Judge**.  On December 29, 2012, Alivia Welch, Susan Johnson, and Derrick Thompson called the Biddeford, Maine Police Department and reported that their landlord James Pak, who lived in a house attached to their apartment, had just made death threats to them.  Police Officers Edward Dexter and Jacob Wolterbeek responded to the call.  On Officer Dexter's instructions, Officer Wolterbeek left shortly after arriving.

We understand the key focus in the case is on what Officer Dexter then did.  Officer Dexter learned that Pak had told the tenants he had a gun, and had threatened to shoot them and to bury Thompson in the snow.  When Officer Dexter went to speak with him, the increasingly angry Pak started to describe what he was going to do to get his name in the newspaper the following day but stopped, saying to his wife he did not want to reveal those plans to the officers.  Pak then screamed at Officer Dexter that he had "nothing to lose" and that "you're going to see me in the newspaper tomorrow," and stated that there would be a "bloody mess."  Officer Dexter chose to leave at that point.  He did so without ascertaining whether Pak indeed had a gun or was drunkenly out of control.  Less than four minutes after Officer Dexter departed, Pak carried out his threats, entered the tenants' apartment, shot and killed Welch and Thompson, and shot and injured Johnson with his gun.

Johnson, wounded in the shooting, and the estates representing the murdered Welch and Thompson (collectively, the "plaintiffs") filed suit, alleging inter alia that the officers had violated their federal constitutional substantive due process rights under the state-created danger doctrine.[1]  The district court granted summary judgment to the defendants, choosing not to address first the officers' qualified immunity defense that the law was not clearly established.  <u>Johnson</u> v. <u>City of Biddeford</u>, 454 F. Supp. 3d 75, 91 n.14 (D. Me. 2020).  Instead it held that no substantive due process claim had been presented.  <u>Id.</u> at 91.  The district court did so before either it or the parties had the benefit of our later decision in <u>Irish</u> v. <u>Fowler</u>, 979 F.3d 65 (1st Cir. 2020) ("<u>Irish II</u>").  We now affirm in part and vacate and remand in part.

## I. Background

On reviewing the grant of defendants' motion for summary judgment, we recite the facts in the light most favorable to the plaintiffs.  <u>Irish II</u>, 979 F.3d at 68.  In doing so, we do not suggest that these facts are sufficient to decide the substantive due process issue, that all of them are material, or that all material facts have been presented.

---

[1]    Johnson sued individually and on behalf of her six-year-old son who was in the apartment at the time of the shooting.

In 2012 Susan Johnson and her son Derrick Thompson were renting an apartment in Biddeford, Maine, from Armit and James Pak.  The apartment was attached to the Paks' home and shared a driveway with the home.  Alivia Welch, Thompson's girlfriend, was also staying in the apartment.

On the evening of December 29, 2012, James Pak got into an argument with Thompson outside the apartment.  Pak screamed at and made obscene gestures at the plaintiffs.  He also threatened to hit Thompson, pointed his fingers at the plaintiffs in the shape of a gun and said "bang," and threatened to bury Thompson in the snow.  Thompson called the police and reported that his landlord was "freaking out on him," making death threats towards him, and pointing his finger at him like it was a gun.  Johnson recorded portions of this altercation on her cellphone.

Officers Dexter and Wolterbeek were dispatched to the apartment.  Officer Dexter arrived at the scene first and spoke to the plaintiffs.[2]  They showed him the videos recorded that evening of Pak screaming at them.  The plaintiffs also told Officer Dexter exactly the threats described before, including the threat to shoot the plaintiffs and the threat to bury Thompson.  The plaintiffs warned Officer Dexter that once Pak had tried to follow Thompson into the apartment after a confrontation.  They said that they

---

[2]   Officer Dexter was wearing an audio recording device which captured his interactions with the plaintiffs and the Paks.

often had confrontations with Pak, but that this time was different because Armit Pak, James Pak's wife, had not come over, as she usually did, to apologize to them after Pak "freak[ed] out." Johnson told Officer Dexter that her six-year-old son was in a different room, as they were trying to keep him away from the situation with Pak.   Officer Wolterbeek arrived while Officer Dexter was speaking with the plaintiffs and briefly spoke with Pak in the driveway.  He then went into the apartment and listened to Officer Dexter's ongoing conversation with the plaintiffs. Officer Dexter asked the plaintiffs what the biggest problem was between them and the Paks. They responded that the current conflict was about how many cars could be parked in the driveway under their lease agreement.  After stepping outside the apartment, Officer Dexter told Officer Wolterbeek that he could leave.

Officer Dexter then went next door to speak to both of the Paks. The doors to the Paks' home and the plaintiffs' apartment are directly adjacent to each other, almost side-by-side.  Armit Pak explained that James Pak was angry with the plaintiffs about the parking as well as other issues and that they were in the process of evicting the plaintiffs.   In describing to Officer Dexter his conflicts with Thompson, Pak said that he told Thompson he had a gun, would shoot him, and said "bang" to Thompson.

Officer Dexter repeatedly explained that he could not do anything about the car parked in the driveway or the eviction as

those were "civil issue[s]."  He also repeatedly told Pak that these civil issues would have to be handled through the courts, that the court process would be difficult, and that the downside of being a landlord in Maine is that "tenants in this state have so many rights," which is frustrating for landlords.  Officer Dexter said several times that he "understood" or "felt sorry" for the Paks.

Officer Dexter also told James Pak that he could not physically threaten or threaten to shoot his tenants, that such threats were a criminal offense, and that he could be issued a criminal summons if he threatened his tenants again.  Pak expressed to Dexter frustration about this information.  He asked why Thompson could threaten him but he could not threaten Thompson. Officer Dexter responded by saying that Thompson was just being rude.  He then stated that he understood how Thompson's actions upset Pak and that Thompson was being disrespectful to Pak.  Later in the conversation, Pak accused Thompson of calling him names and said, "now I just don't, I don't have any rights?"  In response, Officer Dexter again told Pak that he understood his frustration and apologized to Armit Pak for not having more "responses for [her]."  During the conversation, Pak repeatedly expressed frustration to Officer Dexter that he felt like he had no rights, but that his tenants had rights.

The recordings show Pak was angry throughout the conversation and in the last three minutes raised his voice increasingly often and was screaming or yelling.  Pak twice told Officer Dexter that he had "nothing to lose," yelled that he would be a "big name tomorrow," and said that "you're going to see [him] in the newspaper."  Pak started describing what he was going to do to get a big name and to be in the newspapers "tomorrow," but stopped.  Officer Dexter heard him say next to Armit Pak, "I'm not going to tell you in front of [Officer Dexter]."  Pak screamed at Officer Dexter that the "least" he could do was tell the plaintiffs not to park a third car in the driveway.  At one of Pak's angriest moments, seconds after Pak yelled that he was going to be "a big name tomorrow" and screamed that Officer Dexter did not understand Pak's situation, Officer Dexter said, "okay, I'm going to go now."

Officer Dexter then told Pak to keep his distance, and Pak replied that Officer Dexter "d[id]n't have to worry about that."  The last thing Pak said as Officer Dexter left the house was that "it's going to be a bloody mess."

Knowing that Pak told Thompson he had a gun and would shoot him, Officer Dexter nonetheless chose not to ask Pak whether he had any firearms or ammunition, nor did he search Pak for weapons.  Officer Dexter also chose not to ask Pak whether he had consumed any alcohol or conduct a field sobriety test.  The officers who arrested Pak had "smelled the odor of intoxicants" on

him.[3]  Officer Dexter said he was never within six feet of Pak and did not smell the alcohol.

Officer Dexter then went back to speak to the plaintiffs and told them that Pak was very upset and to avoid Pak for the rest of the evening.  Officer Dexter then chose to leave.  He did not mention to the plaintiffs the additional threats Pak had made.  Officer Dexter cleared the scene at 6:51 PM.

Immediately on Officer Dexter's leaving, Pak grabbed his Smith & Wesson .357 revolver and entered the plaintiffs' apartment.  He shot twice and injured Johnson, then shot once and killed Thompson and shot twice and killed Welch.  At 6:55 PM, Johnson called 911 to report what had just happened.

## II. Procedural History

The plaintiffs filed complaints against the City of Biddeford, the Biddeford Police Department, the Maine Department of Public Safety,[4] and Officers Dexter and Wolterbeek alleging, inter alia,[5] that the officers had violated their substantive due

---

[3]    When Pak was arrested, he had a blood alcohol level of .15, roughly twice the legal limit.  After Pak's arrest, Armit Pak reported that Pak had been drinking beer "all day."

[4]    The parties stipulated to dismissing with prejudice all claims against the Department of Public Safety and its Commissioner.  Johnson, 454 F. Supp. 3d at 81 n.2.

[5]    The complaints also alleged negligence, negligent infliction of emotional distress, intentional infliction of emotional distress, assault and battery, wrongful death, civil conspiracy, breach of quiet enjoyment under Maine law, and a claim

process rights under the state-created danger doctrine.   The plaintiffs also brought Monell claims against the Biddeford Police Chief Roger Beaupre and the City of Biddeford and claims under the Maine Civil Rights Act against the officers.   See Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978); Me. Rev. Stat. Ann., tit. 5, § 4682(1-A).   After discovery, the defendants moved for summary judgment.

The district court granted the defendants' motion for summary judgment on all claims.   Johnson, 454 F. Supp. 3d at 95. Relying only on its conclusion that the officers had taken no affirmative act greatly increasing the danger to the plaintiffs, it held that there had been no substantive due process violation. Id. at 91.   It did not address whether the law was "clearly established" for the purposes of the second part of the qualified immunity inquiry.[6]   Id. at 91 n.14.   As to the Monell and Maine Civil Rights Act claims, the district court concluded that because

---

under 42 U.S.C. § 1985.

The district court granted summary judgment to the defendants on all of these claims.  Johnson, 454 F. Supp. 3d at 92-95.  The plaintiffs make no argument in their opening briefs as to any of these claims and any such argument is waived.  See, e.g., Págan-Lisboa v. Soc. Sec. Admin. 996 F.3d 1, 7 (1st Cir. 2021).

[6]   Police officers "are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'"  Dist. of Columbia v. Wesby, 138 S. Ct. 577, 589 (2018) (quoting Reichle v. Howards, 566 U.S. 658, 664 (2012)).

the officers had not violated the plaintiffs' constitutional rights, those claims failed. Johnson, 454 F. Supp. 3d at 92.

### III. Analysis

The Fourteenth Amendment's Due Process clause states that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. In general, the state's failure to protect an individual from private harm does not give rise to a due process claim. DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. 189, 197 (1989). As the law has developed since 1989, this circuit joined other circuits in Irish II in recognizing that a plaintiff may make out a due process claim under the state-created danger doctrine by showing

> (1) that a state actor or state actors affirmatively acted to create or enhance a danger to the plaintiff;
> (2) that the act or acts created or enhanced a danger specific to the plaintiff and distinct from the danger to the general public;
> (3) that the act or acts caused the plaintiff's harm; and
> (4) that the state actor's conduct, when viewed in total, shocks the conscience.

979 F.3d 65, 75 (1st Cir. 2020).

The plaintiffs present several arguments that various acts taken by Officers Wolterbeek and Dexter were affirmative acts

that enhanced the danger to them.[7]  We affirm the district court's decision that Officer Wolterbeek took no affirmative act that enhanced the danger to the plaintiffs.  We see no evidence in the record that any of Officer Wolterbeek's actions increased any danger to the plaintiffs.  The plaintiffs also do not explain how any of Officer Wolterbeek's actions, on their own, could give rise to a state-created danger claim.  Officers are not liable under § 1983 for the actions of other officers.  See Leavitt v. Corr. Med. Servs., Inc., 645 F.3d 484, 502 (1st Cir. 2011); see also Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009) (stating that in § 1983 cases, the plaintiff must show that "each Government-official defendant, through the official's own individual actions, has violated the Constitution").

As to Officer Dexter, we are disinclined given the changes in the law to ourselves decide the merits of the substantive due process claim.  As previously stated, the parties did not have the benefit of Irish II in conducting their discovery and presenting evidence in this case.  Nor did the district court have the benefit of that opinion, which clarified this circuit's law and now must be applied.  Irish II is pertinent in at least three important senses and all three lead us to conclude that a remand is appropriate here.  See Gastronomical Workers Union Loc.

---

[7]  We do not address Welch's arguments that the decisions not to charge or arrest Pak were affirmative acts.

610 v. Dorado Beach Hotel, 617 F.3d 54, 66 (1st Cir. 2010)
(remanding when intervening precedent meant that district court
"did not engage in the requisite analysis"); United States v.
Taylor, 532 F.3d 68, 70 (1st Cir. 2008) (remanding for
reconsideration where a decision "on the present record would not
fully actualize" the intervening developments in the law).

First, Irish II established that the first prong of the
state-created danger claim is whether a state actor's affirmative
act "created or enhanced" a danger to the plaintiffs. Irish II,
979 F.3d at 75. Without the benefit of our decision, the district
court held, contrary to Irish II, that under the state-created
danger doctrine an affirmative act must "greatly" enhance the
danger to the plaintiffs, rather than simply "enhance" the danger.
Compare Johnson, 454 F. Supp. 3d at 85, with Irish II, 979 F.3d at
75.

Second, Irish II recognized that, "[w]here officials
have the opportunity to make unhurried judgments, deliberate
indifference may shock the conscience, particularly where the
state official performs multiple acts of indifference to a rising
risk of acute and severe danger." 979 F.3d at 75. This holding
may bear on both the parties' argument and the district court's
analysis.

Finally, Irish II established the relevance of state and
national policing policies to the state-created danger analysis.

It explained that "[a] defendant's adherence to proper police procedure bears on all prongs of the qualified immunity analysis," including whether an officer's conduct shocked the conscience and whether a reasonable officer "would have believed that his conduct violated the Constitution." Id. at 77 (quoting Stamps v. Town of Framingham, 813 F.3d 27, 32 n.4 (1st Cir. 2016)). The parties have presented little evidence as to police standards and training in handling disputes between neighbors or landlords and tenants.[8] Such evidence may well be important to the disposition of the case. For example, officers are sometimes required to do more than Officer Dexter did here when credible death threats are made in a domestic violence context. See Irish II, 979 F.3d at 72 (explaining that Maine State Police are required to "use all reasonable means to prevent further abuse" including "[r]emaining on the scene [of a domestic violence incident for] as long as the officer reasonably believes there is a danger to the physical safety of that person without the presence of a law enforcement officer." (quoting Me. Stat. tit. 19-A, § 4012(6)) (alterations in

---

[8] The record states that Officer Dexter was trained on how to deal with landlord/tenant disputes, but does not explain the content of that training.

There is also evidence in the record as to several Biddeford Standard Operating Procedures, including the Biddeford Police Department policy which requires officers "to take action to assist persons who are exhibiting symptoms of deviant behavior and appear to represent an imminent danger to themselves or to someone else."

original)).  There may be an analogous duty in cases such as this one.

We make no determination as to whether the plaintiffs may prevail on any of the prongs of the Irish II state-created danger test.  Indeed, it would be premature to reach the "shocks the conscience" prong, as we here address only the district court's error in evaluating the danger-enhancing prong.  Nor do we suggest that an officer leaving the scene on different facts would amount to or contribute to an affirmative act that created or enhanced the danger to others.  Our narrow decision to remand, however, is consonant with the rulings of other federal courts in state-created danger cases.  See, e.g., Martinez v. City of Clovis, 943 F.3d 1260, 1273 (9th Cir. 2019) (holding that officer's conduct of praising domestic violence abuser as good people in the abuser's presence after officer refused to arrest abuser following plaintiff's domestic violence complaint supported plaintiff's § 1983 substantive due process claim under the state-created danger theory; officer's alleged positive remarks could reasonably have emboldened abuser to continue abusing plaintiff); id. at 1272 (holding that reasonable jury could find officer violated plaintiff's substantive due process rights under state-created danger theory where officer "provoked" and "emboldened" domestic abuser by disclosing to abuser plaintiff's "testimony relating to [] prior abuse and also stat[ing] that [plaintiff] was not 'the

right girl' for him"); Mackie v. Cnty. of Santa Cruz, 444 F. Supp. 3d 1094, 1105-07 (N.D. Cal. 2020) (holding that plaintiffs had adequately pled a state-created danger claim where officer's interaction with plaintiffs' neighbor regarding plaintiffs' previous complaints about the neighbor left the neighbor "in an agitated state" and neighbor subsequently attacked plaintiffs); Lipman v. Budish, 974 F.3d 726, 746 (6th Cir. 2020) (interviewing abused child in front of possible abusers was affirmative act that could give rise to state-created danger claim); McClammy v. Halloran, No. CV-18-68-GF-BMM, 2019 WL 4674462, at *3 (D. Mont. 2019) (holding that there was a genuine issue of material fact as to plaintiff's state-created danger claim where plaintiff argued officers had "increased her risk of harm by 'stoking [her abuser's] anger' during their investigation").

In these circumstances, it is fairer to all concerned to remand to the district court in light of this opinion.  This decision makes no new law and does not expand the state-created danger doctrine; it is simply a remand for consideration of the factors identified above.  We make no factual findings, and our holding is based on legal error under Irish II.  The district court may in its discretion permit additional discovery in light of the clarification provided by Irish II.  The district court should address on remand whether Officer Dexter is entitled to qualified immunity and may choose to address the second step of the qualified

immunity inquiry before addressing whether Officer Dexter violated the plaintiffs' substantive due process rights under the state-created danger doctrine.  See Maldonado v. Fontanes, 568 F.3d 263, 269-70 (1st Cir. 2009).

We also remand the Monell and Maine Civil Rights Act claims against Officer Dexter, which were resolved on the basis that such claims failed because there was no violation of the plaintiffs' substantive due process rights.

### IV. Conclusion

We vacate the grant of summary judgment as to the § 1983 and Maine Civil Rights Act claims against Officer Dexter and the Monell claims against Police Chief Beaupre and the City of Biddeford and remand for further consideration in light of this opinion and Irish II.

We affirm the grant of summary judgment as to the § 1983 claims against Officer Wolterbeek and all other claims against the defendants.  No costs awarded.  See Fed. R. App. P. 39(a).

**-Dissenting Opinion Follows-**

KAYATTA, Circuit Judge, dissenting. A layperson reading the facts of this case as portrayed in the majority opinion could easily conclude that as a matter of good police practice, Officer Dexter should have arrested Pak for criminal threatening (assuming that he could discount Johnson's statement that he felt harassed, but not really threatened). See, e.g., Me. Stat. tit. 17-A, § 209 (2021). And if the people of Maine wish to render law enforcement officers personally liable for failing to make arrests in situations like this one, they may so provide as a matter of state law. DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. 189, 202 (1989) ("A State may, through its courts and legislatures, impose such affirmative duties of care and protection upon its agents as it wishes.").

As the Supreme Court has made clear, however, an officer's failure to arrest does not violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution. Id. at 196-97 ("If the Due Process Clause does not require the State to provide its citizens with particular protective services, it follows that the State cannot be held liable under the Clause for injuries that could have been averted had it chosen to provide them. As a general matter . . . we conclude that a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause."). The Due Process Clause provides impediments to arrest; it does not

encourage, much less require, arrests.  Given the weight of precedent on this point, DeShaney's succinct summation must guide our holding in this case:  "Because . . . the State had no constitutional duty to protect [the victim] against [another's] violence, its failure to do so -- though calamitous in hindsight -- simply does not constitute a violation of the Due Process Clause."  Id. at 202.

By vacating the judgment, the majority suggests that perhaps a jury could hold Officer Dexter liable -- not for failing to arrest, but for affirmatively doing something that increased the likelihood that Pak would kill.  But this "state-created danger" exception only works if what the officer did, other than failing to arrest Pak, is "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." County of Sacramento v. Lewis, 523 U.S. 833, 847 n.8 (1999).  In Lewis, the officer deliberately, recklessly, and with "indifference to life" initiated a high-speed chase -- of up to 100 miles per hour -- in pursuit of two teenagers on a motorcycle who had committed only a speeding violation.  Id. at 836, 837, 854.  The officer followed so closely that it was impossible for him to stop safely, should the motorcycle he was chasing come to a halt.  When the chased motorcycle tipped over, the officer hit and killed its sixteen-year-old passenger, all in assumed violation of sound law enforcement practice.  Id. at 837, 854.  The Supreme Court

nevertheless found that the officer's conduct "[did] not shock the conscience." Id. at 855.

The Court in Lewis "left open the possibility that unauthorized police behavior in other contexts might 'shock the conscience,'" Chavez v. Martinez, 538 U.S. 760, 774 (2003) (citing Lewis, 523 U.S. at 850). It gave two examples of such other contexts: First, the "shock the conscience" standard might be "satisfied where the conduct was 'intended to injure in some way unjustifiable by any government interest[.]'" Lewis, 523 U.S. at 849—50. Second, "deliberate indifference" might in theory suffice to shock the conscience, when such indifference is "patently egregious." Id. at 850. And the Court has never suggested that failing to arrest can be rendered actionable simply by labeling such failure deliberate indifference. To conclude otherwise would be to overrule DeShaney.

So what did Officer Dexter affirmatively do that was so egregious and outrageous as compared to the conduct found not to shock the conscience in Lewis? The answer is "nothing." There is no dispute as to the content of the conversations he had with either the victims or with the Paks, as those conversations were recorded. Officer Dexter listened patiently to the tenants and gave them common-sense advice about staying away from Pak for the evening if they could. And he spoke with Pak. Suffice it to say, he did not urge Pak to shoot anybody. To the contrary, Dexter

repeatedly and firmly told Pak that violence and threats of violence were crimes and would lead to his arrest.  Pak replied that he was "not going to shoot [Johnson]."  The conversation ended with Officer Dexter repeating twice an admonishment for Pak to "keep [his] distance from [the tenants]," to which Pak replied "[n]o, no you don't have to worry about that."

The majority points to the fact that Officer Dexter expressed some sympathy for Pak's complaints about his tenants.  To be precise, what he did was play good-cop, bad-cop with Pak, expressing some sympathy regarding Pak's frustration that the tenants were in violation of their lease and that the eviction process was difficult, while admonishing Pak for his threats.

The majority also observes that Officer Dexter did not ask whether Pak had a gun.  This is clear in the record.  What is not clear is why the majority thinks it matters.  Following my colleagues' reasoning, had the officer inquired about the presence of a firearm, he could now be said to have caused the tenants' deaths by reminding Pak that he did indeed have a gun.  Of course, asking about the gun might have led the officer to make an arrest.  But as explained above, the failure to arrest does not give rise to liability under federal law.

Similarly, the majority comments that Officer Dexter did not ask Pak whether he had consumed any alcohol and did not conduct a field sobriety test.  Although my colleagues make note of Officer

Dexter's testimony that he was never within six feet of Pak and did not smell any alcohol, they fail to elucidate what affirmative duty Dexter was under to investigate Pak's alcohol consumption, especially when the "legal limit" for blood alcohol levels the majority cites applies to individuals operating motor vehicles in the state of Maine, rather than to individuals in their homes.

Officer Dexter's effort clearly did not work in this instance. Even if we assume that his intervention angered Pak further, however, I can still say with confidence that no reasonable person could possibly find that such actions as Officer Dexter undertook could shock anyone's conscience as that test is defined in Lewis. Lewis, 523 U.S. at 836, 849—51; id. at 855 ("Regardless whether [the officer's] behavior offended the reasonableness held up by tort law or the balance struck in law enforcement's own codes of sound practice, it does not shock the conscience, and petitioners are not called upon to answer for it under § 1983."). Indeed, if what Officer Dexter said to Pak could satisfy the "shock the conscience" standard, then it is fair to ask my colleagues a question that they cannot answer:  Short of arresting Pak, what could the officer had said to him or done that could not now in hindsight equally be said to shock our consciences? Suppose, for example, that Officer Dexter had instead told Pak that he had no sympathy for Pak's complaints as a

landlord.  The officer might now be equally second-guessed by my colleagues for having worsened things by further provoking Pak.

Aside from detailing certain facts, such as Officer Dexter's failure to arrest, that could potentially support a negligence suit but not a federal claim, the majority never really says what specific facts might be found on remand and how those facts could change the result of the district court's opinion.  To the contrary, my colleagues seem to hold their own opinion with pinched noses and at arm's length.  So why remand a case that we already know can go nowhere under current legal standards, creating false hope for the plaintiffs?  The majority cites two justifications.

First, the majority alleges that Irish v. Fowler, 979 F.3d 65 (1st Cir. 2020) ("Irish II") supposedly "clarified this circuit's law."  But the whole point of Irish II was that the law regarding the state-created danger doctrine was already so "clearly established" that qualified immunity was inapplicable. 979 F.3d at 77—80 (describing as "simply incorrect" an assertion that the law of the state-created danger doctrine was not "clearly established").

Second, the majority notes that in describing the exception for state-created dangers, the district court asked whether Officer Dexter's actions "greatly increas[ed] the danger" rather than whether they "enhanc[ed] the danger."  But this

difference in terminology could only matter if a jury could reasonably find that Officer Dexter engaged in affirmative conduct that both enhanced the danger and was shocking to the conscience. And as I have explained, even the majority avoids saying that Dexter's conduct could be found to have shocked the conscience.

If, on remand, the district court reads the majority opinion carefully, it will note that the opinion does not actually preclude the district court from rewording its summary of the applicable enhancement standard and re-entering its order of dismissal. Should the district court so proceed, perhaps no great harm will be done, even if nothing is gained beyond a display of understandable sympathy for the victims. But there is a chance that courts -- including the district court -- will read the majority opinion otherwise. They might sensibly think that no appellate court would remand this case unless, on the present record, it thought that a judgment for plaintiffs was somehow possible. And litigants or potential litigants in other cases in which officers fail to arrest someone will cite this case as watering down the "shock the conscience" test to a form of re-labeled negligence.

Such an outcome is contrary to existing law. As the Supreme Court said in DeShaney: "The most that can be said of the state functionaries in this case is that they stood by and did nothing when suspicious circumstances dictated a more active role

for them.   In defense of them it must also be said that had they
moved too soon to [act], they likely would have been met with
charges of improper [behavior], charges based on the same Due
Process Clause that forms the basis for the present charge of
failure to provide adequate protection."   DeShaney, 489 U.S. at
203.   The same point applies here.

I must therefore respectfully dissent.   Officer Dexter
took no affirmative act that could conceivably be said to shock
the conscience as that standard is defined in Lewis.   And whether
he should be held personally liable for not doing more is not a
concern of the Due Process Clause.