## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

### Civil Action No. 17-cv-00264-KFW

| |
|---|
| **SUSAN JOHNSON, individually and on behalf of her minor son B.L., and on behalf of DERRICK THOMPSON, deceased,** Plaintiff <br><br> v. <br><br> **CITY OF BIDDEFORD, BIDDEFORD POLICE DEPARTMENT, a Municipal Corporation organized and existing under the laws of the State of Maine; MAINE DEPARTMENT OF PUBLIC SAFETY, a state agency organized under the laws of the State of Maine; JOHN E. MORRIS, individually and as the Commissioner of the Maine Department of Public Safety; ROGER BEAUPRE, individually and as Chief of Biddeford Police Department; EDWARD DEXTER, individually and as an employee of the Biddeford Police Department; JACOB WOLTERBEEK, individually and as an employee of the Biddeford Police Department and JANE DOE,** Defendants |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' *RENEWED* MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rules of Civil Procedure Rule 56, this Memorandum is submitted in

support of the Defendants, the City of Biddeford, Roger Beaupre, and Edward Dexter[1]

("Defendants"), renewed Motion for Summary Judgment seeking judgment as a matter of law on all

---

[1] The United States Court of Appeals for the First Circuit vacated the grant of summary judgment as to the § 1983 and Maine Civil Rights Act claims against Officer Dexter and the Monell claims against Police Chief Beupre and the City of Biddeford, claims which were remanded for further consideration in light of the First Circuit's opinion and Irish II.  The First Circuit affirmed the grant of summary judgment as to the § 1983 claims against Officer Jacob Wolterbeek and all other claims against the defendants.

remaining claims made against them in the Plaintiff's Complaint in the matter of <u>Susan Johnson v. Biddeford Police Dept.</u>, et al. 2:17-cv-00264-JDL ("Johnson Complaint") and all remaining claims made against them in the Plaintiff's Complaint in the consolidated matter of <u>Jocelyne Welch v. City of New Bedford</u>, et al. 2:18-cv-00160-JDL ("Welch Complaint").

Pursuant to the First Circuit's Decision and remand order, the remaining claims are Plaintiffs' § 1983 and Maine Civil Rights Act claims against Officer Dexter and the <u>Monell</u> claims against Police Chief Beaupre and the City of Biddeford.  <u>Welch v. City of Biddeford Police Dep't</u>, Nos. 20-1474, 20-1481, 2021 U.S. App. LEXIS 26001 (1st Cir. Aug. 27, 2021).

## I.   STATEMENT OF FACTS

The Defendants rely on the *Statement of Material Facts in support of Defendants' Motions for Summary Judgment* (Ecf. No. 68), *Plaintiffs' Response to Defendants' Statement of Material Facts* (Ecf. No. 78), *Plaintiffs' Addendum to Additional Statement of Facts* (Ecf. No. 108) and *Defendants' Response to Plaintiffs' Addendum to Additional Statement of Facts* (Ecf. No. 109).

## II.  STANDARD OF REVIEW

Summary judgment should enter where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law."  <u>Straughn v. Delta Air Lines, Inc.</u>, 250 F.3d 23, 33 (1st Cir. 2001) (citing Fed. R. Civ. P. 56(c)).

## III. APPLICABLE LAW

### A.     42 U.S.C. § 1983

It is well established, that § 1983 creates no independent substantive rights but rather provides a cause of action by which individuals may seek money damages for governmental violations of rights protected by federal law. <u>See, e.g.</u>, <u>Albright v. Oliver</u>, 510 U.S. 266, 271, 114 S.Ct.

807, 127 L.Ed.2d 114 (1994). Hence, to state a claim under § 1983, a plaintiff must allege (1) the violation of a right protected by the Constitution or laws of the United States and (2) that the defendant was acting under color of law. See, e.g., Pittsley v. Warish, 927 F.2d 3, 6 (1st Cir.1991) (citing Parratt v. Taylor, 451 U.S. 527, 535, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981)).

## B.     Substantive Due Process

Substantive due process prevents the government from engaging in conduct that 'shocks the conscience,' ... or interferes with rights 'implicit in the concept of ordered liberty.' County of Sacramento v. Lewis, 523 U.S. 833, 847 (1998).  The law specific to the Plaintiffs' substantive due process claims in the instant matter is more fully addressed in the argument section below.

## C.     Qualified Immunity

Police officers "are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" Dist of Columbia v. Wesby, 138 S. Ct. 577, 589 (2018) (quoting Reichle v. Howards, 566 U.S. 658, 664 (2012)).

Qualified immunity is intended to provide government officials with the ability to "reasonably anticipate when their conduct may give rise to liability for damages." Anderson v. Creighton, 483 U.S. 635, 646 (1987) (quoting Davis v. Scherer, 468 U.S. 183, 195 (1984)). It provides that "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); see also Davis v. Scherer, 468 U.S. at 191; Bonitz v. Fair, 804 F.2d 164 (1st Cir. 1986).

The First Circuit has set out the following test for determining whether qualified immunity is applicable: "(i) whether the plaintiff's allegations, if true, establish a constitutional violation; (ii) whether the constitutional right at issue was clearly established at the time of the putative violation; and (iii) whether a reasonable officer, similarly situated to the defendant, would have understood the challenged act or omission to contravene the discerned constitutional right." Limone v. Condone, 372 F.3d 39, 44 (1st Cir. 2004).  Qualified immunity "protects all but 'the plainly incompetent and those who knowingly violate the law.'" Pagan v. Calderon, 448 F.3d 16, 31 (1st Cir. 2006) quoting Malley v. Brigs, 474 U.S. 335, 341 (1986).

The clearly established "inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" See Mullenix v. Luna, 136 S. Ct. 305, 308 (2015) quoting Brosseau v. Haugen, 543 U.S. 194, 198 (2004) (per curiam) (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001)).  Put another way, the law must have been sufficiently clear at the time of the alleged violation that "any reasonable official in the defendant's position would have known that the challenged conduct is illegal 'in the particular circumstances that he or she faced.'" Rivera-Corraliza v. Morales, 794 F.3d 208, 214-15 (1st Cir. 2015) (quoting Plumhoff v. Rickard, 572 U.S. 765, 779 (2014)). Such precision ensures that government officials are "penalize[d] . . . for violating 'bright lines,' [but] not for making 'bad guesses in gray areas.'" Id. at 215 (quoting Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir. 1992)).

Whether the doctrine of qualified immunity applies is a question of law, Tatro v. Kervin, 41 F.3d 9, 15 (1st Cir. 1994); Whiting v. Kirk, 960 F.2d 248, 250 (1st Cir. 1992). The doctrine is not just a defense; it protects the defendant from suit and therefore it should be raised and decided at the earliest practicable moment. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

Qualified immunity applies to the federal claims and to Ms. Welch's claim under the Maine Civil Rights Act (5 M.R.S.A. § 4682). <u>Adle v. Maine State Police Dep't</u>, 279 F. Supp. 3d 337, 361 (D. Me. 2017) (because the MCRA uses the same standard for qualified immunity for an excessive force claim as the federal standard, no independent analysis is required for the parallel state claim).

### D.    Monell

The doctrine that a municipality cannot incur liability under § 1983 based on *respondeat superior* is well established. <u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658, 691, 98 S.Ct. 2018, 2036 (1978) ("municipality cannot be held liable under § 1983 on a *respondeat superior* theory"). It is well-settled in the First Circuit that to establish municipal liability under § 1983 there must be a finding of two preliminary elements: first, that plaintiff's harm was caused by a constitutional violation, and second, that the Town is responsible for that violation, an element which has three components. First, the alleged municipal action at issue must constitute a 'policy or custom' attributable to the Town. Second, the municipal policy or custom must actually have caused plaintiff's injury; and third, "the municipality possessed the requisite level of fault, which is generally labeled in these sorts of cases as 'deliberate indifference.'" <u>Young v. City of Providence</u>, 404 F.3d 4, 25-26 (1st Cir. 2005).

### E.    5 M.R.S.A. § 4682

To prevail on her Maine Civil Rights Act claim, Ms. Welch[2] must prove, among other things that the individual defendants used or threatened physical force or violence when they deprived the decedent of a constitutional or statutory right. 5 M.R.S. §§ 4682(1-A), 4684 (2013); <u>Clifford v. Maine Gen. Med. Ctr.</u>, 91 A.3d 567, 589 n.22 (Me. 2014); <u>see also</u> <u>Bagley v. Raymond Sch. Dep't</u>, 1999 ME 60, P 10 n.5, 728 A.2d 127 (affirming the grant of summary judgment to the defendants on the

---

[2] The Johnson Plaintiffs did not bring a claim under 5 M.R.S.A. § 4682.

plaintiffs' MCRA claim, citing 5 M.R.S. § 4681 (Supp. 1998), solely on the basis that the plaintiffs did

not present any claim of the use or threat of physical force or violence).

## IV. <u>ARGUMENT</u>

The Plaintiffs have not satisfied the requisite elements of proof for their claims.

The First Circuit remanded Plaintiffs § 1983 and Maine Civil Rights Act claims against Officer

Dexter and Plaintiffs' <u>Monell</u> claims against Police Chief Beaupre and the City of Biddeford.  In doing

so the First Circuit framed the applicable law at the beginning of its analysis:

> The Fourteenth Amendment's Due Process clause states that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. In general, the state's failure to protect an individual from private harm does not give rise to a due process claim. <u>DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.</u>, 489 U.S. 189, 197 (1989). As the law has developed since 1989, **this circuit joined other circuits in Irish II** in recognizing that a plaintiff may make out a due process claim under the state-created danger doctrine by showing:
>
> (1)    that a state actor or state actors affirmatively acted to create or enhance a danger to the plaintiff;
> (2)    that the act or acts created or enhanced a danger specific to the plaintiff and distinct from the danger to the general public;
> (3)    that the act or acts caused the plaintiff's harm; and
> (4)    that the state actor's conduct, when viewed in total, shocks the conscience.
>
> 979 F.3d 65, 75 (1st Cir. 2020).

<u>Welch v. City of Biddeford Police Department, et al.</u>, 12 F.4th 70, 75-76 (2021) (Emphasis added).

The First Circuit remanded for further consideration of its opinion and <u>Irish II</u>.  Except, <u>Irish II</u> was

not decided until November 2020.  <u>Irish I</u>, an earlier interlocutory appeal to the First Circuit arising

out of the same case, was decided in March 2017.  In <u>Irish I</u> the First Circuit made the following

statement about the existence of the state-created danger theory in the circuit:

> The Fourteenth Amendment's Due Process Clause provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const.

amend. XIV, § 1. As a general matter, "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." DeShaney, 489 U.S. at 197. But some circuit courts have recognized the "state-created danger" exception to this rule based on language in DeShaney that "suggested, but never expressly recognized, the possibility that when the state creates the danger to an individual, an affirmative duty to protect might arise." Rivera, 402 F.3d at 34-35 (citing DeShaney, 489 U.S. at 201).3 At least eight sister circuits have recognized the existence of the state-created danger theory. See Kennedy v. City of Ridgefield, 439 F.3d 1055, 1061 n.1 (9th Cir. 2006) (collecting cases). **While this circuit has discussed the possible existence of the state-created danger theory, we have never found it applicable to any specific set of facts.**

Irish v. Maine, 849 F.3d 521, 525-526 (1st Cir. 2017)(emphasis added).

As of 2017, the state-created danger theory was not explicitly recognized in the First Circuit and had never been applied to any specific set of facts. This is highly relevant to the qualified immunity analysis. Not only had the First Circuit not adopted the theory, but in the cases in which it was discussed, the Court specifically declared that the theory did not apply to the fact pattern of each of what are now described as the "contours" cases. The theory was not adopted as a viable source of substantive due process rights until 2020. The incident giving rise to Plaintiffs claims in this case occurred in 2012.

On December 29, 2012, Officers Dexter and Wolterbeek appeared at 17 Sokokis Road, Biddeford, to respond to Derrick Johnson's call. The evidence demonstrates that Officer Wolterbeek checked with dispatch regarding known weapons or proximity of weapons to the location and dispatch replied noting that the caller had not seen any weapons. Upon arrival, Officer Dexter spoke with Ms. Johnson, Derrick Johnson, and Alivia Welch. The interactions were preserved on the officers' WatchGuard audio recording system.

Officer Dexter had no prior contact with the residents at 17 Sokokis Road before December 29, 2012. Nor did any of the Plaintiffs report any threats of harm or violence by James Pak to anyone at any point prior to December 29, 2012.

7

The recording reflects a conversation between Officer Dexter and Derrick Thompson in which Derrick explained to Officer Dexter his version of what occurred between he and James Pak prior to the officers' arrival.  He explained that Pak was screaming at him, got in his face and said, "hit me," to which Derrick replied: "I'm not hitting you.  I'm not going to jail for this."  Officer Dexter was also shown a cell phone video recording which showed Mr. Pak on his steps yelling at Derrick, appearing vulgar and agitated.  Derrick then told Officer Dexter that he thought they had recorded when Mr. Pak threatened him by pointing his finger and saying "bang" towards Derrick and Ms. Johnson, but apparently that was not the case.  Derrick stated he has had a similar confrontation with Mr. Pak before, but Ms. Johnson had not.

Officer Wolterbeek had a brief conversation with Mr. Pak in the driveway before entering the Johnson's apartment and joined the ongoing conversation.  At this time, Officer Dexter asked Derrick if he felt threatened.  He replied, "not really." The verbatim conversation is transcribed at paragraph 28 of the *Defendants Rule 56 Statement of Undisputed Material Facts*.  Officer Dexter, Alivia Welch, Derrick and Ms. Johnson then discussed the parking arrangements and whether they have had disputes over the parking previously. **Derrick and Susan Johnson specifically told Officer Dexter that Mr. Pak is always like that, always yelling, never talking normal.  Alivia Welch specifically told Officer Dexter that Armit Pak "always comes and apologizes to us after he freaks out.  She says, "Sorry he just gets worked up.  I don't know what to do about it.""**

Officer Dexter went over to speak with James and Armit Pak[3].  This conversation was recorded on the WatchGuard recording system as well.  Mrs. Pak initially explained her side of what had occurred before the officers' arrival.  She explained that Derrick and Susan Johnson and Ms. Welch had broken their lease. She explained that they were supposed to meet that same morning to

---

[3] James Pak was in his seventies at the time of the incident, with no prior criminal history.

discuss their issues but the three had left.  She explained that Ms. Welch had moved in without permission.  Her explanations were all landlord-tenant issues regarding lease and parking violations and also regarded an eviction notice that Mrs. Pak stated she served.

James Pak also explained his side of the dispute.  He stated that Derrick had "given him the finger" and said "I would shoot you" to Derrick.  Officer Dexter explained to Mr. Pak that he should not be saying such things or threatening.  Mr. Pak also claimed that Derrick had threatened him, but Officer Dexter again explained that he cannot threaten to shoot.  Then Mr. Pak specifically stated, "I'm not going to shoot him."[4]  The conversation continued.

At the conclusion of the conversation, Officer Dexter advised the Pak's that the tenancy issues were civil in nature but also to avoid Derrick and Susan Johnson and Ms. Welch for the time being. Officer Dexter also stated: **"the bottom line is that you cannot threaten them. If they're outside shoveling, leave them alone. Do it through the courts. That's your best bet is to do it through the courts."** The conversation about shoveling and addressing landlord-tenant matters through the courts continued.  Mr. Pak was still agitated.  He said "I've got nothing to lose" which prompted Officer Dexter to continue the discussion to deescalate Mr. Pak from his agitation.  Mr. Pak said, "He called me 'jap' he called me names and now I just don't, I don't have any rights?"  He also said, "You're going to see me in the newspaper."  Officer Dexter continued to speak with the Paks and continued his attempts to deescalate.  He specifically told Mr. Pak "No I don't wanna see you in the newspaper" and "You keep your distance from them."  The last thing Mr. Pak said was "No, no you don't have to worry about that" to which Officer Dexter responded "Ok. Keep your distance from them.  I'm gonna tell them to keep their distance from you."

---

[4] As a point of emphasis, this fact is admitted by the Plaintiffs.

Officer Dexter returned to speak with Ms. Johnson, Mr. Thompson, and Ms. Welch before completing the call.  He explained to them that Mr. Pak was extremely upset about the second vehicle. He advised them to avoid Mr. Pak.  He advised them that there was not much he could do about lease and tenancy disputes, which are civil matters, but he is able to address harassment and threatening. Ms. Johnson asked Officer Dexter if he was going back to Mr. Pak and he told her he was not, that he was done talking with the Paks.  He advised them to keep their distance, wished them luck and advised them to stay in for the night.  Ms. Johnson asked a follow up question about whether Mr. Pak was acting calm and wondering if he was going to be normal.  Officer Dexter advised Ms. Johnson that Mrs. Pak was present and she stated "Ok."  Officer Dexter wished them luck and cleared the call.

Officer Dexter decided not to summons or arrest Mr. Pak for any crimes during this first call. He explained at his deposition that he specifically asked Susan Johnson, Derrick Thompson and Alivia Welch if they were in fear, and they communicated that they were not.  He advised Mr. Pak that he could not make threats, but given the above discussed circumstances, he concluded that neither the Maine criminal threatening statute nor the Maine criminal terrorizing statute applied to this incident. He further concluded that the disorderly conduct did not apply because Mr. Pak's actions did not rise to the requisite level in order to make an arrest.

Thereafter, Mr. Pak walked into the apartment, took a gun out and shot Ms. Johnson, Derrick Thompson and Alivia Welch.

Officer Dexter received a second call to the residence regarding the shooting.  He was the first officer on scene.  When other officers arrived, Officer Dexter entered the back door of the residence, rescued Ms. Johnson's son (B.L.) and then rescued Ms. Johnson.

Derrick Thompson and Alivia Welch died of the injuries inflicted by Mr. Pak.

10

In 2012, Biddeford Police had Standard Operating Procedure General Order No. 129 in effect which functioned as Department policy establishing guidelines governing the use of force and control, use of conducted electronic weapons, and use of firearms by Biddeford Police Officers, and to describe permitted and prohibited practices, requirements for medical aid, reporting, and review of all such incidents.  Standard Operating Procedure General Order 136-96 functioned as Department policy to describe deviant behavior and circumstances under which police personnel will make an arrest or protective detention in order to assist said person or protect the general public.  Under General Order 136-96, the policy states that an officer who encounters situations of deviant behavior shall exercise their discretion and that any determination that a person represents an imminent and substantial harm to themselves or someone else be based upon probable cause.

Biddeford Police Standard Operating Procedure General Order 02-01 functioned as Department policy to describe the written duty responsibilities of law enforcement officers within the Biddeford Police Department.  Standard Operating Procedure General Order 02-03 functioned as Department policy for the code of ethics and standards of conduct expected of law enforcement officers within the Biddeford Police Department.  Standard Operating Procedure General Order 02-14 functioned as Department policy communicating expectations, guidelines, and requirements for officers assigned to the Patrol Division.

Biddeford Police Standard Operating Procedure General Order 02-15 functioned as Department policy to guide officers in how and when they can make arrests.  Under Standard Operating Procedure 02-15, the policy states that in order for an officer to make an arrest without a warrant for a misdemeanor, the offense must be committed in the officer's presence. Under Standard Operating Procedure 02-15, the policy further states that in order to arrest without a

warrant for a misdemeanor, an officer must have personal knowledge of the facts, in other words, information obtained by direct perception through the officer's own senses.

Biddeford Police Standard Operating Procedure General Order 02-16 functioned as Department policy regarding warrantless searches and seizures. Standard Operating Procedure General Order 04-07 functioned as Department policy outlining and explaining the circumstances under which an officer may lawfully make a forcible entry into or onto private premises.

Officer Dexter received training in November of 2011 about how to deal with emotionally disturbed individuals. Officer Dexter has had more than just this one instance of training regarding emotionally disturbed individuals. From these trainings, Officer Dexter learned key strategies in dealing with emotionally disturbed individuals: to remain calm, not agitate, and keep one's distance. Officer Dexter has previous law enforcement experience dealing with landlord/tenant issues. Officer Dexter received training as part of his law enforcement career regarding how to deal with landlord/tenant disputes.  Clearly, there was no failure to train.

No set of facts was put forth from discovery or otherwise to establish the claim that Chief Beaupre or the City of Biddeford was deliberately indifferent to state created danger type substantive due process violations by the officers in the police department.

Plaintiffs submitted *Plaintiffs' Addendum to Additional Statement of Facts* comprised of statements from Maine State Police Interviews of Mr. Pak and an inmate with whom Pak was housed at the Cumberland County Jail.  None of the statements are relevant to the analysis of the incident on December 29, 2012. The incident on December 29, 2012 was record by the WatchGuard recording system and the parties agree that the recordings capture the full interaction. Statements given by Mr. Pak from his memory after-the-fact, or second hand through a cellmate of Mr. Pak's, do not change the undisputed facts recorded by the WatchGuard system.

12

**A. Defendant Dexter Is Entitled To Summary Judgment On Plaintiffs Claims Under 42 U.S.C. § 1983 Alleging Violations Of The Substantive Due Process Clause Of The Fourteenth Amendment To The United States Constitution**

Officer Dexter did not violate Ms. Johnson, Mr. Thompson or Ms. Welch's rights under the substantive due process clause of the Fourteenth Amendment to the United States Constitution. The state did not create the danger, nor did the theory exist as a viable source of substantive due process rights in the First Circuit in December 2012. The basic framework of such a claim is discussed in Section III above.

1.  *The State-Created Danger Theory Of Liability Was Not A Viable Theory Of Substantive Due Process Liability In This Circuit As Of December 29, 2012*

The substantive due process analysis in these circumstances requires analysis of whether the state created danger doctrine was a cognizable source of rights in the First Circuit on December 29, 2012. It was not. The First Circuit's opinion in Irish v. Maine, 849 F.3d 521 (1st Cir. 2017)("Irish I") makes the following statement which indicates clearly that the state-created danger theory was never previously found to be a cognizable source of rights in this circuit:

**While this circuit has discussed the possible existence of the state-created danger theory, we have never found it applicable to any specific set of facts.**

Irish v. Maine, 849 F.3d at 525-526. The doctrine was not formally recognized even as Irish I was decided in 2017, five years after the incident in this case. Indeed, though the doctrine was mentioned previously, it was never applied and not formally recognized within this circuit until November 5, 2020, when Irish II was decided.

Still, in deciding the Defendants' first motion for summary judgment, this Court assumed for the purpose of its analysis that the First Circuit would eventually adopt the "state-created danger" exception to the DeShaney rule. DeShaney and its progeny establish that omissions and failures to act by police officers do not give rise to substantive due process violations. DeShaney held that state

13

actors do not violate the Due Process Clause by failing to protect an individual from a danger they played no part in creating. DeShaney, 489 U.S. at 201. Notwithstanding the fact that DeShaney was the rule in 2012, on the assumption that the First Circuit would recognize the state created danger exception, the Court determined that no substantive due process violation occurred.  The Court never reached the remainder of the qualified immunity analysis because it did not have to, no constitutional rights were violated.

More specifically, the Court determined that **"the omissions highlighted by Johnson and Welch are, by definition, not affirmative acts."** (Ecf. No. 88 at Pg. 20).  Continuing the discussion, the Court stated:

> Though we know, with the benefit of hindsight, that Officer Dexter's efforts to defuse the situation were unsuccessful, "[f]ailing to defuse a preexisting danger is not an affirmative act" for purposes of the "state-created danger" exception. Doe1 v. Bos. Pub. Sch., No. 17-cv-11653-ADB, 2019 WL 1005498, at *5 (D. Mass. Mar. 1, 2019) (quoting Doe v. Berkeley Cty. Sch. Dist., 189 F. Supp. 3d 573, 577 (D.S.C. 2016) (collecting cases)). It is possible that if Officer Dexter had directly told the victims that Pak had made statements to him indicating that Pak was volatile and that he presented a serious threat of violence toward them and himself, they might have heeded that information by leaving the property or taking other steps to protect themselves. It is settled, however, that an officer's failure to "take further discretionary steps to ensure [a victim's] safety" is "insufficient to maintain a claim of [a] substantive due process violation" under the "state-created danger" exception. Irish, 849 F.3d at 528 (citation omitted).  Further, the omissions relied on by the Plaintiffs do not amount to "repeated, sustained inaction by government officials, in the face of potential acts of violence" which "implicitly but affirmatively encourag[ed] or condon[ed]" Pak's threatening behavior. Okin v. Vill. of Cornwall-On-Hudson Police Dep't, 577 F.3d 415, 428–429 (2d Cir. 2009). The undisputed facts show that, far from encouraging Pak's behavior, Officer Dexter tried to deescalate the situation, telling Pak that he could not make threatening statements, that he should seek a civil remedy, and that he should stay away from the victims.

> Accordingly, the police officers' failure to defuse the situation and to provide a clearer explanation to the victims of the degree of danger Pak represented to them does not establish a substantive due process violation under the "state-created danger" exception.

(Ecf. No. 88 at Pgs. 20-21).  The case was not previously decided by this Court on whether **an affirmative act** "greatly" enhanced the danger to the Plaintiffs.[5]  The case was decided because, by definition, Officer Dexter did not engage in an affirmative act.  Thus, even assuming the viability of the state-created danger theory to the facts of this 2012 case, there was no substantive due process right that was violated.

Notwithstanding the above analysis, it cannot be said that the substantive due process clause contained a source of rights provided by a state-created danger exception to the <u>DeShaney</u> rule as of December 29, 2012.

As indicated in <u>Irish II</u>, the First Circuit had decided approximately a dozen cases prior to <u>Irish II</u> discussing the "contours" of the state-created danger doctrine.  <u>Soto v. Flores</u>, 103 F.3d 1056 (1st Cir. 1997); <u>Lord v. Town of Lincolnville</u>, No. 96-2201, 1997 U.S. App. LEXIS 8615, at *3-4 (1st Cir. Apr. 25, 1997); <u>Coyne v. Cronin</u>, 386 F.3d 280, 287 (1st Cir. 2004); <u>Rivera v. Rhode Island</u>, 402 F.3d 27, 37 (1st Cir. 2005); <u>Vélez-Díaz v. Vega-Irizarry</u>, 421 F.3d 71, 81 (1st Cir. 2005); <u>Enwonwu v. Gonzales</u>, 438 F.3d 22 (1st Cir. 2006); <u>Ramos-Pinero v. Puerto Rico</u>, 453 F.3d 48, 55 (1st Cir. 2006); <u>Lockhart-Bembery v. Sauro</u>, 498 F.3d 69 (1st Cir. 2007); <u>Estate of Bennett v. Wainwright</u>, 548 F.3d 155, 162 (1st Cir. 2008); <u>J.R. v. Gloria</u>, 593 F.3d 73, 76 (1st Cir. 2010)

---

[5] The First Circuit scrutinized this Court's use of the word "greatly" in its discussions of the contours of the state created danger exception in the first summary judgment decision. <u>Welch</u>, 12 F.4th at 76.  The scrutiny was essentially to say that this Court did not know that when <u>Irish II</u> was decided, the word "greatly" would not be used in the description of the elements of the formally recognized state-created danger exception.  <u>Id.</u>  Except, in <u>Rivera v. Rhode Island</u>, 402 F.3d 27, 35 (1st Cir. 2005) the First Circuit cited <u>Soto v. Flores</u>, 103 F.3d 1056, 1063-64 (1st Cir. 1997), to discuss the theory.  And, in <u>Rivera</u>, the First Circuit summarized <u>Soto</u> as "discussing, as a possible exception to the general <u>DeShaney</u> rule, a substantive due process violation when the state, through its affirmative acts, creates or **greatly enhances the danger** faced by the plaintiff from third parties."  So, at least as of 2005, the language used by the First Circuit to discuss the contours of a possible, but not yet recognized <u>DeShaney</u> exception, included the word "greatly." (Emphasis added).

Meléndez-García v. Sánchez, 629 F.3d 25, 29 (1st Cir. 2010) Marrero-Rodríguez v. Municipality of San Juan, 677 F.3d 497, 500-02 (1st Cir. 2012).  These are the cases where the First Circuit outlined the contours of the doctrine prior to the incident in Irish II (July 2015), in each of which finding that the doctrine did not apply.

Not all of the contours cases involve fact patterns which are illustrative or analogous to the facts of this case.  E.g. Ramos-Pinero v. Puerto Rico, 453 F.3d 48, 55 (1st Cir. 2006)(state roadways and sewer systems deficiencies); Enwonwu v. Gonzales, 438 F.3d 22 (1st Cir. 2006)(non-citizen trying to avoid removal from the country); Lord v. Town of Lincolnville, No. 96-2201, 1997 U.S. App. LEXIS 8615, at *3-4 (1st Cir. Apr. 25, 1997)(automobile collision); Lockhart-Bembery v. Sauro, 498 F.3d 69 (1st Cir. 2007)(automobile accident); J.R. v. Gloria, 593 F.3d 73, 76 (1st Cir. 2010)(alleged foster care violations); Marrero-Rodríguez v. Municipality of San Juan, 677 F.3d 497, 500-02 (1st Cir. 2012)(accidental shooting during training exercise).  However, some of the earlier cases show clearly that as of December 29, 2012, this Circuit had not recognized a substantive due process right applicable to the circumstances of this case.

In Soto v. Flores, 103 F.3d 1056, 1058 (1st Cir. 1997) – A husband killed himself and his two young children. This tragedy occurred four days after appellant mother complained to the police about physical and emotional abuse. The police, knowing that the husband had threatened to kill appellant and her family if she went to the police to have him jailed for his spousal abuse, nonetheless violated their obligations of confidentiality and informed the husband of appellant's complaints. Having done so, the police did not jail the husband or take steps to protect appellant and her family.  In deciding the appellant's "state-created danger" claim, the First Circuit held:

> [W]e cannot extract a clearly established right from a somewhat confusing body of caselaw through the use of hindsight, or "permit claims of qualified immunity to turn on the eventual outcome of a hitherto problematic constitutional analysis." Martinez-Rodriguez v. Colon-Pizarro, 54 F.3d 980, 989 (1st Cir. 1995). The history of the state-created danger theory, although recently comprehensively described by the Third Circuit in Kneipp, is an uneven

16

one. The distinction between affirmatively rendering citizens more vulnerable to harm and simply failing to protect them has been blurred. Moreover, courts have sometimes found that a given action, while rendering the plaintiff more vulnerable to danger, did not amount to a constitutional violation, but instead should be viewed as a state law tort. See, e.g., Cannon v. Taylor, 782 F.2d 947, 950 (11th Cir. 1986). It is more recent judicial opinions that have begun to clarify the contours of this doctrine. See, e.g., Kneipp, 95 F.3d at 1208-10; Pinder, 54 F.3d at 1174-1177.

We conclude therefore that, in 1991, "the contours of the right were [not] sufficiently plain that a reasonably prudent state actor would have realized not merely that his conduct might be wrong, but that it violated a particular constitutional right." Martinez-Rodriguez, 53 F.3d at 988. Accordingly, we find that the defendants are entitled to the protections of qualified immunity and affirm the district court's grant of summary judgment on plaintiff's substantive due process claim.

Soto, supra.

In Coyne v. Cronin, 386 F.3d 280, 287 (1st Cir. 2004), an inmate came forward with information about illegal activities by inmates and about their intent to commit a robbery after being released. He met with the FBI agent, who directed him to send a letter addressed to a conspiring party to the FBI with other information. The FBI then mistakenly forwarded information to the conspirators disclosing that the inmate was cooperating with the FBI. As a result, the inmate had his teeth broken and he and his family were repeatedly harassed and threatened. This Court affirmed the dismissal of the inmate's action under the shocks the conscience test, theoretically focusing the analysis on this prong of the test because the plaintiff's incarceration status placed him in an "especially vulnerable position." Id. Yet, applying DeShaney, the First Circuit found no substantive due process right was violated. Id.

In Rivera v. Rhode Island, 402 F.3d 27, 37 (1st Cir. 2005), one of the more analogous fact patterns, the plaintiff alleged that a young girl's rights were violated by police and others because they failed, after promising, to protect the girl from the danger posed by a murder suspect if she agreed to testify against him. The complaint alleged that identifying the girl as a witness and

compelling her to testify were actions that violated the girl's rights. While the officials' promises to provide protection could have rendered the girl more vulnerable, the First Circuit found that such an increased risk did not itself create a constitutional duty to protect. Because the promises did not deprive the girl of her liberty to act on her own behalf, they did not rise to the level of a constitutional deprivation of rights.  The court further held, even if there exists a special relationship between the state and the individual or the state plays a role in the creation or enhancement of the danger, under a supposed state created danger theory, there is a further and onerous requirement that the plaintiff must meet in order to prove a constitutional violation: the state actions must shock the conscience of the court.  Id. at 35.  While requiring the girl's testimony may in fact have increased her risk, issuance of a subpoena did not do so in the sense of the state created danger doctrine.  Id. at 37.  Further, while the unkept promises may have rendered the girl more vulnerable to the danger posed by a third party, merely rendering a person more vulnerable to risk does not create a constitutional duty to protect.  Id.  In so holding, the First Circuit further stated:

> Ultimately, the claims alleged in the complaint are indistinguishable from those in DeShaney. The allegation -- that [the girl] trusted the state to do what it said and relied on that promise in agreeing to testify -- is not materially different from DeShaney, where the state was aware of the risk, by its actions expressed promises of help, and then failed to protect a young boy from his abusive father.[6]

> DeShaney directs that a state's affirmative constitutional duty to protect an individual from private violence arises when there is some deprivation of liberty by state actors. See DeShaney, 489 U.S. at 200 ("The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf.").

Rivera, 402 F.3d at 38.

---

[6] Note the analogy between the First Circuit's summary of DeShaney and Plaintiffs' theory of liability in this case.  Unlike in DeShaney or Rivera, where the state was aware of the risk, promised to protect and then failed to protect.  Here, it is alleged that the state was aware of the risk and failed to protect, there were no promises to protect.

In <u>Vélez-Díaz v. Vega-Irizarry</u>, 421 F.3d 71, 81 (1st Cir. 2005) the First Circuit held that a criminal suspect turned informant who was killed in a large-scale controlled substance/firearms transaction did not have a claim sufficient to recognize and apply the theory. *Id.* at 78-81. In <u>Vélez-Díaz</u>, the court reminded the circuit that, as of 2005 though other circuits had recognized the theory, the Fifth Circuit had "flatly rejected" the theory and this Circuit had discussed the theory but "never found it actionable on the facts alleged." <u>Id.</u> <u>citing</u> <u>Rivera</u>, 402 F.3d at 35 (collecting cases).

<u>Estate of Bennett v. Wainwright</u>, 548 F.3d 155, 162 (1st Cir. 2008) is a case involving the tragic death of Daniel Bennett II ("Bennett"), a mentally ill young man, when he opened fire against Maine law enforcement officers who had been called to his home. The officers responded with gunfire and Bennett was killed. Bennett's estate ("the Estate") -- his mother, Arlene Bedard ("Arlene"); his grandmother, Isabel Bedard ("Isabel"); and his sister, Laurie Hart ("Laurie") -- brought suit against the officers asserting numerous violations of both the Estate's and Bennett's constitutional rights, as well as state law claims. The Estate claimed it had shown that the defendants engaged in conscience-shocking behavior, and that it may also recover under a state-created danger theory because the defendants caused Bennett to become vulnerable by forcing his family to leave the Bedard residence, thus placing Bennett in the care of Deputy Sheriff Christopher Wainwright, who was known in the community as "Deputy Death" because of prior instances of violence. The state-created danger aspect of the case was resolved in the following footnote:

> Since the Estate failed to meet the threshold pleading requirement of identifying the deprivation of a recognized interest, we need not reach the question of whether this circuit recognizes a state-created danger theory of liability. <u>See</u> <u>Rivera</u>, 402 F.3d at 35.

<u>Estate of Bennett v. Wainwright</u>, 548 F.3d 155, 179 Fn. 2 (1st Cir. 2008). In other words, the claim failed on the first prong of proof, for failure to identify a recognized constitutional right.

<u>Meléndez-García v. Sánchez</u>, 629 F.3d 25, 29 (1st Cir. 2010) was decided just two years before the incident in this case. On April 30, 2001, Segundo Meléndez-García, a Reserve Officers'

Training Corps officer, was assaulted during a student protest on the University of Puerto Rico's Río Piedras campus. Due to the University's non-confrontation policy, Puerto Rico Police Department officers were unable to come to his aid. In April 2002, Meléndez sued various university officials pursuant to 42 U.S.C. § 1983, alleging, among other things, that they had violated the equal protection and due process clauses of the Fourteenth Amendment by failing to protect him from injury. Quoting the following excerpt from DeShaney, the First Circuit concluded that it would not have been clear to a reasonable university official that the conduct at issue was unlawful:

> **"As a general matter, . . . a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause."** **DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.,** 489 U.S. 189, 197, 109 S. Ct. 998, 103 L. Ed. 2d 249 (1989).

The Court held, even if Meléndez were able to establish that the officials (1) either (a) created a danger and then failed to protect him from it or (b) limited his ability to protect himself or receive protection from outside sources, and (2) engaged in conscience-shocking conduct, he would still need to prove that it would have been clear to a reasonable University official that the relevant behavior here was unlawful. He cannot do so. Melendez, supra.

It is beyond reasonable argument. The law in this circuit at the time of this incident on December 29, 2012, shows that the circumstances of the case do not give rise to a substantive due process right. Indeed, the contours cases repeatedly reaffirmed the DeShaney rule – failure to protect from private violence is not a substantive due process violation. This Court was correct to decide the case on this basis on the Defendants' first motion for summary judgment and, on remand, it would be correct for this Court to reaffirm its earlier decision.

2.      *Alternatively, It Is Clear That The Law In This Area Was Not Clearly Established As Of December 29, 2012.*

In <u>Irish,</u> the incident underlying the complaint occurred in July 2015.  The victim was engaged in a relationship with an extremely violent registered sex offender named Lord.  She had an on and off relationship with Lord until getting a Protection From Abuse ("PFA") order against him for herself and her son.  The first PFA expired after two years, and Irish rekindled the relationship until, again, she had to go through the process of getting another PFA.

In July of 2015, Irish met Lord at a grocery store at which time Lord proceeded to abduct and repeatedly rape, strangle and threaten to kill her.  The next day, Irish went to the hospital and submitted to a rape kit evaluation, and she reported what happened to the local police who referred the case to the State Police.  Irish submitted a statement to the state police and subsequently advised them that Lord was attempting to contact her.  **With the knowledge of Lords criminally violent history, registered sex offender status and existing PFA, the State Police investigator told Irish that they were going to call Lord, explain the accusations made against him and ask for his side of the story.  Irish begged them not to do so stating that Lord would become terribly violent if they did.  They called him anyways.**[7]  When they called, he did not answer but the investigator left the details on his voicemail requesting a call back.

**A few hours after the voicemail, Irish learned her family's barn was set on fire.  She also received a call from a friend advising her that they overheard Lord at a bar saying "someone was going to die tonight."  She informed the State Police and specifically asked them for protection which they declined to provide despite the fact that their voicemail**

---

[7] This is one of the affirmative acts that is discussed in the <u>Irish I</u> and <u>Irish II</u> decisions.  It is discussed as an affirmative act and one which arguably departs from established law enforcement procedures, two reasons why it *could* support a liability determination on the newly recognized state-created danger exception to the <u>DeShaney</u> rule.

incited the violence.[8]  Later that same night, Lord found Irish, entered the home in which she was staying, shot her son and her mother and abducted Irish.  Lord later got into a shootout with the Maine State Police and fatally shot another person in the process.

Irish brought suit against the investigating officers and the State, alleging violations of the rights guaranteed to her by the substantive due process clause of the Fourteenth Amendment to the United States Constitution.  This court entered a dismissal order on the defendants' motion to dismiss.

The First Circuit vacated the order and permitted the case to proceed to discovery to determine whether the State Police created the danger by calling Lord and leaving a voicemail against Irish's protests.  The Court specifically instructed that discovery was to focus on whether the State Police policies for investigations permitted such conduct in investigations.  If the call was in line with policy, the Court suggested that dismissal at the summary judgment stage would still be appropriate, despite the gruesome facts of the case.   The distinctions between the facts of Irish and this case are stark.

In that case, the police had far more specific facts of violence upon which to take police action against Lord than Officers Dexter and Wolterbeek had against Mr. Pak.  Lord was a registered sex offender; with a lengthy criminal record, previous acts of violence against Lord specifically, and had very recently abducted, strangled and raped Irish.  Irish had a PFA against

---

[8] The discussion of these facts is part of the analysis of the state's awareness of the danger and deliberate indifference thereto. The analysis performed by the Court in Irish I and Irish II goes into far greater detail.  For example, the officers also spoke to Irish as Lord was getting closer and closer to her location.  Still, they declined to provide protection and specifically told her not to come to the state police barracks where she wanted to go with her children so they would be safe.  They also knew he had just attacked another person with a hammer, stolen his vehicle and guns, and was heading in Irish's direction.  They told her to remain at her location despite knowing of Lords active violence and knowing that he was getting closer and closer to Irish's location.

Lord.  All of these facts were known to the officers *before* they were advised not to contact Lord because of the risk of violence.  They did so anyways.

Thereafter, they were advised of the barn fire and Lord's specific threats that "someone was going to die."  They were aware of the hammer assault and stolen vehicle/guns that brought him closer and closer to Irish's location.  Lord not only had a criminal history, but he had a violent history with this particular victim and the victim had specifically advised the troopers not to contact Lord because of his penchant for violence.  It was *after* all of the above that Irish specifically requested protection which was still not provided.

The First Circuit's remand order in <u>Irish</u> specifically directed for discovery to proceed to determine whether there was a departure from police procedure.  The First Circuit stated that the case was more appropriately decided at summary judgment given the open questions on that limited issue.  And it was not until <u>Irish II</u>, in November 2020, that the circuit formally adopted the state created danger theory, directing this Court to apply it to the facts of that case.  <u>Irish</u> is currently on the trial list.

Here, there can be no question that Officer Dexter did not create the danger, nor did he exacerbate the danger as the troopers arguably did in <u>Irish</u>. Ms. Johnson, Mr. Thompson and Ms. Welch each specifically stated that they did not feel threatened which is in contrast with the specific request for protection in Irish.  The only facts in common between the two cases are the tragic loss of life caused by the deplorable criminal acts of a third party.

This Court and the First Circuit in <u>Irish</u> follow a very distinct line of United States Supreme Court cases that have uniformly held that the state must do something to create the danger or exacerbate the danger that previously existed in order to survive a dispositive motion on such a substantive due process claim.  <u>See e.g.</u> <u>Town of Castle Rock v. Gonzales</u>, 545 U.S. 748 (2005)(failure to enforce a state issued restraining order not actionable even though the RO

contained language mandating police enforcement; resulting in children's murders); <u>Deshaney v. Winnebago County Dep't of Soc. Serv.</u>, 489 U.S. 189 (1989)(protective services agents not responsible for failing to intervene to protect the child against the known violent father; child beaten to the point he was deemed to be profoundly retarded); <u>Rivera v. Rhode Island</u>, 402 F.3d 27 (1st Cir. 2005)(state not liable for failing to protect a witness who they subpoenaed in a murder trial even though officials promised protection; girl subsequently murdered to silence her testimony).  No such affirmative acts exist in this case.  The facts of this case show that the state-created danger theory does not apply.

Even if the state-created danger theory were applicable, to be successful in a claim under 42 U.S.C. § 1983, a plaintiff would also have to prove: "the state actions must shock the conscience of the court." <u>Irish</u>, 849 F.3d at 526 <u>quoting</u> <u>Rivera</u>, 402 F.3d at 35.

Mr. Thompson and Ms. Welch are deceased.  Ms. Johnson was brutally shot and emotionally traumatized.  No child (B.L.) should suffer the emotional pain inflicted by Mr. Pak's horrendous acts.  They suffer sadly because of the criminal acts of James Pak, a man in his mid-seventies at the time with no known history of violence.  His acts were unconscionable.

Officer Edward Dexter was doing his job, making discretionary decisions in the circumstances that were presented to him.  They were decisions which are questioned only in the clear and unfortunate hindsight of this case.  But decisions made in the context of the contours cases, all of which repeatedly reaffirmed the principal that there was not a duty to protect from private violence.  Edward Dexter did not set out to violate Ms. Johnson, Mr. Thompson, and Ms. Welch's substantive due process rights; he simply did not.  And, Edward Dexter did not engage in conscious shocking behavior.

Police officers must make discretionary decisions over the course of their careers which have implications in the lives of others.  Where an officer makes such a decision with the intent to violate

24

a citizen's constitutional rights, he or she is rightly implicated in the violation. There is intent in such a violation. There is an affirmative act in such a violation. There is an injury caused specifically by that officers intended affirmative act. Such statements do not aptly describe the actions or decisions made by Officer Dexter or Officer Wolterbeek on December 29, 2012, in the context of existing substantive due process law. Here, at the outset of the analysis, there was no violation of rights guaranteed by the substantive due process clause of the Fourteenth Amendment to the United States Constitution.

### B. Officers Dexter And Wolterbeek And Chief Beaupre Are Entitled To Qualified Immunity Which Applies To The Remanded § 1983 And MCRA[9] Claims Against Officer Dexter And The <u>Monell</u> Claim Against Chief Beaupre.

For the reasons discussed herein, the facts of this case do not make out a violation of a constitutional right. However, the qualified immunity doctrine provides protection to individuals such as Officers Dexter and Wolterbeek and Chief Beaupre even if there were constitutional violations so long as the violations were not of clearly established statutory or constitutional rights of which a reasonable person in their position would have known. <u>Pearson v. Callahan</u>, 555 U.S. 223, 234 (2009).

For the reasons discussed above, at the time of the incident, it was clearly established that there was no private right to police protection from private violence. The state-created danger doctrine had never been applied in the State of Maine or the Federal District of Maine. The cases discussing the contours of the doctrine prior to the date of this incident all discussed the requirement that <u>if</u> the doctrine were to be applicable, at minimum, it would require proof of some affirmative causal act or guarantee of state protection. <u>Irish I</u> makes clear the requirement that the

---

[9] Qualified immunity is available to governmental employees for claims brought pursuant to the Maine Civil Rights Act. <u>Clifford v. Maine Gen. Med. Ctr.</u>, 91 A.3d 567, 570 (Me. 2014).

officers must have done something affirmative, other than to fail to provide protection, to create the danger in order for it to be said that their actions were intentional substantive due process violations.

The Supreme Judicial Court of Maine has taken the same view on a similar set of facts as the First Circuit. See Webb v. Haas, 728 A.2d 1261 (Me. 1999). In Webb, a Maine State Trooper drove past the victim's freshly abandoned vehicle; a witness saw the victim at her vehicle at 11:20p.m., 10 minutes before the officer came upon it on the side of a highway. The officer did not stop or investigate. It was later discovered that the victim's vehicle was abandoned on the side of a highway because she was abducted and murdered. Her body was discovered in New Hampshire. The trooper was questioned on when he first saw the vehicle and he lied and said 2:00a.m. That trooper became a suspect in the murder investigation. It was only after he became a suspect that he admitted his lie and that he had driven past the vehicle at 11:30p.m.

The estate brought suit alleging that the officer's misconduct in failing to investigate and subsequent lying deprived the decedent of the benefit of an adequate police response, which may have saved her life. There, the plaintiff alleged due process violations as well as violations of state law, arguing that the decedent could have been found and saved but for the multiple instances of misconduct. Despite the officers admitted malfeasance and untruthfulness, the SJC held there was not sufficient evidence from which a juror could reasonably infer that the trooper's acts and omissions were a substantial factor in the victim's death.

It was not until November 2020 that the First Circuit adopted the theory. The theory's adoption does not abrogate the contours cases or the law as it existed in December 2012. The clearly established law was such that the state created danger theory was not adopted in the First Circuit. It was discussed in a handful of cases but found to be inapplicable. It was found inapplicable specifically to fact patterns in which officers knew of the third party danger, promised protection, and subsequently failed to protect. The contours cases all discussed how an affirmative

26

act which created or enhanced the danger would be required _if_ the theory was adopted, but in all cases occurring prior to December 2012 (in all actuality, November 2020), the fact patterns were insufficient to establish a violation.

It simply cannot be said that the state created danger theory was clearly established and in such a way as to make clear to Officer Dexter that he had an affirmative duty to protect in the circumstance or to make clear to Chief Beaupre that his Departmental training and supervision was not in accord with constitutional requirements.

### C. Officers Dexter And Wolterbeek Were Properly Trained And Supervised By Chief Beaupre And The City Of Biddeford, And The Plaintiff Has Otherwise Failed To Support Their Monell Claims

The Monell claim against Chief Beaupre and the City of Biddeford fails at the outset for the fact that neither Officer Dexter nor Officer Wolterbeek engaged in an underlying constitutional violation.

The Monell claim also fails because the record has revealed that the officers of the Biddeford Police Department, including Officers Dexter and Wolterbeek, were properly trained and supervised.  The officers received specific training prior to the incident on dealing with emotionally disturbed individuals.  They were taught key strategies in dealing with emotionally disturbed individuals in these trainings.  The officers received trainings on how to handle landlord-tenant disputes.  The Biddeford Police Department had policies and procedures in place directing officers in the performance of their duties to ensure proper training regarding the proper handling of such situations.  There is nothing in the record which would indicate that the City of Biddeford or Chief Beaupre established a policy or custom which caused the Plaintiffs' injuries.  Wherefore, Chief Beaupre and the City of Biddeford are entitled to summary judgment.

## V.    CONCLUSION

WHEREFORE, the Defendants, the City of Biddeford, Roger Beaupre, and Edward

Dexter, most respectfully request that this Honorable Court grant them summary judgment on all

remaining counts of the Johnson Complaint and the Welch Complaint.

Respectfully submitted,
Defendants, City of Biddeford, Roger P.
Beaupre, and Edward Dexter,
By their attorneys,


 /s/ Joseph A. Padolsky
Douglas I. Louison (BBO# 008288)
dlouison@lccplaw.com
Joseph A. Padolsky (BBO# 006251)
jpadolsky@lccplaw.com
Louison, Costello, Condon & Pfaff, LLP
Ten Post Office Square, Suite 1330
Boston, MA 02109
(617) 439-0305

Dated: April 25, 2022

### CERTIFICATE OF SERVICE

I, hereby certify that this document filed through the ECF system will be sent electronically
to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper
copies will be sent to those indicated as non-registered participants as listed below:

/s/ Joseph A. Padolsky
Joseph A. Padolsky

Dated: April 25, 2022

### CERTIFICATION PURSUANT TO LOCAL RULE 7.1

Undersigned counsel hereby certifies pursuant to Local Rule 7.1(A)(2) that counsel
conferred in good faith with counsel for the plaintiff in an effort to resolve and/or narrow
the issues related to the above captioned motion.

/s/ Joseph A. Padolsky
Joseph A. Padolsky

Dated: April 25, 2022