## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| SUSAN JOHNSON, individually and on behalf of her minor son B.L., and on behalf of Derrick Thompson, deceased; and JOCELYNE WELCH, as personal representative of the Estate of Alivia Welch, | ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | 2:17-cv-00264-JDL |
| CITY OF BIDDEFORD, et al., | ) ) | |
| Defendants. | ) | |

## ORDER ON DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT

This case returns to the District Court after a remand from the United States Court of Appeals for the First Circuit entered on August 27, 2021 (ECF Nos. 101, 102), and the subsequent filing of a Renewed Motion for Summary Judgment by the remaining Defendants, the City of Biddeford, Biddeford Police Chief Roger P. Beaupre, and Biddeford Police Officer Edward Dexter (ECF No. 113).

## I. INTRODUCTION

On December 29, 2012, James Pak, a landlord in Biddeford, argued with his tenants, Susan Johnson and her son Derrick Thompson, as well as Thompson's girlfriend, Alivia Welch, about the number of cars that they were allowed to park in the property's driveway. The argument escalated: Pak made threats and Thompson, at his mother's request, called 9-1-1. Biddeford Police Officer Edward Dexter arrived

1

on the scene, and he spoke with Johnson, Thompson, and Welch (collectively, "the tenants"[1]). He then spoke separately with Pak[2] and Pak's wife Armit Pak in their residence, and Pak made a number of violent threats against the tenants during his conversation with Officer Dexter. Officer Dexter then met again with the tenants in their apartment attached to the Paks' residence. Officer Dexter explained to the tenants that there was not much he could do about the parking situation because it was a "civil issue" and he advised them to use caution. ECF No. 78 at 24, ¶ 47. Minutes after Officer Dexter left the scene, Pak entered the tenants' apartment and shot Johnson, Thompson, and Welch. The attack killed Thompson and Welch and seriously wounded Johnson. Pak was arrested and ultimately pleaded guilty to two counts of homicide.

Johnson, on her own behalf and that of her minor son, B.L., and as personal representative of the Estate of Derrick Thompson, and Jocelyne Welch, as personal representative of the Estate of Alivia Welch (collectively, "the Plaintiffs"), bring this action[3] against the Defendants, including Officer Dexter, the City of Biddeford, and Police Chief Roger P. Beaupre. The Plaintiffs bring claims under 42 U.S.C.A. § 1983 (West 2022) and the Maine Civil Rights Act, 5 M.R.S.A. § 4682(1-A) (West 2022). In their Complaints, the Plaintiffs allege that Officer Dexter violated the tenants'

---

[1] All references in this Order to "the tenants" refer to Susan Johnson, Derrick Thompson, and Alivia Welch, although Alivia Welch appears to have been a guest at the apartment and not a tenant.

[2] All references to "Pak" in this Order refer to James Pak individually, and not also to his wife Armit Pak.

[3] Welch and Johnson originally brought their claims separately, but the cases were ordered consolidated on November 21, 2018.

Fourteenth Amendment substantive due process rights and request that he be held liable in both his individual and official capacities. The Plaintiffs further allege that the City of Biddeford should be held liable for the violation of the tenants' substantive due process rights under the doctrine established by *Monell v. Department of Social Services*, 436 U.S. 658 (1978), and that Police Chief Roger P. Beaupre should be held liable in his individual and official capacities.[4]

## II.  PROCEDURAL HISTORY

The Defendants first moved for summary judgment in June 2019 (ECF No. 66), contending, among other things, that there were no genuine disputes of material fact as to whether they could be held liable for the injuries caused by Pak because the Plaintiffs had failed to show that their rights had been violated under the state-created danger doctrine. After a hearing, I issued an Order granting the Defendants' Motion for Summary Judgment (ECF No. 88). *See Johnson v. City of Biddeford*, 454 F. Supp. 3d 75, 95 (D. Me. 2020). The Plaintiffs appealed to the First Circuit (ECF Nos. 90, 95), which, with one Judge dissenting, affirmed the judgment in part and vacated and remanded the judgment in part (ECF Nos. 101, 102). *See Welch v. City of Biddeford Police Dep't*, 12 F.4th 70, 72 (1st Cir. 2021). Specifically, the First Circuit vacated and remanded the grant of summary judgment as to the section 1983 and Maine Civil Rights Act claims against Officer Dexter in his individual and official capacities, the claims against Chief Beaupre in his individual and official capacities,

---

[4]  The Plaintiffs originally brought other claims in this case, including claims against other Defendants such as Officer Jacob Wolterbeek. These claims were resolved by my Order on the Defendants' Motion to Dismiss (ECF No. 33) and my Order on the Defendants' Motion for Summary Judgment (ECF No. 88), and they were not remanded by the First Circuit.

and the *Monell* claims against the City of Biddeford.  *Id.* at 77-78.  The First Circuit affirmed the grant of summary judgment in all other respects, including the grant of summary judgment with respect to Officer Jacob Wolterbeek.  *Id.* at 78.

In its decision, the First Circuit noted that my order granting summary judgment preceded the First Circuit's decision in *Irish v. Fowler* ("*Irish II*"), 979 F.3d 65 (1st Cir. 2020), which laid out the elements that a plaintiff must prove in order for government defendants to be held liable under the state-created danger doctrine for having increased the danger of third-party violence.  *Welch*, 12 F.4th at 76.  The First Circuit identified several factors, drawn from *Irish II*, that would be relevant to the state-created danger analysis in this case, but it did not reach the merits of the Plaintiffs' argument that Officer Dexter violated the tenants' substantive due process rights.  *Id.* at 76-77.  The Court indicated that I "should address on remand whether Officer Dexter is entitled to qualified immunity and may choose to address the second step of the qualified immunity inquiry before addressing whether Officer Dexter violated the plaintiffs' substantive due process rights under the state-created danger doctrine."  *Id.* at 77.

After remand, the remaining Defendants filed a Renewed Motion for Summary Judgment (ECF No. 113), supported by a separate memorandum of law (ECF No. 114).  The Plaintiffs filed a Response in Opposition (ECF No. 118), and the Defendants filed a Reply (ECF No. 119).  The Plaintiffs also filed an Addendum to their Additional Statements of Material Facts (ECF No. 108), to which the Defendants replied (ECF No. 109).

Two hearings were held on the Renewed Motion for Summary Judgment, with

the first being held on July 27, 2022 (ECF No. 121).  Following that hearing, I directed the parties to submit additional memoranda addressing decisions from outside the First Circuit "that demonstrate whether it was clearly established in December 2012 that the state-created danger doctrine applied to claims based on an officer's decision to withdraw from a situation in which serious threats of violence had been made by a third-party, without taking effective action to protect or warn the targets of those threats."  ECF No. 122 at 2.  In late summer and fall of 2022, the parties submitted the requested memoranda (ECF Nos. 123, 127, 130).

The second hearing was held on October 21, 2022 (ECF No. 131).  Because the parties' Statements of Material Facts did not capture all of the relevant conversations recorded by the WatchGuard recording system on Officer Dexter's person, I directed the parties to submit an agreed-to transcript of the audio recordings of the events of December 29, 2012.  On December 12, 2022, the parties submitted the transcript (ECF No. 134), which they agree is, in almost all respects, an accurate transcription.[5] *See* ECF No. 134 at 1.

For the reasons that follow, I grant the Defendants' Renewed Motion for Summary Judgment.

---

[5] The cover memo to the transcript notes that there are two points on which the parties disagree about the accuracy of the transcript (ECF No. 134).  Neither point of disagreement is material to my decision.  In paragraph 5 of the cover memo, the Plaintiffs contend that the transcript at several points identifies the person who was speaking as Alivia Welch when the speaker was actually Susan Johnson. The Defendants take no position on this issue.  On this point, I agree with the Plaintiffs and, in light of the fact that the Defendants take no position on the subject, I will treat Susan Johnson as having spoken the identified lines.  In paragraph 6, the parties disagree about whether a word in the transcript should have been identified as unintelligible.  Because the parties dispute the accuracy of the transcript, I do not consider the transcript's representation as to that particular word or words and will instead rely on the audio recording, as agreed by the parties.  Two other, more substantive, points of disagreement came to light during my review of the transcript, and I heard from the parties on these points.  These points are addressed in footnotes 7 and 10, *infra*.

## III.  FACTUAL BACKGROUND

At the summary judgment stage, the facts are viewed in the light most favorable to the Plaintiffs as the non-moving party.  *See Bienkowski v. Ne. Univ.*, 285 F.3d 138, 140 (1st Cir. 2002).  I previously set forth the relevant facts in my original order granting summary judgment.[6]  *See Johnson*, 454 F. Supp. 3d at 81-83.  I revisit those facts here because the Plaintiffs have filed an Addendum to their Statement of Additional Material Facts since the remand.  The following facts are primarily drawn from the parties' original Statements of Material Facts and responses thereto (ECF Nos. 68, 78, 84), the Plaintiffs' Addendum to their Additional Statements of Material Facts (ECF Nos. 108), and the Defendants' Response to the Addendum (ECF No. 109).  Some facts are also drawn from the agreed-to portions of the transcript (ECF No. 134).  However, the parties disagree as to the accuracy of several portions of the transcript, *see supra* n.5, and they agree that the transcript does not constitute evidence in this case.  I therefore disregard the disputed portions of the transcript and rely only on the portions to which the parties have agreed.

### A.    The Events of December 29, 2012

Susan Johnson and Derrick Thompson leased an apartment in Biddeford from the Paks.  The apartment was attached to the Paks' residence, and the entryways to the two units were close to one another.  On the evening of December 29, 2012, Thompson was outside shoveling snow when Pak appeared and began arguing with him about the number of cars that the tenants were permitted to park in the driveway

---

[6]  The First Circuit remanded solely on the basis of legal error under *Irish II* and did not disturb any of the factual findings in my previous order.  *See Welch*, 12 F.4th at 77.

of the property.  After Pak made threatening hand gestures in the shape of a gun and said "Bang," Johnson, who had videotaped a portion of the argument on her smart phone, directed Thompson to call the police.  Thompson called 9-1-1 and told the dispatcher that his landlord was "freaking out" on him, making death threats, and had made gestures toward him in the shape of a gun.  ECF No. 78 at 3, ¶ 7.  After Thompson made the call, Thompson, Johnson, and Alivia Welch waited inside the apartment for the police to arrive.

Biddeford Police Officer Edward Dexter responded to the call.  He was equipped with an operating WatchGuard recording system on his person.  Officer Dexter spoke first with Johnson, Thompson, and Welch in their apartment. Thompson told Officer Dexter that Pak had started screaming at him about the number of cars parked in the driveway while Thompson had been shoveling snow and that Pak had told Thompson to hit him.  Thompson and Johnson explained that Pak frequently behaved in an angry manner, including following Thompson around in the driveway while harassing him and yelling at him.  Johnson stated that there was "something wrong" with Pak.  ECF No. 134-1 at 5:20-21.  Officer Dexter viewed the video footage Johnson had taken on her smart phone of Pak arguing with Thompson in which Pak was agitated, had grabbed his own crotch, and made sexual comments about Thompson.  Thompson and Johnson also described how Pak had threatened them by pointing his fingers at them in the shape of a gun and saying "Bang" and by telling Thompson that Thompson should hit him so that Pak could "bury [Thompson] in the snow."  ECF No. 134-1 at 10:7. Johnson and Thompson told Officer Dexter that

Johnson's other son, six-year-old B.L., was in a back room in the apartment and they were trying to "keep [him] away from this."  ECF No. 134-1 at 13:11-12.

Thompson explained that he had had this kind of conflict with Pak before, although Johnson said that she had not because she was rarely home.  Thompson agreed with Officer Dexter when Officer Dexter suggested that Pak had "a beef" with Thompson.  ECF No. 134-1 at 16:14-16.  Officer Dexter then asked Thompson whether he had "actually fe[lt] threatened" by Pak at any time.  ECF No. 78 at 10, ¶ 27.  With Officer Dexter speaking over him, Thompson responded, "Not that—well, not really I mean."  ECF No. 78 at 10, ¶ 27.  Still speaking over Thompson, Officer Dexter asked if Thompson instead felt "obviously more harassed," and Thompson said that he did.  ECF No. 78 at 10, ¶ 27.  Thompson, Johnson, and Welch then told Officer Dexter about Pak's frequent rages and their dispute with Pak about the number of cars that could be parked in the driveway.  Officer Dexter told them that their dispute with Pak about the cars was a "civil issue," but that Pak was "obviously not [allowed] to cause harassment, threaten, et cetera."  ECF No. 78 at 12, ¶ 29.  The tenants also explained that the issue might be that Pak's wife, Armit, was not home, and that she would always speak to them and apologize when her husband was angry.  Officer Dexter suggested staying away from Pak, taking videos of future confrontations, and disengaging when those confrontations arose.

Officer Dexter asked Thompson, Johnson, and Welch if they had any questions, and they responded that they did not.  He then told them that he was going to speak with the Paks and would come back afterwards.

Officer Dexter then went to the Paks' residence and spoke with Pak and his wife, Armit.  Armit told Officer Dexter that her husband was angry with Thompson and Johnson because they had broken their lease by, among other things, having an additional car in the driveway, which made it difficult for Pak to remove snow.  She also told Officer Dexter that she and Pak had served an eviction notice on the tenants.  Officer Dexter asked if the Paks were "familiar with the whole eviction process."  ECF No. 78 at 17, ¶ 41.  Armit responded that they were learning about it, and Officer Dexter responded, "Ok.  That's a civil issue between you guys . . . and there's nothing that we can do about that."  ECF No. 78 at 17-18, ¶ 41.  Armit stated that she knew that.  Officer Dexter then brought up Pak's earlier altercation with the tenants, and Armit responded that the issues with the tenants were "frustrating."  ECF No. 78 at 18, ¶ 41.  Officer Dexter said that he understood that, particularly because the Paks just wanted to remove snow from the yard.

Pak entered the conversation, and he told Officer Dexter that Thompson had given him the finger and that, in response, Pak had told Thompson that he would shoot him.  Pak also complained that Thompson had acted rudely, and he stated that he had told Thompson that he had a gun.  Officer Dexter told Pak that he understood that Pak was upset that Thompson had acted disrespectfully, but that even if Thompson had been rude and disrespectful, Pak could not threaten to shoot or hurt Thompson.[7]  Officer Dexter then said that Pak could not say those things and that

---

[7] The parties dispute what precisely Pak said after this comment.  Paragraph 42 of the Defendants' Statement of Material Facts states that Pak said, "I'm not going [to] shoot him."  ECF No. 68 at 12, ¶ 42.  The Plaintiffs admitted this fact.  As noted above, I later ordered that a transcript of Officer Dexter's WatchGuard recording be created (ECF No. 131).  The parties submitted the transcript, which

Pak's behavior could constitute criminal threatening. Pak then stated that he would like to "shoot" and "smack" Thompson. ECF No. 134-1 at 32:14-15. Officer Dexter told Pak that he could not threaten his tenants, that he should just "turn around and come inside," and that he needed to go through the civil process of evicting Thompson and Johnson, which would be "difficult" and would require patience. ECF No. 134-1 at 32:17-18, 23.

Pak again brought up the issue of the number of cars that could be parked in the driveway, and Officer Dexter told him that that was a "civil issue between you and them with your . . . lease agreement." ECF No. 134-1 at 33:9-11. Pak then reiterated that the tenants were only entitled to two cars, and he asked Officer Dexter whether the fact that Officer Dexter said that it was a civil issue meant that the tenants have the "right to any car they want?" ECF No. 78 at 19, ¶ 43. Officer Dexter explained again that the lease was a civil agreement between the Paks and the tenants and that although he understood Pak's side of the story, "the bottom line is

---

they agree does not constitute evidence (ECF No. 134). The transcript represents that Pak's response was "I'd like to shoot him." ECF No. 134-1 at 31:17-18. After this issue was brought to the attention of the parties (ECF Nos. 136, 138), the Plaintiffs moved to amend their response (ECF No. 140) to paragraph 42 of the Defendants' Statement of Material Facts to deny that Pak said, "I'm not going [to] shoot him." The Defendants opposed this motion (ECF No. 141). I granted the Plaintiffs' motion and permitted them to amend their response to paragraph 42 (ECF No. 143). Accordingly, there is a genuine dispute of fact as to what Pak then said. If a disputed fact is material, summary judgment will be denied. *See Theriault v. Genesis HealthCare LLC*, 890 F.3d 342, 348 (1st Cir. 2018) ("A swing of the summary judgment axe can be averted if the nonmoving party adduces competent evidence demonstrating the existence of a genuine dispute about a material fact."). I conclude, however, that the resolution of this disputed statement made by Pak is not material because regardless of how the dispute as to Pak's words is resolved, it does not alter the outcome. *See United States v. P.R. Indus. Dev. Co.*, 18 F.4th 370, 377 (1st Cir. 2021) ("A fact is material if 'it possesses the capacity, if determined as the nonmovant wishes, to alter the outcome of the lawsuit under the applicable legal tenets.'" (quoting *Finamore v. Miglionico*, 15 F.4th 52, 58 (1st Cir. 2021))); *Feliciano-Muñoz v. Rebarber-Ocasio*, 970 F.3d 53, 62 (1st Cir. 2020) ("[A] fact is 'material' if it 'has the potential of affecting the outcome of the case.'" (quoting *Xiaoyan Tang v. Citizens Bank, N.A.*, 821 F.3d 205, 215 (1st Cir. 2016))).

that [Pak] cannot threaten" his tenants and instead had to resolve the dispute "through the courts."  ECF No. 78 at 20, ¶ 43.

Pak then said that he couldn't "believe [this was] happening."  ECF No. 134-1 at 35:11-12.  Officer Dexter again acknowledged that he understood that the situation was frustrating.  Pak then told Officer Dexter, "I got news though.  I'm glad that you say that I don't have any right[s].  They got right[s]."  ECF No. 134-1 at 36:17-19.  Officer Dexter said that that was the "downside of being a landlord in this state," that he knew it was "very frustrating," that he felt "sorry for [Pak] as a landlord because of the frustration," and that he "[did not] have a good answer" for Pak.  ECF No. 134-1 at 36:20-37:3.  Pak then discussed removing the tenants' furniture, and Officer Dexter told him that Pak could be charged with criminal mischief if he damaged the tenants' items.  Pak asked whether he had "any right[s]," and Officer Dexter said that Pak would have to go through the eviction process.  ECF No. 134-1 at 37:3.  Pak continued to complain about the number of cars, and Officer Dexter said, "I can't do a thing about it."  ECF No. 134-1 at 38:10-11.  Officer Dexter also suggested that Pak avoid his tenants for the rest of the night and avoid speaking with them.  Officer Dexter then told Pak, "It's frustrating[,] I understand that and that's the downside of being a landlord here.  I wish I could give you more . . . of a guidance or anything but once you enter into a lease agreement it all becomes a civil issue so you have to go through the eviction process if that's what you want to do."  ECF No. 78 at 21, ¶ 44.

Pak then told Officer Dexter, "I ain't got nothing to lose.  I came from orphanage . . . ."  ECF No. 78 at 21, ¶ 44.  Officer Dexter responded by telling Pak that he had a "lot to lose," including his house, his wife, his dog, and his vehicles.

ECF No. 78 at 22, ¶ 44.  After Pak again said that he had "nothing to lose," Officer Dexter reminded him that he did have a lot to lose, and that Pak should not let the tenant issues get to him.  ECF No. 78 at 22, ¶ 44.

Pak then told Officer Dexter that Thompson had "called [Pak] jap[,] he called me names and now I just don't, I don't have any rights?"  ECF No. 78 at 22, ¶ 45. Armit told Pak that he had to "stop it."  ECF No. 78 at 22, ¶ 45.  Officer Dexter again expressed that he understood how "frustrating" the situation was for the Paks and that he wished that he had "more [r]esponses" for them.  ECF No. 78 at 22-23, ¶ 45. Pak then told Officer Dexter, "You're going to see me in the newspaper."  ECF No. 78 at 23, ¶ 45.  Officer Dexter responded that he did not want to see Pak in the newspaper.  Pak then reiterated that Officer Dexter would see him in the newspaper and that he had nothing to lose.  He then said to his wife, "I'm not going to tell you in front of Officer . . . Dexter."  ECF No. 134-1 at 41:21-25.  Officer Dexter simply responded, "Don't."  ECF No. 134-1 at 42:1.  Pak told Officer Dexter that he had had enough and that the tenants owned him, and Officer Dexter responded that they did not own him.

Pak asked Officer Dexter to tell the tenants that they had to move one of the cars, but Officer Dexter explained that it was a civil issue, so the police "can't tell them that."  ECF No. 134-1 at 42:17-18.  Pak continued to complain about the tenants' rudeness and that they slept all day and Officer Dexter twice said, "I can't do anything about that."  ECF No. 134-1 at 42:22-23.

Pak continued to express his anger, and Officer Dexter told Pak to keep away from his tenants.  Pak responded, "[n]o, no, no," and again referenced the fact that he

came from an orphanage, as well as "thousands of dead people."  ECF No. 134-1 at 43:11-15.  Pak then told Officer Dexter that Officer Dexter was letting the tenants "go free."  ECF No. 134-1 at 43:20.  Officer Dexter responded that he was not doing that, and then told Pak that he was leaving and that Pak should keep his distance from the tenants.  Pak again brought up the car issue and asked whether Officer Dexter could do anything about it.  Officer Dexter responded, "I'm sorry.  I can't do more . . . ."  ECF No. 134-1 at 44:17-18.  Pak told him that he didn't have to be sorry, and that Pak hoped that Officer Dexter would "sleep tight."  ECF No. 134-1 at 44:20.

Toward the end of the conversation, Pak said that he was going to go see the tenants.  Officer Dexter told him to instead keep his distance, and Pak responded that Officer Dexter didn't "have to worry about that."  ECF No. 78 at 23, ¶ 46.  Officer Dexter then reiterated that Pak should keep his distance from his tenants and that he would tell the tenants to keep their distance from him.  Near the end of the conversation, Pak said that there was going to be a "bloody mess" and he also said "God help you.  Looks like we'll see.  There gonna be big name tomorrow."[8]  ECF No. 134-1 at 43:7-9; ECF No. 84 at 8, ¶ 19.

---

[8] The summary judgment record is unclear as to the precise point at which these statements were made.  In their Statement of Material Facts, the Defendants originally said that the "final words" in the conversation consisted of Pak telling Officer Dexter that he didn't "have to worry about that."  ECF No. 68 at 14, ¶ 46.  The Plaintiffs admitted this fact.  But in their Statement of Additional Material Facts, the Plaintiffs averred that "At the end of Officer Dexter's exchange with James Pak, Officer Dexter told Pak that he couldn't help him, it was a civil issue.  James Pak said that there would be a big name tomorrow and that it would be a bloody mess."  ECF No. 78 at 43, ¶ 19.  The Defendants qualified this statement, noting that the "last thing James Pak told Officer Dexter before Dexter left the apartment was that he did not need to worry about him."  ECF No. 84 at 8, ¶ 19.  Additionally, the transcript indicates that the statements were made near the end of the conversation.  For the purposes of summary judgment, I treat it as admitted that these comments were made near the end of the conversation, but not that they were the last words that Pak said to Officer Dexter.

Pak was angry, agitated, and incoherent at various points during his interaction with Officer Dexter. Officer Dexter did not arrest Pak, nor did he ask Pak whether Pak had access to a firearm or whether Pak had been drinking alcohol.[9]

Officer Dexter returned to the tenants' apartment and discussed the situation with Johnson, Thompson, and Welch. Officer Dexter told them to keep their distance from Pak, and he also told them that Pak's wife was in the residence. Officer Dexter then said:

> I explained to them that this is a civil issue. He's obviously extremely upset about the second car and whatnot. Ok? Use caution. You're out there shoveling, he comes out, come inside. I think at this point in time trying to get him to understand what's happening and the issues of civil issue between you guys . . . is gonna be hard pressed and you guys are gonna have more than one conflict unfortunately.

ECF No. 78 at 24, ¶ 47. When Johnson told Officer Dexter that Pak doesn't listen or understand, Officer Dexter said, "there's not much I can do about it because it is a civil issue." ECF No. 78 at 24, ¶ 47. He also told Johnson:

> So whether you guys are going through the eviction process, the lease disagreement, whatever process that you guys are going through I can't do much about that. . . . But, I can do things about the harassment[,] et cetera[, and] the threatening.

---

[9] In their Addendum to their Additional Statements of Material Facts, the Plaintiffs assert that (1) "[o]n the night of December 29, 2012, Pak felt emboldened to immediately carry out his threat when Officer Dexter left right after Pak verbalized his threat"; and (2) "[o]n the night of December 29, 2012, Pak felt encouraged to act on his threats based on Officer Dexter confirming his belief that he had no rights and had to take matters into his own hands." ECF No. 108 at 3, ¶¶ 44-45. Defendants deny these statements of fact and object because neither statement is supported by a citation to admissible evidence. I agree with the Defendants and disregard these statements of fact because they are not supported by specific citations to the record as required by District of Maine Local Rule 56. *See* D. Me. Loc. R. 56(f) ("The court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment. The Court shall have no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of facts."); *see also Lennan v. Healthcare Servs. Grp., Inc.*, 2:20-cv-00057-GZS, 2022 WL 504113, at *1 & n.2 (D. Me. Feb. 17, 2022).

ECF No. 78 at 24-25, ¶ 47.  Johnson then asked whether Officer Dexter was going back to the Paks' residence, and Officer Dexter responded that he was done talking with the Paks.  Johnson then told Officer Dexter that Pak often peered into their windows, and Officer Dexter advised her to use shades to block Pak's view.  Officer Dexter said, "I wish I had a better answer for you."  ECF No. 134-1 at 47:19-20.

Officer Dexter then said, "I advised [Pak] he can't harass you, he can't threaten you.  Whether it was successful or not I don't know."  ECF No. 78 at 25, ¶ 48.  Thompson responded that they would find out soon enough, and Officer Dexter again told him and the others to keep their distance from Pak.  Officer Dexter and the tenants discussed Pak's issues with the number of cars parked in the driveway, and Officer Dexter said that although the car issues were civil in nature, the tenants could call the police if there was damage to their vehicles because that could constitute criminal mischief.

Officer Dexter advised the tenants to stay in for the night, and Johnson asked Officer Dexter whether Pak had been acting calm during their conversation.[10]  Officer Dexter replied that "[c]alm is not the best word" and told Johnson that Pak's wife was with Pak in the residence.  ECF No. 78 at 26, ¶ 49.  He then said that Pak and his wife were "frustrated" and "hung up" on the car issue.  ECF No. 78 at 26, ¶ 49.  Johnson described some of the issues that she had had with the Paks, such as the fact

---

[10]  The Defendants' Statement of Material Facts states the question asked by Susan Johnson as "Was he acting calm while you were over there?"  ECF No. 68 at 16, ¶ 49.  The Plaintiffs admitted this fact.  The transcript, however, reported Johnson's question as "Was his wife calm when you went over there?"  ECF No. 134-1 at 49:14-15.  This is a notable difference, but because the parties both agreed to paragraph 49 of the Defendants' Statement of Material Facts and that the transcript does not constitute evidence, the Defendants' original framing of the question governs for purposes of summary judgment.

that they wanted her to attend mandatory meetings with them, and Officer Dexter just told her, "I can't."  ECF No. 134-1 at 50:24.  Officer Dexter then said goodbye to the tenants and left the apartment and the residence.

A few minutes after Officer Dexter left the premises in his cruiser, Pak walked into the tenants' apartment, took out a gun, and shot Johnson, Thompson, and Welch. Four minutes after Officer Dexter's departure, 9-1-1 dispatch received a call about a shooting at the tenants' apartment.  Officer Dexter was the first law enforcement officer to respond to the call and arrived at the scene one minute later.  After backup arrived, Officer Dexter entered the apartment and found Thompson and Welch dead, and Johnson seriously injured.  Officer Dexter removed Johnson's minor son, B.L., who had not been shot, from the apartment.  Johnson was taken by ambulance to a hospital and she ultimately survived the shooting, but she suffered extensive injuries. Pak was arrested that same night.

## B.   Events After Pak's Arrest

Pak was interviewed the next day, December 30, 2012, by Maine State Police Detectives Corey Pike and Lauren Edstrom.[11]  In the interview, Pak spoke at length in a rambling and confused manner that is, at times, hard to understand.[12]  Among

---

[11]  In their Addendum to their Additional Statements of Material Facts, the Plaintiffs state that the interview with Detectives Pike and Edstrom occurred on December 30, 2019.  The Defendants admitted this fact.  This appears to be a typographical error.  According to an audio recording of the interview, the interview occurred on December 30, 2012—just hours after the shootings.  Pak was interviewed again by Detective Pike on December 31, 2012.  However, no further details about this interview are included in the parties' Statements of Material Facts.

[12]  In their Addendum to their Additional Statements of Material Facts, the Plaintiffs assert that Pak told his cellmate at the Cumberland County Jail that, regarding his conflict with his tenants, he "took care of it himself" because the police did nothing to help him.  ECF No. 108 at 3, ¶ 42.  The Defendants deny this statement, and they object to the statement on the grounds that it contains inadmissible

many other things, Pak said that (1) he felt that Officer Dexter was "wrong" and that Dexter had told Pak that the tenants "were protected 'by the constitution or some shit,'" ECF No. 109 at 3, ¶ 34; (2) he had told Officer Dexter that "there would be a bloody mess," ECF No. 109 at 3, ¶ 33; (3) he felt that Officer Dexter protected the tenants and not him; and (4) he felt that he had no rights and that Officer Dexter had said that the tenants had more rights than he did as a landlord.[13]

Pak eventually pleaded guilty to two counts of homicide and was sentenced to life in prison.

## C.   Police Procedures and Training

In 2012, the Biddeford Police Department had a number of standard operating procedures in effect.  The most pertinent[14] is General Order 136-96, which sets out the Police Department's policy for handling deviant behavior.  The General Order

---

hearsay.  *See* D. Me. Loc. R. 56(e).  Because the statement was made by an out-of-court declarant, James Pak, is being offered for the truth of the matter asserted, *see* Fed. R. Evid. 801, and falls within no exceptions or exclusions to the hearsay rule, *see* Fed. R. Evid. 802, I grant their objection and do not consider the statement at the summary judgment stage.  *See Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990) ("Hearsay evidence, inadmissible at trial, cannot be considered on a motion for summary judgment.").  Because this statement is largely duplicative of other record evidence, even if it were deemed admissible evidence, it would not affect my ultimate conclusions.

[13]  The Defendants "qualifiedly den[y]" some of the assertions that the Plaintiffs make about the interview with Pak in their Addendum to their Additional Statements of Material Facts, including paragraphs 33, 36, 39, and 40.  However, I deem these facts admitted because Local Rule 56 only permits parties to admit, deny, or qualify statements of fact—not to "qualifiedly den[y]" them.  D. Me. Loc. R. 56(c).  In any event, the citations provided by the Defendants to support their qualified denials do not properly controvert the Plaintiffs' statements.  The Defendants only provide broader excerpts of the interview with Pak that do, in fact, contain the statements referred to by the Plaintiffs.

[14]  Throughout this litigation, the Plaintiffs and Defendants have cited to a number of other Biddeford Police Department Standard Operating Procedures, including General Order No. 129 and General Order No. 02-01.  The parties have focused their arguments on General Order 136-96, likely because the other policies contain irrelevant or overly general provisions, such as the requirements in Standard Operating Procedure General Order No. 02-01 that police officers take appropriate action to "protect life and property," "preserve the peace," "prevent crime," and "detect and arrest violators of the law."  ECF No. 69 at 418.  Like the parties, I focus my analysis on General Order 136-96, which provides specific guidance and bears most heavily on the issues before me.

expressly provides, "It shall be the policy of the Biddeford Police Department to assist persons who are exhibiting symptoms of deviant behavior and appear to represent an imminent danger to themselves or to someone else." ECF No. 69 at 411. The order accordingly empowers officers to use their discretion to take into custody people exhibiting deviant behavior who represent an imminent and substantial danger to themselves or others, so long as probable cause is present. Additionally, Officer Dexter had received training about how to deal with emotionally disturbed individuals and training on handling landlord/tenant disputes, but, as the First Circuit noted in *Welch*, 12 F.4th at 76, the summary judgment record contains scant information about the content, frequency, or extent of that training.[15]

## IV.  LEGAL ANALYSIS

Summary judgment is granted when the moving party shows that "there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if "its existence or nonexistence has the potential to change the outcome of the suit." *Rando v. Leonard*, 826 F.3d 553, 556 (1st Cir. 2016) (quoting *Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 5 (1st Cir. 2010)). "An issue is 'genuine' if the evidence of record permits a rational factfinder to resolve it in favor of either party . . . ." *Id.* (quoting *Borges*, 605 F.3d at 4). The facts in the record are construed in the light most favorable to

---

[15]  In *Welch*, the First Circuit suggested that the parties could supplement the record with additional evidence as to police standards and training, particularly in the context of landlord/tenant disputes. 12 F.4th at 76. Despite this invitation, the parties did not supplement the record with details about any additional training or standards not previously referenced in the case.

the nonmoving party, and all reasonable inferences are drawn in favor of the nonmoving party. *See Braga v. Genlyte Grp., Inc.*, 420 F.3d 35, 38 (1st Cir. 2005).

I proceed by addressing, in turn, (A) the Plaintiffs' claim under section 1983 that Officer Dexter violated the tenants' substantive due process rights and that he can be held liable in his individual capacity; (B) the Plaintiffs' claims that Chief Beaupre and the City of Biddeford can be held liable for Officer Dexter's alleged constitutional violations, and that Officer Dexter can be held liable in his official capacity; and (C) Welch's claim that she is entitled to relief under the Maine Civil Rights Act, 5 M.R.S.A. § 4682(1-A), for violations of the U.S. Constitution and the Maine Constitution.

## A.   Section 1983 Claim Against Officer Dexter

I first consider whether the Defendants are entitled to summary judgment on the Plaintiffs' claim, brought under 42 U.S.C.A. § 1983, that Officer Dexter should be held liable in his individual capacity because he deprived the tenants of their Fourteenth Amendment substantive due process rights by enhancing the danger that Pak posed toward them, resulting in harm to them.[16]   The Defendants argue that they are entitled to summary judgment based on qualified immunity because (1) Officer Dexter did not violate the tenants' substantive due process rights and (2) the

---

[16]   In the sections of their Complaints detailing the alleged section 1983 violation, the Plaintiffs also contend that the tenants' rights under the Maine Constitution were violated by Officer Dexter and the other Defendants.  However, section 1983 provides a right of action only for violations of the United States Constitution—not state constitutions.  Thus, the Plaintiffs' state constitutional claims are not properly presented as section 1983 violations. *See Grenier v. Kennebec Cnty.*, 748 F. Supp. 908, 913 (D. Me. 1990) ("Section 1983 does not make available to Grenier a federal private right of action to seek relief from violations either of Maine's constitution or any of Maine's statutes.  Section 1983 claims are valid only against officials who, acting under state law, violate either the federal Constitution or federal statutes."); *Ahern v. O'Donnell*, 109 F.3d 809, 815 (1st Cir. 1997) ("By the terms of the statute itself, a section 1983 claim must be based upon a *federal* right.").

19

unlawfulness of Officer Dexter's conduct was not clearly established in 2012 when the shootings occurred.  In response, the Plaintiffs argue that summary judgment is not appropriate because (1) there is a genuine dispute of material fact as to whether the Defendants violated the tenants' substantive due process rights under the state-created danger doctrine, and (2) the applicability of that doctrine to the facts of this case was apparent at the time of the shootings in 2012.  Resolving the Defendants' Renewed Motion for Summary Judgment thus turns on whether Officer Dexter is entitled to qualified immunity.

"Qualified immunity is a doctrine that shields government officials performing discretionary functions from liability for civil damages 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Est. of Bennett v. Wainwright*, 548 F.3d 155, 167 (1st Cir. 2008) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "Government officials sued in their individual capacities are immune from damages claims unless '(1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time.'"  *Irish II*, 979 F.3d at 76 (quoting *Dist. of Columbia v. Wesby*, --- U.S. ---, 138 S. Ct. 577, 589 (2018)); *see also Cortés-Reyes v. Salas-Quintana*, 608 F.3d 41, 51 (1st Cir. 2010) ("The qualified immunity analysis has two parts.  A court must decide whether the facts shown by the plaintiff make out a violation of a constitutional right and whether the right was 'clearly established' at the time of the alleged violation by the defendant." (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009))).  I will address both prongs of the clearly established test, beginning with the first prong—whether the facts set out by the

parties show that the tenants' constitutional rights were violated.  At the summary judgment stage, a court resolves this prong by "look[ing] beyond the complaint to the broader summary judgment record." *Riverdale Mills Corp. v. Pimpare*, 392 F.3d 55, 62 (1st Cir. 2004); *see also id.* ("The first prong inquiry will usually gain specificity at th[e] summary judgment stage because of the ability to determine then whether [the] plaintiff's claim survives in light of all the uncontested facts and any contested facts looked at in the plaintiff's favor, rather than just the allegations that appear on the face of the complaint.").

### 1. Whether the Tenants' Substantive Due Process Rights Were Violated

The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.  "This guarantee has both substantive and procedural components.  The substantive due process guarantee functions to protect individuals from particularly offensive actions on the part of government officials, even when the government employs facially neutral procedures in carrying out those actions." *Pagán v. Calderón*, 448 F.3d 16, 32 (1st Cir. 2006).  "In order to establish a substantive due process claim, the plaintiff must first show a deprivation of a protected interest in life, liberty or property." *Rivera v. Rhode Island*, 402 F.3d 27, 33-34 (1st Cir. 2005).  "Second, the plaintiff must show that the deprivation of this protected right was caused by governmental conduct." *Id.* at 34.

### (a) Deprivation of a Protected Interest in Life, Liberty, or Property

As to the first requirement, the Plaintiffs have shown that the tenants were deprived of an interest protected by the Constitution. It is undisputed that the deprivation of life, as occurred here, is a violation of a constitutionally protected interest. *See Rivera*, 402 F.3d at 34; *Irish v. Fowler* ("*Irish II*"), 436 F. Supp. 3d 362, 413 (D. Me. 2020), *aff'd in part and rev'd in part*, 979 F.3d at 75. Additionally, personal harm, as was done to Susan Johnson, can also result in a violation of a constitutionally protected interest.[17] *See Irish II*, 436 F. Supp. 3d at 413. The difficulty arises with the second requirement of the substantive due process analysis because the violence that deprived the tenants of their constitutionally protected interests was committed by James Pak, a private individual, rather than by a government actor. *See Rivera*, 402 F.3d at 34; *Irish II*, 436 F. Supp. 3d at 413. Thus, whether the tenants' constitutional rights were violated turns on a difficult question: under what circumstances does the failure of a governmental actor, such as a police officer, to protect an individual from private violence violate the individual's constitutional rights.

### (b) Deprivation Caused by Government Conduct: The State-Created Danger Doctrine

The starting point for the analysis of whether a constitutional deprivation was caused by government conduct is the Supreme Court's decision in *DeShaney v.*

---

[17] The Plaintiffs, citing the dissenting opinion in a Law Court case, *Blackhouse v. Doe*, 2011 ME 86, ¶ 37, 24 A.3d 72, also argue that the tenants suffered a deprivation of their fundamental right to quiet enjoyment of their residence. As noted above, however, section 1983 does not provide a right of action for violations of the Maine Constitution, so I decline to address this argument.

*Winnebago County Department of Social Services*, 489 U.S. 189 (1989).  In *DeShaney*,
the Supreme Court recognized that, as a general matter, "a State's failure to protect
an individual against private violence simply does not constitute a violation of the
Due Process Clause."  *Id.* at 197.  Like this case, the facts of *DeShaney* are shocking
and tragic: Joshua DeShaney, a child, had been repeatedly abused by his father—a
fact that was brought to the attention of the Winnebago County Department of Social
Services.  *Id.* at 192.  The Department had several interactions with the child and his
father, and caseworkers observed injuries to the child and learned that he had been
hospitalized for injuries caused by suspected child abuse.  *Id.* at 192-93.  The
Department obtained a court order temporarily placing the child in the custody of the
hospital in which he was being treated for his injuries, but the child was ultimately
returned to his father.  *Id.* at 192.  Despite strong evidence of child abuse, the
Department did not remove the child from his father's custody, and his father
eventually severely and permanently injured him.  *Id.* at 193.

The child, through his mother, brought an action under section 1983, alleging
that the Department "had deprived [him] of his liberty without due process of law, in
violation of his rights under the Fourteenth Amendment, by failing to intervene to
protect him against a risk of violence at his father's hands of which they knew or
should have known."  *Id.*  The District Court granted summary judgment for the
Department, and the Seventh Circuit affirmed.  *Id.*  The Supreme Court agreed,
rejecting the mother's argument and concluding that "nothing in the language of the
Due Process Clause itself requires the State to protect the life, liberty, and property
of its citizens against invasion by private actors."  *Id.* at 195.  The Supreme Court

further concluded that the Due Process Clause "forbids the State itself to deprive individuals of life, liberty, or property without 'due process of law,' but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means." *Id.* In reaching this conclusion, the Supreme Court emphasized that although the Department might have been liable under principles of tort law, the Due Process Clause "does not transform every tort committed by a state actor into a constitutional violation." *Id.* at 202.

However, *DeShaney* also acknowledged that under certain circumstances, a State's failure to protect an individual from private violence can result in a constitutional violation. *Id.* at 198. One such circumstance is when there is a "special relationship" between the State and the individual.[18] *See id.* at 197-98. Additionally, and particularly relevant to this case, the Supreme Court further noted:

> While the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them. That the State once took temporary custody of Joshua does not alter the analysis, for when it returned him to his father's custody, it placed him in no worse position than that in which he would have been had it not acted at all . . . . Under these circumstances, the State had no constitutional duty to protect Joshua.

---

[18] Later cases have interpreted the "special relationship" discussed in *DeShaney* as being present, for example, when an individual is involuntarily committed to the custody of the State. *See Meléndez-García v. Sánchez*, 629 F.3d 25, 36 (1st Cir. 2010); *Vélez-Díaz v. Vega-Irizarry*, 421 F.3d 71, 79-80 (1st Cir. 2005). There has been no assertion that the "special relationship" exception to *DeShaney* applies in this case.

*Id.* at 201.  This language has been cited by those courts which have adopted the doctrine at issue in this case: the state-created danger doctrine.[19]  *See, e.g., Irish II*, 979 F.3d at 73; *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066 (6th Cir. 1998); *Kneipp v. Tedder*, 95 F.3d 1199, 1205 (3d Cir. 1996); *Wood v. Ostrander*, 879 F.2d 583, 590 (9th Cir. 1989).

The state-created danger doctrine has been recognized by a substantial majority of federal circuits.[20]  *Irish II*, 979 F.3d at 73.  Under this doctrine, "although the state's failure to protect an individual against private violence does not generally violate the guarantee of due process, it can where the state action 'affirmatively place[s] the plaintiff in a position of a danger,' that is, where state action creates or exposes an individual to a danger which he or she would not have otherwise faced."  *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061 (9th Cir. 2006) (alteration in

---

[19]  It is worth noting that the state-created danger theory was recognized or discussed by multiple federal circuits prior to *DeShaney*.  *See, e.g., Wells v. Walker*, 852 F.2d 368, 370 (8th Cir. 1988); *Escamilla v. City of Santa Ana*, 796 F.2d 266, 269 (9th Cir. 1986); *Bowers v. DeVito*, 686 F.2d 616, 618 (7th Cir. 1982).  In a memorable turn of phrase relied upon by other courts, the Seventh Circuit in *Bowers* noted:

> We do not want to pretend that the line between action and inaction, between inflicting and failing to prevent the infliction of harm is clearer than it is.  If the state puts a man in a position of danger from private persons then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit.

686 F.2d at 618; *see also Escamilla*, 796 F.2d at 269 (quoting *Bowers*, 686 F.2d at 618).

[20]  The Fifth and Eleventh Circuits have largely refused to recognize the state-created danger exception to the *DeShaney* rule.  *See Cook v. Hopkins*, 795 F. App'x 906, 914 (5th Cir. 2019); *Beltran v. City of El Paso*, 367 F.3d 299, 307 (5th Cir. 2004); *Vaughn v. City of Athens*, 176 F. App'x 974, 976 n.1 (11th Cir. 2006); *Waddell v. Hendry Cnty. Sheriff's Off.*, 329 F.3d 1300, 1305 (11th Cir. 2003); *White v. Lemacks*, 183 F.3d 1253, 1258 (11th Cir. 1999).  However, as the First Circuit noted in *Irish II*, 979 F.3d at 78 n.7, the Eleventh Circuit still allows for recovery in some circumstances involving state-created danger even though it no longer has a discrete state-created danger doctrine, and the Fifth Circuit "has not explicitly foreclosed the possibility that it might recognize the doctrine in the future."  *Irish II*, 979 F.3d at 78 n.7 (citing *Waddell*, 329 F.3d at 1305-06, and *Doe ex rel. Magee v. Covington Cnty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 865-66 (5th Cir. 2012) (en banc)).

original) (quoting *Wood*, 879 F.2d at 589-90).   Courts that have recognized the doctrine "require[] that the defendant's acts be highly culpable and go beyond mere negligence." *Irish II*, 979 F.3d at 74.

In *Irish II*, the First Circuit officially recognized the state-created danger doctrine and identified four elements that a plaintiff asserting a state-created danger claim must show.  *Id.* at 75.  Specifically, the Plaintiffs must demonstrate:

> (i) that a state actor or state actors affirmatively acted to create or enhance a danger to the plaintiff;
>
> (ii) that the act or acts created or enhanced a danger specific to the plaintiff and distinct from the danger to the general public;
>
> (iii) that the act or acts caused the plaintiff's harm; and
>
> (iv) that the state actor's conduct, when viewed in total, shocks the conscience.

*Id.*  I consider each element in turn.

### (i)  Affirmative Act that Created or Enhanced a Danger

The first element of a state created danger claim is proof that "a state actor's affirmative act 'created or enhanced' a danger to the plaintiffs." *Welch*, 12 F.4th at 76 (quoting *Irish II*, 979 F.3d at 75).  It is not required that the affirmative act be shown to have "greatly" enhanced the danger.   *Id.*   Rather, the plaintiff must demonstrate only that "a state actor or state actors affirmatively acted to create or enhance a danger to the plaintiff." *Irish II*, 979 F.3d at 75; *Welch*, 12 F.4th at 76. "[T]he absence of an affirmative act by the state in creating the danger is fatal to [a state-created danger] claim." *Ramos-Piñero v. Puerto Rico*, 453 F.3d 48, 55 n.9 (1st Cir. 2006); *see also Burella v. City of Philadelphia*, 501 F.3d 134, 147-48 (3d Cir. 2007)

("[I]t is apparent that what [the plaintiff] actually contends is that the officer failed to act at all.  We agree with the officers that this argument is deficient as a matter of law.").  "And although 'inaction can often be artfully recharacterized as "action," courts should resist the temptation to inject this alternate framework into omission cases.'" *Doe v. Rosa*, 795 F.3d 429, 441 (4th Cir. 2015) (quoting *Pinder v. Johnson*, 54 F.3d 1169, 1176 n.* (4th Cir. 1995)).

The Plaintiffs contend that the affirmative act requirement is met here for two reasons.  First, they argue that the affirmative act requirement should be read broadly so as to be satisfied when "law enforcement has responded to a situation, is made directly aware of a specific risk of harm, and then withdraws without mitigating that harm."  ECF No. 118 at 6.  In support, they contend that an officer's decision to "withdraw[] without action is a choice" and that the "choice not to act should bear equal liability as when officers act."  ECF No. 118 at 7.  This argument, however, runs directly contrary to the *DeShaney* rule that state actors are not liable for their failure to act.  489 U.S. at 202-03.  The Plaintiffs cannot circumvent that rule by recasting law enforcement inaction as action.  *See Soto v. Flores*, 103 F.3d 1056, 1064 (1st Cir. 1997); *Pinder*, 54 F.3d at 1175.  Accepting such a broad reading of the affirmative act requirement would greatly expand the circumstances in which the state-created danger doctrine applies.  *See Pinder*, 54 F.3d at 1175 (concluding that an officer's assurances to the victim and his decision not to charge the assailant were not affirmative acts giving rise to civil liability because, if so, "every representation by the police and every failure to incarcerate would constitute 'affirmative actions' giving rise to civil liability").

27

The Plaintiffs' second argument is more persuasive.  They contend that Officer Dexter committed an affirmative act that enhanced the danger to the tenants by the way he interacted with Pak, which had the effect of agitating Pak, thereby increasing the risk that Pak would act on his desire to harm the tenants, and by failing to inform the tenants of the increased risk to them.[21]

Courts have concluded that law enforcement officers have enhanced the risk of harm to a plaintiff by disclosing information or conducting an interview in a manner that placed a plaintiff at greater risk of harm.  *See Irish II*, 436 F. Supp. 3d at 415-16 (concluding that there was a dispute of material fact as to whether a police officer's voicemail informing a violent suspect that he had been accused of rape increased the danger to the victim who reported the rape); *Kennedy*, 439 F.3d at 1063 (concluding that police officers placed the victim in greater danger by notifying a person accused of child molestation of the accusation made against him by the victim despite a promise to warn the victim before doing so); *Lipman v. Budish*, 974 F.3d 726, 746 (6th Cir. 2020) (concluding it was a reasonable inference that interviewing a child

---

[21] The Plaintiffs also argue that Officer Dexter's expressions of sympathy for the Paks' difficulties as landlords and his decision not to arrest Pak could have had the effect of emboldening Pak by leading him to believe that he would not be punished for his criminal misconduct.  The Plaintiffs are correct that a police officer's implicit or explicit condonation of criminal conduct can lead to state-created danger liability.  *See Martinez v. City of Clovis*, 943 F.3d 1260, 1273, 1276-77 (9th Cir. 2019) (concluding that police officers affirmatively enhanced the danger to a domestic abuse victim when they, among other things, disparaged the victim, praised the abuser, and signaled to the abuser that he would not be arrested); *Okin v. Vill. of Cornwall-on-Hudson Police Dep't*, 577 F.3d 415, 429-30 (2d Cir. 2009) (concluding that police officers affirmatively enhanced the danger to a domestic abuse victim by, among other things, discussing football with an abuser when responding to a domestic abuse complaint, not making any domestic incident report, and repeatedly declining to arrest the abuser despite his admission that he could not help "smack[ing] [the victim] around").  However, Officer Dexter's actions, including his expressions of sympathy, do not align with the actions of the officers in these cases.  Officer Dexter did not condone Pak's actions over the course of multiple interactions—instead, his interaction with Pak took place in the span of one conversation in which he repeatedly told Pak that Pak could be arrested if he continued his criminal conduct.  Consequently, I reject the Plaintiffs' attempt to recast Officer Dexter's conduct as implicitly condoning Pak's criminal actions.

abuse victim "in front of her alleged abusers and asking about the source of her injuries increased her risk of further abuse"); *Martinez v. City of Clovis*, 943 F.3d 1260, 1272 (9th Cir. 2019) (concluding that the record showed that a police officer "provoked" a domestic abuser by, among other things, relating that his victim had said that she had previously been abused).  Although these cases are not entirely comparable to the circumstances facing Officer Dexter because Officer Dexter did not reveal any information to Pak that put the tenants at greater risk, they do support the view that police officers can be held liable for conduct that agitates a third party and makes it more likely that the third party will harm a particular person.  Two District Court decisions are particularly helpful in illustrating this point: *Mackie v. County of Santa Cruz*, 444 F. Supp. 3d 1094 (N.D. Cal. 2020), and *McClammy v. Halloran*, No. CV-18-68-GF-BMM, 2019 WL 4674462 (D. Mont. Sept. 25, 2019).

In *Mackie*, a police officer confronted a neighbor who had been having conflicts with one of the plaintiffs, Mackie.  *See* 444 F. Supp. 3d at 1100-02, 1105.  The officer exchanged vulgar insults with the neighbor, worked the neighbor up into a "deranged and threatening state," and did not disabuse the neighbor of the notion that Mackie had called the police.  *Id.* at 1105.  The neighbor subsequently shot Mackie after the officer left.  *Id.* at 1102.  The District Court concluded that the plaintiffs' complaint stated a state-created danger claim because the officer's "actions left [the neighbor] in an agitated state and thereby increased the risk that [he] would attack [Mackie]." *Id.* at 1106.  The District Court found it noteworthy that prior to the interaction with the officer, the neighbor "was not in an aggressive state."  *See id.*  Liability under the state-created danger doctrine was cognizable because the officer left the plaintiffs "in

a situation that was more dangerous than the one in which [he] found [them]." *Id.* at 1106 (second alteration in original) (quoting *Munger v. City of Glasgow Police Dep't*, 227 F.3d 1082, 1086 (9th Cir. 2000)).

In *McClammy*, police officers responded to a 9-1-1 call in which the plaintiff said that she had been physically abused by her boyfriend. 2019 WL 4674462, at *1. The officers spoke separately with the alleged abuser and the plaintiff, and they allegedly acted dismissively toward the plaintiff's complaints before leaving the scene. *Id.* After the officers left, the abuser threw the plaintiff on the couch, grabbed her hair, and screamed, "[n]o red marks bitch!" *Id.* at *3 (alteration in original). According to the plaintiff, this behavior indicated that the Officers must have told the abuser that they had not seen any red marks. *Id.* The court concluded that summary judgment on the plaintiff's state-created danger claim was inappropriate because there existed genuine disputes as to whether the officers had actually made the statement about not seeing red marks and, if so, the nature of the abuser's reaction to that statement. *Id.* With respect to the latter, the court observed that "[t]he trier of fact must determine whether the statement increased [the abuser]'s anger towards [the victim], thereby placing her in more danger than when the Officers first arrived at the scene." *Id.*

In this case, Officer Dexter's efforts to assuage Pak not only did not succeed— they arguably made matters worse. From the outset, Pak expressed a desire to shoot the tenants. The record supports a conclusion that Pak's level of agitation increased after Pak expressed his belief that Officer Dexter had confirmed that, as a landlord, Pak did not have any rights. Pak stated, "I got news though. I'm glad that you say

that I don't have any right[s].  They got right[s]."  ECF No. 134-1 at 36:17-19.  A jury could find that Officer Dexter seemingly confirmed Pak's beliefs, with his statements about how that was the "downside of being a landlord here," that he knew it was "very frustrating," and that he wished he "had more [r]esponses" for the Paks.  ECF No. 78 at 21-23, ¶¶ 44, 45.  Pak then made statements indicating (1) that he would act on his threats—"[y]ou're going to see me in the newspaper," (2) that he would act soon— there's going to be a "big name tomorrow," and (3) what he intended to do—there was going to be a "bloody mess."  ECF No. 78 at 23, ¶ 45; ECF No. 84 at 8, ¶ 19.

The content of Officer Dexter's conversation with Pak and Pak's reactions to Officer Dexter's statements support the view that, like the officer in *Mackie*, 444 F. Supp. 3d at 1106, Officer Dexter agitated Pak and enhanced the danger to the tenants.

The Defendants attempt to distinguish *Mackie* on its facts.  They note that in *Mackie*, unlike in this case, there was no evidence suggesting a preexisting risk of danger to the plaintiffs and that the *Mackie* court rested its holding in part on the fact that "prior to [the officer]'s arrival and interactions with [the neighbor], [the neighbor] was not in an aggressive state and was merely walking on the . . . street, apparently drinking from a can of beer."  444 F. Supp. 3d at 1106 (fourth alteration in original).  It is true that in this case, Pak was agitated and aggressive before Officer Dexter arrived and had already made threatening comments to the tenants.  But state-created danger liability need not be predicated on a police officer creating a new danger.  Rather, as recognized in *Irish II*, state-created danger liability can arise where "a state actor or state actors affirmatively acted to create *or enhance* a danger

31

to the plaintiff."  979 F.3d at 75 (emphasis added).  There is a genuine dispute of material fact as to whether that occurred here.

The undisputed facts also support a conclusion that Officer Dexter further enhanced the danger to the tenants by his actions after he left the Paks.  After leaving the residence, Officer Dexter returned to meet with the tenants, but he failed to inform them of the extent and immediacy of the danger that Pak presented.  Instead, he advised the victims to go inside when Pak came outside and to keep their distance from Pak.  The preventative measures he suggested were far less than what was needed to protect the tenants from a landlord threatening, as Pak had stated moments earlier, that there was going to be a "bloody mess."  ECF No. 84 at 8, ¶ 19. Officer Dexter's advice also failed to convey that the danger facing the tenants had increased since he had first spoken to them.  His comments were, therefore, misleading, and thus could give rise to state-created danger liability.  *See Irish II*, 979 F.3d at 79 ("[F]ailing to take steps to mitigate the danger [that the police] had created and misleading the victim about the level of police protection she had could likewise give rise to a constitutional violation under the state-created danger doctrine." (citing *Kennedy*, 439 F.3d at 1063-65)).

Based on the undisputed material facts viewed in the light most favorable to the Plaintiffs as the nonmoving party, a jury could conclude that the affirmative act requirement is met here because Officer Dexter's interactions with Pak enhanced the danger Pak posed toward the victims, and Officer Dexter's final meeting with the tenants misled them as to the immediacy and extent of the danger they faced. Although the Defendants are correct that merely "[f]ailing to defuse a preexisting

32

danger is not an affirmative act" that would impose liability under the state-created danger doctrine, *Doe1 v. Bos. Pub. Schs.*, 17-cv-11653-ADB, 2019 WL 1005498, at *5 (D. Mass. Mar. 1, 2019) (quoting *Doe v. Berkeley Cnty. Sch. Dist.*, 189 F. Supp. 3d 573, 577 (D.S.C. 2016)), the summary judgment record supports the conclusion that not only did Officer Dexter fail to defuse the preexisting danger presented by Pak, Officer Dexter's actions enhanced the danger.   Thus, the Defendants are not entitled to summary judgment on the first prong of the state-created danger test.

### (ii)  Specific Danger

The second element of the state-created danger test is whether "the act or acts created or enhanced a danger specific to the plaintiff and distinct from the danger to the general public." *Irish II*, 979 F.3d at 75.  Nowhere in the Defendants' summary judgment briefing do they contend that they are entitled to summary judgment on this element.  Moreover, the record evidence could support the conclusion that this element is satisfied.  If a fact-finder were to determine that Officer Dexter's efforts agitated Pak and thus increased the danger of violence, that enhanced danger would almost certainly be to Johnson, Thompson, and Welch—the people with whom Pak had argued earlier in the evening and who had been present for his threats—rather than the general public at large.  As such, the Defendants are not entitled to summary judgment on this element.

### (iii)  Causation

The third element of the state-created danger test is whether "the act or acts caused the plaintiff's harm." *Id.* at 75.  Again, the Defendants have not provided any developed argument as to why they are entitled to summary judgment on this

element.   Moreover, the sequence of events occurring on December 29, 2012, as described in this decision could support a conclusion that the causation element has been satisfied.

### (iv)  Shock the Conscience

The fourth element of the state-created danger test is whether "the state actor's conduct, when viewed in total, shocks the conscience." *Id.* at 75.   In determining whether conduct shocks the conscience for purposes of the state-created danger doctrine, all of the circumstances should be considered and not just the defendant's affirmative acts.   *See id.* at 75 (noting that the state actor's conduct should be "viewed in total"); *Irish II*, 436 F. Supp. 3d at 418 ("While these examples of inaction by the Individual Officers do not independently give rise to a state-created danger theory of liability, they are relevant to the Court's consideration of the 'shocks the conscience' standard." (citing *Irish v. Maine* ("*Irish I*")*,* 849 F.3d 521, 528 (1st Cir. 2017))); *Est. of B.I.C. v. Gillen*, 710 F.3d 1168, 1174 (10th Cir. 2013) ("Although affirmative conduct is 'a necessary precondition' of a danger-creation claim, the shock-the-conscience part of such a claim concerns the defendant's 'conduct as a whole.'" (citations omitted) (first quoting *Gray v. Univ. of Colo. Hosp. Auth.*, 672 F.3d 909, 925 (10th Cir. 2012); then quoting *Uhlrig v. Harder*, 64 F.3d 567, 576 (10th Cir. 1995))).

For conduct to shock the conscience, the conduct "must be 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" *Rivera*, 402 F.3d at 36 (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998)); *see also J.R. v. Gloria*, 593 F.3d 73, 80 (1st Cir. 2010) ("The burden to show state

conduct that 'shocks the conscience' is extremely high, requiring 'stunning' evidence of 'arbitrariness and caprice' that extends beyond '[m]ere violations of state law, even violations resulting from bad faith' to 'something more egregious and more extreme.'" (alteration in original) (quoting *DePoutot v. Raffaelly*, 424 F.3d 112, 119 (1st Cir. 2005))).  Furthermore, "[w]here officials have the opportunity to make unhurried judgments, deliberate indifference may shock the conscience, particularly where the state official performs multiple acts of indifference to a rising risk of acute and severe danger." *Irish II*, 979 F.3d at 75.  On the other hand, "[w]here state actors must act in a matter of seconds or minutes, a higher level of culpability is required." *Id.*

Here, because Officer Dexter had time to reflect and did not have to act in haste, the Plaintiffs can make out a claim that his conduct shocks the conscience if they show that he acted with deliberate indifference.[22]  In order to show that Officer Dexter acted with deliberate indifference, the Plaintiffs "must, at a bare minimum, demonstrate that [Officer Dexter] actually knew of a substantial risk of serious harm to [the tenants] and disregarded that risk." *Coyne v. Cronin*, 386 F.3d 280, 288 (1st Cir. 2004); *see also Mackie*, 444 F. Supp. 3d at 1108.  For reasons I will explain, a reasonable fact-finder could conclude that this standard was met here.

Pak's statements to Officer Dexter could support the conclusion that Pak presented a growing and immediate danger to the tenants.  As previously explained, Pak expressed his belief to Officer Dexter that Officer Dexter had confirmed that Pak, as a landlord, did not have any rights and that Pak's tenants owned him.  Further,

---

[22]  As in *Irish II*, the Defendants do not argue that a standard higher than deliberate indifference is necessary in this case.  979 F.3d at 74 n.5.

Pak's statements that Officer Dexter would see him in the newspaper, that there would be a big name tomorrow, and that there was going to be a bloody mess indicate that Pak intended to act on that belief.  Pak also ominously warned Officer Dexter, "God help you.  Looks like we'll see."  ECF No. 134-1 at 43:7-8.

There is also record support for the conclusion that Officer Dexter disregarded the risk presented by Pak.  Among other things, Officer Dexter failed to (1) inquire whether Pak had ready access to a firearm (as suggested by Pak's earlier statements to the tenants indicating that he had a gun); (2) initiate a mental health intervention in keeping with the Biddeford Police Department's deviant behavior policy, General Order 136-96; or (3) arrest or summons Pak for a criminal violation based on Pak's repeated threats to shoot or otherwise harm his tenant or tenants.  Further, as previously explained, Officer Dexter did not inform the tenants of the extent and immediacy of the actual danger facing them, expressing instead a more neutral message:  "I advised [Pak] he can't harass you, he can't threaten you.  Whether it was successful or not I don't know."  ECF No. 78 at 25, ¶ 48.  These facts, when viewed in the light most favorable to the Plaintiffs, could support a finding that Officer Dexter acted with deliberate indifference.  *See Mackie*, 444 F. Supp. 3d at 1109-10 (concluding that an officer's actions in agitating an assailant, observing increasingly vitriolic comments, and then leaving demonstrated deliberate indifference).

The Defendants raise several arguments in response, but none are persuasive. First, the Defendants emphasize that Pak told Officer Dexter toward the end of the conversation that he would keep away from the tenants.  The record on that point, however, is not as straightforward as the Defendants contend.  As previously noted,

toward the end of the conversation, Officer Dexter told Pak to keep away from the tenants. Pak responded, "No, no, no." ECF No. 134-1 at 43:11. Pak later said, "No, no. I'm gonna go see them now." ECF No. 134-1 at 44:22-23. In response to this, Officer Dexter again told Pak to keep his distance, to which Pak responded, "No, no you don't have to worry about that." ECF No. 78 at 23, ¶ 46. But Pak also remarked that there was going to be a "bloody mess," ECF No. 84 at 8, ¶ 19, and he had previously remarked to his wife that there was something that he did not want to tell her in front of Officer Dexter. When viewed in the context of the entire interaction, a shocks-the-conscience finding is not foreclosed by Pak's single statement to Officer Dexter suggesting that he would stay away from the tenants.

Next, the Defendants argue that Officer Dexter's actions do not shock the conscience because he was justified in viewing the threat to the tenants as insubstantial in light of all of the circumstances. The Defendants point to a number of factors which weigh against concluding that Office Dexter should have viewed the risk to the tenants as substantial, including that (1) Pak was an older man with no criminal history; (2) Thompson represented that he felt more harassed than threatened; (3) Pak's wife Armit, who was known to have calmed tensions between Pak and the tenants in the past, was present; and (4) Pak and the tenants had previously argued without Pak resorting to violence.

The circumstances cited by the Defendants are, no doubt, relevant to the shocks-the-conscience inquiry. *See, e.g., Mackie,* 444 F. Supp. 3d at 1110 (noting that a police officer's awareness that a victim was "terrified" of her neighbor was relevant to whether he acted with deliberate indifference). But the existence of evidence

weighing in favor of the Defendants' case is not, without more, a reason to grant summary judgment for the Defendants. "Summary judgment 'admit[s] of no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails . . . .' If the facts permit more than one reasonable inference, the court on summary judgment may not adopt the inference least favorable to the nonmovant." *Casas Off. Machines, Inc. v. Mita Copystar Am., Inc.*, 42 F.3d 668, 684 (1st Cir. 1994) (alterations in original) (citation omitted) (quoting *Greenburg v. P.R. Mar. Shipping Auth.*, 835 F.2d 932, 936 (1st Cir. 1987)).

Finally, the Defendants argue that there was no violation of written police procedure and that this weighs against concluding that Officer Dexter's behavior was shocking to the conscience. To the extent that Defendants argue that violations of police procedure are strictly required for an officer's conduct to shock the conscience, they are incorrect. As noted in *Irish II*, violations of state law and police policy "are, at the very least, *relevant* to determining the conscience-shocking nature of the defendants' conduct." 979 F.3d at 75 (emphasis added). And the First Circuit in *Welch* again emphasized the relevance of "proper police procedure":

> "[A] defendant's adherence to proper police procedure bears on all prongs of the qualified immunity analysis," including whether an officer's conduct shocked the conscience and whether a reasonable officer "would have believed that his conduct violated the Constitution." [*Irish II*, 979 F.3d] at 77 (quoting *Stamps v. Town of Framingham*, 813 F.3d 27, 32 n.4 (1st Cir. 2016)). The parties have presented little evidence as to police standards and training in handling disputes between neighbors or landlords and tenants. Such evidence may well be important to the disposition of the case. For example, officers are sometimes required to do more than Officer Dexter did here when credible death threats are made in a domestic violence context. *See Irish II*, 979 F.3d at 72 (explaining that Maine State Police are required to "use all reasonable means to prevent further abuse" including "[r]emaining on

38

the scene [of a domestic violence incident for] as long as the officer reasonably believes there is a danger to the physical safety of that person without the presence of a law enforcement officer." (quoting Me. Stat. tit. 19-A, § 4012(6)) (alterations in original)).

12 F.4th at 76-77. Contrary to the Defendants' argument, however, and for reasons addressed in Part IV.A.2.(c).(iii) of this decision, the Biddeford Police Department's deviant conduct policy, General Order 136-96, the policy in place at the time of the shootings, is relevant to what an appropriate response would have been.[23]

Because there is evidentiary support in the summary judgment record to show that Officer Dexter's conduct shocked the conscience, the Defendants are not entitled to summary judgment on the shock-the-conscience element of the state-created danger test. Consequently, the Defendants are not entitled to summary judgment on the first prong of the qualified immunity test because there is a genuine dispute of material fact as to whether the tenants' constitutional rights were violated. I therefore turn to consider the second prong's requirement that the unlawfulness of the challenged conduct was, at the time the conduct was committed, clearly established.

## 2. Clearly Established

### (a) Legal Standard

As the Supreme Court has explained, the unlawfulness of a public official's action is considered "clearly established" at the time of the official's violative conduct if "the law was '"sufficiently clear" that every "reasonable official would understand

---

[23] As noted above, see supra n.14, I do not address the other policies and procedures cited by the Plaintiffs. These policies, including Standard Operating Procedure 02-01, speak only to general functions, see Johnson, 454 F. Supp. 3d at 87-88, and are therefore of limited utility in deciding whether Officer Dexter's actions shocked the conscience.

that what he is doing'" is unlawful." *Wesby*, 138 S. Ct. at 589 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).   Thus, in determining whether a right is clearly established, "the salient question . . . is whether the state of the law . . . gave [the defendants] fair warning that their alleged [conduct] was unconstitutional." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).   "[I]t is important to emphasize that this inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Maldonado v. Fontanes*, 568 F.3d 263, 269 (1st Cir. 2009) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)).

There are two primary considerations that go into whether the clearly established standard has been met.   First, the court must inquire "whether the precedent is 'clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply.'" *Irish II*, 979 F.3d at 76 (quoting *Wesby*, 138 S. Ct. at 590).   The precedent must be "dictated by 'controlling authority' or 'a robust "consensus of cases of persuasive authority."'" *Wesby*, 138 S. Ct. at 589-90 (quoting *al-Kidd*, 563 U.S. at 741-42).

Second, the court must ask "whether '[t]he rule's contours [were] so well defined that it [would be] clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Irish II*, 979 F.3d at 76 (first and second alterations in original) (quoting *Wesby*, 138 S. Ct. at 590).   In other words, the legal principles must "clearly prohibit the conduct in the particular circumstances before him." *Wesby*, 138 S. Ct. at 590.

Although cases involving similar facts can be helpful, they are not necessary to a determination that the law is clearly established, particularly when the officer's

conduct is egregious or otherwise obviously unconstitutional.  *See Irish II*, 979 F.3d at 76, 78; *see also Mlodzinski v. Lewis*, 648 F.3d 24, 33 (1st Cir. 2011) ("[T]he Supreme Court has made clear that officers can 'be on notice that their conduct violates established law even in novel factual circumstances.'" (quoting *Hope*, 536 U.S. at 741)).  But although "[t]he existing legal principle need not be derived from a case 'directly on point,' . . . precedent must 'place[] the statutory or constitutional question beyond debate.'"  *French v. Merrill*, 15 F.4th 116, 126 (1st Cir. 2021) (third alteration in original) (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017)).  "To that end, general statements of the law may give '"fair and clear warning" to officers' so long as, 'in the light of the pre-existing law[,] the unlawfulness [of their conduct is] apparent.'"  *Id.* at 126-27 (alterations in original) (quoting *White*, 580 U.S. at 79-80).

"A rule is too general, however, 'if the unlawfulness of the officer's conduct "does not follow immediately from the conclusion that [the rule] was firmly established."'"  *Id.* at 127 (quoting *Wesby*, 138 S. Ct. at 590).  Courts must take care, then, not to "define clearly established law at a high level of generality, since doing so avoids the crucial question of whether the official acted reasonably in the particular circumstances that he or she faced."  *Wesby*, 138 S. Ct. at 590 (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014)); *see also White*, 580 U.S. at 79 ("[T]he clearly established law must be 'particularized' to the facts of the case.  Otherwise, '[p]laintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights.'" (second and third alterations in original) (citation omitted) (quoting *Anderson v. Creighton*, 483 U.S. 635, 639-40 (1987))).

In sum, for a right to be clearly established, "existing law must have placed the constitutionality of the officer's conduct 'beyond debate.'" *Wesby*, 138 S. Ct. at 589 (quoting *al-Kidd*, 536 U.S. at 741).  "The plaintiff's burden to demonstrate that the law was clearly established is thus 'a heavy burden indeed.'" *Est. of Rahim by Rahim v. Doe*, 51 F.4th 402, 410 (1st Cir. 2022) (quoting *Lachance v. Town of Charlton*, 990 F.3d 14, 20 (1st Cir. 2021)).

### (b)  The Parties' Arguments

I begin by addressing two of the primary arguments made by the parties which I conclude are unpersuasive:  (i) the Defendants' argument that Officer Dexter did not violate clearly established law because the state-created danger doctrine was not a viable theory of liability in 2012; and (ii) the Plaintiffs' argument that the First Circuit's *Irish II* decision is, standing alone, sufficient to resolve the clearly established inquiry in this case.

### (i)  The Defendants' Argument

The Defendants primarily argue that the substantive due process rights invoked by the Plaintiffs cannot be clearly established in this case because the state-created danger theory could not have been clearly established as of 2012.  Specifically, the Defendants argue that  "[t]he [state-created danger] theory was not adopted as a viable source of substantive due process rights until 2020 . . . [and t]he incident giving rise to Plaintiffs['] claims in this case occurred in 2012."  ECF No. 114 at 7.  For support, the Defendants rely on *Irish I*, in which the First Circuit observed, "While this circuit has discussed the possible existence of the state-created danger theory, we have never found it applicable to any specific set of facts."  849 F.3d at 526.

The Defendants' argument is, however, foreclosed by *Irish II*, which concluded that the fact that police conduct could give rise to liability under the state-created danger doctrine was clearly established in July 2015, when the events at issue in that case occurred—notwithstanding the fact that the First Circuit had not previously found the doctrine applicable to any specific set of facts. 979 F.3d at 77-78. The *Irish II* decision, which was issued in 2020, observed that by 2015, "[t]he widespread acceptance of the state-created danger theory . . . was sufficient to clearly establish that a state official may incur a duty to protect a plaintiff where the official creates or exacerbates a danger to the plaintiff." *Id.* at 77.

As the First Circuit noted in *Irish II*, the stated-created danger doctrine has developed over the course of "decades." *Id.* at 78; *see, e.g.*, *Okin v. Vill. of Cornwall-on-Hudson Police Dep't*, 577 F.3d 415, 428-29 (2d Cir. 2009); *Sanford v. Stiles*, 456 F.3d 298, 304-05 (3d Cir. 2006). Moreover, the First Circuit observed that its 2005 decision in *Rivera v. Rhode Island*, 402 F.3d 27, "was a critical warning bell that officers could be held liable under the state-created danger doctrine when their affirmative acts enhanced a danger to a witness." *Irish II*, 979 F.3d at 78. And the *Irish II* court further observed that "[b]y July 2015, this court had discussed the state-created danger doctrine at least a dozen times, even if it had never found it applicable to the facts of a specific case." *Id.* There is no reason to believe that the fact that the events of this case occurred three years before the events considered in *Irish II* changes this analysis. On the contrary, most of the state-created danger cases discussed in *Irish II*, including *Rivera*, were decided prior to 2012. *See id.* at 73-74, 77-79.

Accordingly, the Defendants' argument that the rights at issue here cannot have been clearly established in 2012 because the state-created danger theory was not formally adopted by the First Circuit until 2020 is unavailing.

The Defendants also argue that the state-created danger doctrine could not be clearly established in 2012 because not all circuits had accepted the theory in 2012. But the defendants in *Irish II* made this exact same argument, and it was rejected by the First Circuit. *Id.* at 78. Thus, this argument is unpersuasive.

### (ii) The Plaintiffs' Argument

Whereas the Defendants overlook key aspects of *Irish II*, the Plaintiffs read too much into that decision when they argue that the clearly established prong is satisfied in this case because the First Circuit concluded in *Irish II* that the state-created danger doctrine is clearly established.[24]

In *Irish II*, 979 F.3d at 78, the First Circuit concluded that the fact that it had never formally found the state-created danger doctrine to apply did not foreclose a determination that the doctrine was clearly established. After discussing comparable cases, the *Irish II* court concluded,

> These cases gave the defendants notice that they could be held liable for violating the Due Process Clause if, after receiving a report of criminal activity, they effectively alerted the suspect that he was under investigation in a manner that notified the suspect who the reporting individual was, despite knowing that the suspect was likely to become violent toward that person. The officers were also on notice that failing to take steps to mitigate the danger they had created and misleading

---

[24] The Plaintiffs also appear to argue that because the First Circuit in *Welch* directed me to apply the *Irish II* test, there is no need to reach the clearly established prong of the qualified immunity analysis. To the extent that the Plaintiffs make this argument, I find it unpersuasive. The *Welch* opinion specifically said that I could consider the clearly established prong of the qualified immunity test first. 12 F.4th at 77. Although I elected not to do so, this statement is a clear indication that the *Welch* court did not consider the "clearly established" issue to be resolved.

> the victim about the level of police protection she had could likewise give rise to a constitutional violation under the state-created danger doctrine.

*Id.* at 79 (citation omitted).

*Irish II* is undoubtedly a significant development in the First Circuit's state-created danger jurisprudence. But it does not follow that the clearly established inquiry was finally resolved for all subsequent state-created danger cases. The fact that the overall state-created doctrine was recognized and held to be clearly established in *Irish II* is not enough because "[t]he 'clearly established' inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Rocket Learning, Inc. v. Rivera-Sánchez*, 715 F.3d 1, 9 (1st Cir. 2013) (quoting *Brosseau*, 543 U.S. at 198); *see also White*, 580 U.S. at 79 ("[T]he clearly established law must be 'particularized' to the facts of the case." (quoting *Anderson*, 483 U.S. at 640)). Therefore, even though *Irish II* concluded that the state-created danger test was a viable theory of relief, in order to defeat qualified immunity, the Plaintiffs must also show that a reasonable officer would have known that Officer Dexter's specific conduct was unlawful in the circumstances of this case. Like the *Irish II* court, then, I must particularize my inquiry and determine whether, considering the state of the law as of December 29, 2012, a reasonable officer would have known that agitating Pak, misleading the tenants, and withdrawing without defusing the situation would have been unlawful for purposes of the state-created danger doctrine.

### (c) Analysis

Having disposed of several of the parties' primary arguments, I now turn to whether the Plaintiffs have carried their "heavy burden" to show that Officer Dexter violated clearly established law. *Est. of Rahim*, 51 F.4th at 410 (quoting *Lachance*, 990 F.3d at 20). I conclude that they have not because, with respect to the allegation that Officer Dexter violated the tenants' rights by agitating Pak and making the harm to them more likely, the Plaintiffs have not shown that the precedent was "clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply" or that "'[t]he rule's contours [were] so well defined that it [would be] clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Irish II*, 979 F.3d at 76 (first and second alterations in original) (quoting *Wesby*, 138 S. Ct. at 590). And with respect to the allegation that Officer Dexter violated the tenants' rights by misleading the tenants about the extent of the danger posed by Pak, the Plaintiffs have not shown that "'[t]he rule's contours [were] so well defined that it [would be] clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Id.* (first and second alterations in original) (quoting *Wesby*, 138 S. Ct. at 590). I reach these conclusions based on several factors.

First, there was no case law in 2012 containing facts that could have put a reasonable officer on notice that Officer Dexter's conduct was unlawful. Second, this is not a circumstance in which Officer Dexter's conduct was so obviously unconstitutional that it clearly violated the general principles of the state-created danger doctrine despite the absence of comparable case law. Third, although General

Order 139-96, the City of Biddeford's deviant conduct policy, is relevant to the clearly established inquiry, the General Order was insufficient to give Officer Dexter fair warning that he was violating the tenants' constitutional rights by inadvertently agitating Pak and then failing to protect the tenants.

### (i) Whether the Plaintiffs have Pointed to Factually Similar Precedents

Although, as discussed below, factually similar cases are not required for a right to be clearly established, "[p]recedents involving 'similar facts' help 'provide an officer notice' that certain conduct is unlawful." *Fraser v. Mass. Bay Transp. Auth.*, 544 F. Supp. 3d 148, 159 (D. Mass. 2021) (quoting *Kisela v. Hughes*, --- U.S. ---, 138 S. Ct. 1148, 1153 (2018)); *see also Hope*, 536 U.S. at 741 ("Although earlier cases involving 'fundamentally similar' facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding. The same is true of cases with 'materially similar' facts."). Here, there are no factually similar cases.

The particular circumstances of the present case bear repeating. A reasonable jury could conclude that Officer Dexter violated the tenants' substantive due process rights by enhancing the danger that Pak posed to the tenants by Officer Dexter's inadvertent agitation of Pak and his subsequent misleading of the tenants about the extent of the danger that they could potentially be facing. The question, then, is whether the state of the law was sufficiently clear that a reasonable officer would have known that this conduct could violate the tenants' rights under the state-created danger doctrine.

47

The Plaintiffs have not pointed to any contemporary state-created danger cases that found liability based on a police officer speaking to a third party and inadvertently agitating that third party, who then commits violence. Although the Plaintiffs cite to *McClammy*, 2019 WL 4674462, and *Mackie*, 444 F. Supp. 3d 1094, which arguably contain comparable facts, these cases post-date the events of December 29, 2012. Consequently, they "could not have given fair notice to [Officer Dexter] and are of no use in the clearly established inquiry."[25] *Brosseau*, 543 U.S. at 200 n.4.

Most of the state-created danger cases cited by the Plaintiffs, which contain remarkably disparate fact patterns, have little in common with the actions of Officer Dexter because they do not involve an increase of danger through an officer's agitation of a third party.[26] Therefore, although these cases could give a reasonable officer fair warning that plaintiffs generally have a substantive due process right not to have officers take affirmative acts that increase the risk of third-party harm, they do not contain factual circumstances that could have put Officer Dexter on notice that his specific conduct violated that right. *See Wesby*, 138 S. Ct. at 590 ("A rule is too

---

[25] For the same reason, *Martinez v. City of Clovis*, 943 F.3d 1260, also cited by the Plaintiffs, does not bear on the clearly established inquiry.

[26] *See, e.g.*, *Rivera*, 402 F.3d at 38 (rejecting a state-created danger claim based on the assertion that officers had rendered a plaintiff more vulnerable to harm by giving her a subpoena to testify and falsely promising police protection); *Bright v. Westmoreland Cnty.*, 443 F.3d 276, 285 (3d Cir. 2006) (rejecting a state-created danger claim based on the assertion that officers had rendered a plaintiff more vulnerable to harm by, among other things, delaying the arrest of a third party who had reason to target the plaintiff's family); *Freeman v. Ferguson*, 911 F.2d 52, 54 (8th Cir. 1990) (finding state-created danger when a police chief prevented police officers from responding to abusive conduct committed by a friend of the chief); *Pinder*, 54 F.3d at 1175-76 (rejecting a state-created danger claim when officers had falsely promised to arrest a dangerous assailant and to provide protection); *Wood*, 851 F.2d at 1219 (concluding that there was an issue of fact as to state-created danger when officers arrested a driver and stranded a passenger on the side of the road in a dangerous area).

general if the unlawfulness of the officer's conduct 'does not follow immediately from

the conclusion that [the rule] was firmly established.'" (alteration in original) (quoting

*Anderson*, 483 U.S. at 641)).  And, as discussed below, Officer Dexter's conduct was

not so clearly unconstitutional that it was obviously precluded by the general state-

created doctrine notwithstanding the lack of cases involving similar facts.

Several of the cases cited by the Plaintiffs require a more extended discussion

because it is a closer question as to whether they could have provided fair warning to

Officer Dexter that his specific conduct was unlawful.  Specifically, the Plaintiffs

point to *Okin v. Village of Cornwall-on-Hudson Police Department*, 577 F.3d 415;

*Kennedy v. City of Ridgefield*, 439 F.3d 1055; and *Monfils v. Taylor*, 165 F.3d 511 (7th

Cir. 1998).

In *Okin*, the Second Circuit found state-created danger liability when police

officers "implicitly but affirmatively encouraged [a third party's] domestic violence."

577 F.3d at 430.  Specifically, the officers who responded to a domestic violence

complaint, some of whom may have known the abuser, discussed football with the

abuser, expressed contempt for the victim, and declined to arrest the abuser despite

his open admission that he could not help but abuse the victim.  *Id.* at 430.

*Okin*, however, did not involve the affirmative acts at issue here: the

unintentional agitation of a third party and subsequent misleading of the victims

regarding the risk of danger.  Instead, liability in *Okin* was based on the fact that the

police enabled and emboldened the abuser by sending a message that he would not

be punished for his criminal conduct.  Here, Officer Dexter repeatedly told Pak that

he could not and should not continue to make threats, and he encouraged Pak to

pursue his claims in civil court.  Moreover, the events at issue in this case took place over the course of a relatively brief encounter, while the events in *Okin* involved multiple instances over many months by which the officers enabled the abuser and ignored the victim.  *Okin* is too factually different to have provided Officer Dexter notice that he could incur constitutional liability for agitating Pak and then misleading the tenants.

Similarly, Plaintiffs' argument that *Kennedy v. City of Ridgefield* and *Monfils v. Taylor* could have provided Officer Dexter with the requisite notice is unpersuasive.  Like *Irish II*, both of these cases involve situations in which officers disclosed incendiary information to a third party that put the plaintiff at risk notwithstanding the fact that the third party was known to be violent.  In *Kennedy*, an officer disclosed to the plaintiff's neighbor that the plaintiff had accused him of child molestation—despite the officer's promise to notify the plaintiff before doing so and despite the plaintiff's warning that the neighbor was violent.  439 F.3d at 1057-58.  The neighbor then shot the plaintiff and murdered her husband.  *Id.* at 1058.  *Monfils* was similar: the plaintiff called the police and told them that his coworker was going to steal from their place of employment.  165 F.3d at 513.  Despite the plaintiff warning them that the coworker was violent and despite the police having promised not to release a tape of the phone call, the officers released to the coworker a copy of the recorded phone call that the plaintiff had made about the theft.  *Id.* at 513-15.  The coworker recognized the plaintiff's voice and subsequently murdered him.  *Id.* at 515.

The *Irish II* court concluded that these cases were sufficient to put the officers in that case on notice that "they could be held liable for violating the Due Process

Clause if, after receiving a report of criminal activity, they effectively alerted the suspect that he was under investigation in a manner that notified the suspect who the reporting individual was, despite knowing that the suspect was likely to become violent toward that person." 979 F.3d at 79. But these cases are insufficient to put Officer Dexter on notice that it was unconstitutional for him to unintentionally agitate Pak by repeatedly telling him that the police could not help to resolve his disputes with the tenants. Although disclosing incendiary information to a third party might—possibly—be described as "agitating" that third party and making harm more likely, the lessons that can be drawn from *Kennedy* and *Monfils* did not clearly apply in the complex situation facing Officer Dexter.

Additionally, in *Irish II, Monfils* and *Kennedy* were deemed to have put police officers on notice that "failing to take steps to mitigate the danger they had created and misleading the victim about the level of police protection she had could likewise give rise to a constitutional violation." *Id.* Thus, *Kennedy* and *Monfils* arguably could have put Officer Dexter on notice of the rule that he could not mislead the tenants about the danger they were in once he had unconstitutionally enhanced the danger to them.[27] *See id.*; *Kennedy*, 439 F.3d at 1063. But unlike in those cases, Officer Dexter did not make false promises—instead, he left out details and arguably minimized the danger posed to the tenants by Pak. Accordingly, these cases are insufficient to put Officer Dexter on notice that his specific conduct in misleading the

---

[27] *But see Rivera*, 402 F.3d at 37-38 (rejecting an argument that there could be state-created danger liability based on broken promises of police protection); *Bright*, 443 F.3d at 284 (rejecting an argument that there could be state-created danger liability based on broken promises that a suspect would be arrested); *Pinder*, 54 F.3d at 1175 (same).

tenants about the extent of the danger facing them was unconstitutional in the circumstances confronting him.

Thus, unlike in *Irish II*, 979 F.3d at 79, there are not cases containing comparable fact patterns that could have put a reasonable officer on notice that Officer Dexter's conduct violated the tenants' rights.

### (ii) Whether the Right Was Clearly Established Despite the Absence of Factually Similar Cases

Even in the absence of factually similar law, it is possible that the general principles of the state-created danger doctrine were sufficient to put a reasonable officer on notice that Officer Dexter's specific conduct was unlawful.  Because there are no comparable precedents, whether this standard has been met here is the key question to be answered to determine whether the law was clearly established.

"[C]ases involving materially similar facts are not necessary to a finding that the law was clearly established," and "'[o]fficials can still be on notice that their conduct violates established law even in novel factual circumstances.'"  *Irish II*, 979 F.3d at 76 (quoting *Hope*, 536 U.S. at 741).  This is because "[i]n some cases, 'a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question.'"  *McKenney v. Mangino*, 873 F.3d 75, 83 (1st Cir. 2017) (quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997)); *see also Irish II*, 979 F.3d at 78 ("[A] general proposition of law may clearly establish the violative nature of a defendant's actions, especially when the violation is egregious."); *Brosseau*, 543 U.S. at 199 ("Of course, in an obvious case, [general] standards can 'clearly establish' the answer, even without a body of relevant case law.").

Accordingly, "general statements of the law may give "'fair and clear warning" to officers' so long as, 'in the light of the pre-existing law[,] the unlawfulness [of their conduct is] apparent.'" *French*, 15 F.4th at 126-27 (alterations in original) (quoting *White*, 580 U.S. at 79-80).

The reasoning behind this principle was made clear in *Browder v. City of Albuquerque*, 787 F.3d 1076, 1082-83 (10th Cir. 2015), a Tenth Circuit decision that was cited in *Irish II*, 979 F.3d at 76.  In *Browder*, the Tenth Circuit explained:

> In deciding the "clearly established law" question this court employs a "sliding scale" under which "the more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation." *Shroff v. Spellman*, 604 F.3d 1179, 1189-90 (10th Cir. 2010) (alteration omitted) (quoting *Fogarty v. Gallegos*, 523 F.3d 1147, 1161 (10th Cir. 2008)) (internal quotation marks omitted).  After all, some things are so obviously unlawful that they don't require detailed explanation and sometimes the most obviously unlawful things happen so rarely that a case on point is itself an unusual thing.  Indeed, it would be remarkable if the most obviously unconstitutional conduct should be the most immune from liability only because it is so flagrantly unlawful that few dare its attempt.

787 F.3d at 1082-83.

But this exception is "narrow," and cases in which a general constitutional rule will suffice to clearly establish the law are rare.  *See Belsito Commc'ns, Inc. v. Decker*, 845 F.3d 13, 26 (1st Cir. 2016) ("Of course, . . . 'a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not been held unlawful.'  But this is a narrow exception . . . ." (citation omitted) (quoting *Lanier*, 520 U.S. at 271)); *see also Wesby*, 138 S. Ct. at 590 ("Of course, there can be the rare 'obvious case,'

where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances.").[28]

The question, then, is whether, notwithstanding the fact that there were no cases involving comparable facts, it would have been apparent to a reasonable officer that Officer Dexter's conduct was unlawful in light of the general principle of the state-created doctrine: that it is unconstitutional for officers to affirmatively enhance or create a danger to plaintiffs and then fail to ameliorate that danger.

To begin, I note that the Plaintiffs do not explain in any detail *why* it would have been apparent to a reasonable officer that the state-created danger doctrine applied in the circumstances presented here in the absence of any similar case law. As in *Belsito Communications, Inc. v. Decker*, the Plaintiffs have "present[ed] nothing to persuade [me] that [Officer Dexter's] actions . . . constitute conduct so egregious that a reasonable official must have known it was unconstitutional." 845 F.3d at 28. The Plaintiffs have primarily argued, without elaboration, that the general principles drawn from the wide variety of contemporary state-created danger cases were enough to put Officer Dexter on notice that his conduct was unlawful. For several reasons, I do not agree.

Considering the specific circumstances of the case, Officer Dexter's conduct was not so egregious that it is objectively apparent that it was unconstitutional.

---

[28] Specificity is particularly important in the Fourth Amendment context, *Wesby*, 138 S. Ct. at 590, and it is often in this context that courts discuss the rarity of "obvious" cases in which factual similar cases are unnecessary, *see id.*; *Brosseau*, 543 U.S. at 199; *White*, 580 U.S. at 80; *Belsito Commc'ns, Inc.*, 845 F.3d at 26.  But I do not read the case law as implying that this principle is unique to the Fourth Amendment context, in part because courts have discussed the same principles in other circumstances, *see Belsito Commc'ns, Inc.*, 845 F.3d at 28 (discussing the First Amendment); *Hope*, 536 U.S. at 741 (discussing the Eighth Amendment); *Irish II*, 979 F.3d at 78 (discussing general principles in the state-created danger context).

Here, a jury could conclude that Officer Dexter acted in a manner that goes beyond negligence and shocks the conscience. But for a right to be clearly established despite the absence of cases with similar facts, something more is required: the actions must be so egregious that they would be obviously unlawful in light of general legal principles. As an extreme example, the Supreme Court noted in *United States v. Lanier* that qualified immunity would not protect welfare officials who sold foster children into slavery even though there had never been a case involving those facts. 520 U.S. at 271. That is not to say, of course, that an officer's actions need to be *that* blatantly unconstitutional in order for general principles to provide sufficient notice. *Belsito Comm'cns, Inc.*, 845 F.3d at 26 n.11. But the circumstances in which general principles are enough to put the constitutional issue beyond debate in the absence of comparable case law are still narrow. *See id.* at 26.

Comparing other cases with Officer Dexter's conduct here makes it clear that this standard is not met. For example, in the state-created danger context, the District Court in *Cohen v. City of Portland* concluded that, at the pleading stage, the general principles of the state-created danger doctrine as recognized in *Irish II* were sufficient to put any reasonable officer on notice that it was unlawful for officers to chase a plaintiff into freezing water and then make threats about what would happen when he came out, resulting in the plaintiff's drowning death. No. 2:21-cv-00267-NT, 2022 WL 1406204, at *8-9 (D. Me. May 4, 2022). In *Okin*, the Second Circuit concluded that factually similar circumstances were not necessary for officers to violate clearly established rights when they, over repeated interactions, discussed football with a person accused of domestic abuse and declined to arrest the abuser or

even file a report despite the abuser admitting that he abused the victim.[29]  577 F.3d at 436-37.  And in *Kennedy*, the Ninth Circuit concluded that no factually similar cases were necessary because no reasonable officer could have believed that the officer's actions in that case—namely, promising a plaintiff that they would not notify a violent neighbor that the plaintiff had accused him of child molestation without telling the plaintiff, subsequently notifying the neighbor, and then falsely promising police protection—would have been constitutional under the state-created danger doctrine.  439 F.3d at 1066-67.

Although Officer Dexter's conduct here is arguably sufficiently irresponsible to be conscience shocking, it was not as egregiously unlawful as the officers' conduct in these other cases.  In the context of a conversation that lasted approximately thirteen minutes, it is plain that Officer Dexter sought to deescalate the situation by encouraging Pak to seek civil remedies and discouraging Pak from threatening violence.  Officer Dexter's failure to take more affirmative steps to prevent violence from occurring in his absence is as least partially explained by his knowledge that, according to the tenants, Pak was prone to fits of rage, but had not acted out violently in the past.  It is also possible that Officer Dexter sought to deescalate the dispute by providing the tenants only a vague account of his time speaking to the Paks.  Unlike the officers in *Cohen*, *Kennedy*, and *Okin*, Officer Dexter did not take intentional acts that obviously put the tenants at increased risk.  Although Officer Dexter's efforts to

---

[29]  Even in *Okin*, that there were factually similar cases appears to have been an important consideration to the conclusion reached by the court.  *See* 577 F.3d at 434-35 (discussing *Hemphill v. Schott*, 141 F.3d 412, 419 (2d Cir. 1998), and *Dwares v. City of New York*, 985 F.2 94, 99 (2d Cir. 1993), *abrogated by Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit, 507 U.S. 163* (1993), which also involved the condonation of violence).

deescalate the situation proved to be ineffective and were accompanied by Officer Dexter's apparent failure to understand the increasingly perilous nature of the situation developing before him, those efforts were neither callous to the safety of the tenants nor dismissive of their reports regarding Pak.  Further, Officer Dexter may have misled the tenants regarding the extent of the danger that they faced from Pak, but not to a degree which was so egregious that the "general statements of the law" of state-created danger made it "apparent" that Officer Dexter's conduct was unlawful.  *French*, 15 F.4th at 126-27 (quoting *White*, 580 U.S. at 79-80).  Thus, although hindsight leads me to conclude that a jury could find that Officer Dexter violated the tenants' constitutional rights, his failed efforts to deescalate the situation did not rise to the level necessary for the general principles of the state-created danger doctrine to apply with "obvious clarity" to the circumstances facing him. *McKenney*, 875 F.3d at 83 (quoting *Lanier*, 520 U.S. at 271).

In reaching the preceding conclusion, I am also guided by cases from outside the state-created danger context involving egregious conduct.  In *Jennings v. Jones*, for example, officers increased the force they were using on a restrained plaintiff who had stopped resisting.  499 F.3d 2, 5 (1st Cir. 2007).  Despite the plaintiff's protestations, the force continued, and a police officer broke the plaintiff's ankle.  *Id*. The First Circuit concluded that in these circumstances, the officer's "conduct was such an obvious violation of the Fourth Amendment's general prohibition on unreasonable force that a reasonable officer would not have required prior case law on point to be on notice that his conduct was unlawful." *Id*. at 17.  In *Hope v. Pelzer*, the Supreme Court suggested that chaining a prisoner to hitching post for hours,

denying him regular water, and leaving him sunburned was an "obvious" violation of the Eighth Amendment even if there had been no relevant case law.  536 U.S. at 737, 741.  And in *Taylor v. Riojas*, a case in which officers housed a prisoner in a cell that was overflowing with feces, the Supreme Court concluded that comparable precedents were unnecessary because "no reasonable correctional officer could have concluded that, under the extreme circumstances of this case, it was constitutionally permissible to house [the plaintiff] in such deplorably unsanitary conditions for such an extended period of time."  141 S. Ct. 52, 53 (2020) (per curiam).  Finally, in *McIntyre v. United States*, the District of Massachusetts concluded that no comparable case law was necessary to conclude that officers violated clearly established rights when an officer aided and abetted the murder of a plaintiff by a private citizen.  336 F. Supp. 2d 87, 123-25 (D. Mass. 2004).

This case is different in kind.  Officer Dexter's actions may have been a serious dereliction of duty.  But in light of the circumstances facing him, they were not so egregiously unlawful that it would have been clear to any reasonable officer that they were proscribed by the general principles of the state-created danger doctrine even without comparable case law.

Additionally, I note that this is not a case in which the general principle of law is readily applied by officers.  In some cases, the fact that general principles of law are readily applied makes it less difficult for plaintiffs to show that any reasonable officer would have known that the challenged conduct was unconstitutional.  For example, in *Morse v. Cloutier*, a case involving a warrantless entry to a home, the First Circuit concluded that factual similarity was unnecessary because general

Fourth Amendment law provided "a firm line and a bright line" as to the unauthorized entry to the home by police.  869 F.3d 16, 29 (1st Cir. 2017).  Thus, the court concluded, general Fourth Amendment principles applied with "obvious clarity" to the circumstances of the case, in which officers forced their way into the plaintiffs' home.  *Id.* (quoting *Lanier*, 520 U.S. at 271).  In contrast, as applied to the circumstances presented here, the state-created danger doctrine does not offer firm and bright lines—instead, it is highly fact-specific.

For the preceding reasons, in the absence of comparable case law, I conclude that the general principles of the state-created danger test are not enough to put it "beyond debate" that Officer Dexter violated the tenants' rights.  *Est. of Rahim*, 51 F.4th at 413 (quoting *Kisela*, 138 S. Ct. at 1152).

### (iii)    Whether General Order 136-96 Should Have Put Officer Dexter On Notice

As the *Irish II* court explained, "A defendant's adherence to proper police procedure bears on all prongs of the qualified immunity analysis," including whether a right is clearly established.  979 F.3d at 77.  "[W]hen an officer disregards police procedure, it bolsters the plaintiff's argument . . . that 'a reasonable officer in the [officer's] circumstances would have believed that his conduct violated the Constitution."  *Id.* (third alteration in original) (quoting *Stamps v. Town of Framingham*, 813 F.3d 27, 32 n.4 (1st Cir. 2016)).  Thus, I turn to consider whether there were police procedures in place at the time of the shootings that could have put Officer Dexter on notice that his actions were unconstitutional.  As noted above, most of the procedures pointed to by the Plaintiffs are too general to provide the necessary

guidance or were otherwise not applicable to the situation confronting Officer Dexter. Indeed, the Plaintiffs give those procedures no more than passing mention. Consequently, I focus on General Order 136-96, the Biddeford Police Department's deviant conduct policy.

As a preliminary note, the Plaintiffs have not developed the argument that General Order 136-96 is relevant to the clearly established inquiry.  Instead, they primarily argue that General Order 136-96 helps to illustrate that Officer Dexter acted with deliberate indifference and make only passing reference to General Order 136-96's relevance to the clearly established inquiry.  But even if the Plaintiffs had fully developed this argument, General Order 136-96 does not alter the conclusion that it was not "beyond debate" that Officer Dexter's conduct was unconstitutional.

General Order 136-96 has a broad purpose: "To describe deviant behavior and circumstances under which police personnel will make an arrest or protective detention in order to assist said person or protect the general public."  ECF No. 69 at 411.  The General Order further notes that "[i]t shall be the policy of the Biddeford Police Department to assist persons who are exhibiting symptoms of deviant behavior and appear to represent an imminent danger to themselves or to someone else."  ECF No. 69 at 411.  The General Order defines "deviant behavior" as "[b]ehavior which creates a condition, either physical or psychological in nature, which presents a threat of imminent and substantial harm to that person or to other persons."  ECF No. 69 at 412.  The order further defines "imminent and substantial physical harm" as "any condition which creates a reasonably foreseeable risk of harm to someone if not prevented or precluded.    The terms (imminent and substantial) take into

consideration the immediacy of an event occurring, the seriousness of the event[,] and the likelihood the event will take place." ECF No. 69 at 412. Additionally, the General Order provides that when an officer encounters "deviant persons who represent an imminent and substantial harm to themselves or someone else, the officer(s) shall be empowered, based upon probable cause, to take that person into protective custody" and that "[o]fficers who encounter situations of deviant behavior shall exercise their discretion." ECF No. 69 at 412. Although the General Order provides that variances from the terms of the order must be justified, it also provides that "while the provisions of this procedure are to be utilized whenever possible, the employee may be called upon to exercise common sense, judgment, and ingenuity, based upon his/her training, education, and/or experience." ECF No. 69-5 at 413.

Viewing the facts in the light most favorable to the Plaintiffs, Pak's behavior was arguably deviant and fell within the terms of the policy. In keeping with the general aims of the policy, Officer Dexter could have taken Pak into custody so as to protect him and the tenants. Thus, this General Order is relevant to both the shock-the-conscience inquiry and the clearly established inquiry. But even though the discretion to take a deviant person into custody recognized by the General Order "bolsters" the Plaintiffs' position, *Irish II*, 979 F.3d at 77, that discretion is sufficiently general so as not to render it beyond debate that Officer Dexter's failure to take Pak into custody was unconstitutional. Because the General Order directs officers to use their discretion to effectuate the aims of the policy, Officer Dexter did not violate any bright lines established by the policy. *See Stamps*, 813 F.3d at 39-40 (concluding that in light of case law, widely accepted norms of firearm safety, and police procedures, a

61

reasonable officer would have understood that pointing a loaded assault rifle at an innocent, unarmed, person would have violated the Constitution); *see also Irish I*, 849 F.3d at 527 (discussing the importance of the violation of police procedures in *Marrero-Rodríguez v. Municipality of San Juan*, 677 F.3d 497, 500-02 (1st Cir. 2012)), in which a police officer shot a fellow officer during a training exercise while flagrantly violating police procedures, including rules that no firearms were to be used during the training session and that firearms must be discharged before officers enter the training area).  Thus, although the policy established by the General Order is supportive of the Plaintiffs' claims, on balance that policy does not alter the conclusion that the Plaintiffs have failed to show that any reasonable officer would have known that Officer Dexter's conduct was unconstitutional in the situation before him.

### 3.      Conclusion as to the Section 1983 Claim Against Officer Dexter

What happened to Susan Johnson, Derek Thompson, and Alivia Welch is undeniably tragic, and it is abundantly clear that Officer Dexter mishandled the situation in front of him.  But although a jury could conclude that Officer Dexter violated the tenants' substantive due process rights under the state-created danger doctrine, the state of the law in 2012 would not have given Officer Dexter fair warning that his conduct was unconstitutional.  There were no factually similar cases putting him on notice that he could be violating the tenants' rights by agitating Pak and making the harm to them more likely.  Nor do the general principles of the state-created danger doctrine suffice to clearly establish the law because it would not have been apparent to a reasonable officer that those principles applied to proscribe Officer

Dexter's conduct in that specific situation.  I therefore conclude that, with respect to Officer Dexter's agitation of Pak, the precedent was not "clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply," nor were the contours of the rule "so well defined that it [would be] clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Irish II*, 979 F.3d at 76 (quoting *Wesby*, 138 S. Ct. at 590).  Additionally, although there is an argument that the existing case law established the rule that Officer Dexter could not increase the danger to the tenants by misleading them, *see Kennedy*, 439 F.3d at 1063, the Plaintiffs have again not shown that the contours of that rule were "so well defined that it [would be] clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Irish II*, 979 F.3d at 76 (quoting *Wesby*, 138 S. Ct. at 590).

Because qualified immunity protects Officer Dexter, the Defendants are entitled to summary judgment on the section 1983 claim against Officer Dexter in his individual capacity.  *See Swartz v. Sylvester*, 53 F.4th 693, 698 (1st Cir. 2022) ("[A]n [official] may be entitled to immunity based on either prong [of the qualified immunity test]." (first and second alterations in original) (quoting *Est. of Rahim*, 51 F.4th at 410)).

## B. The Plaintiffs' Claims Against the City of Biddeford, Chief Beaupre, and Officer Dexter in his Official Capacity

The Defendants also seek summary judgment as to the Plaintiffs' claims against the City of Biddeford and Chief Beaupre, as well as the claims brought against Officer Dexter in his official capacity.

### 1. City of Biddeford

The Plaintiffs assert that the City of Biddeford can be held liable for the constitutional violations committed by Officer Dexter based on the Supreme Court's decision in *Monell*, 436 U.S. 658.[30]  In *Monell*, the Supreme Court "held that a municipality could be liable in certain cases when its agents and employees committed constitutional violations, but not under a theory of *respondeat superior*." *Young v. City of Providence ex rel. Napolitano*, 404 F.3d 4, 25 (1st Cir. 2005). Municipal liability under *Monell* has "two basic elements: first, that the plaintiff's harm was caused by a constitutional violation, and second, that the [municipal defendants] be responsible for that violation."  *Id.* at 25-26; *Collins v. City of Harker Heights*, 503 U.S. 115, 122 (1992) (emphasizing "the separate character of the inquiry into the question of municipal responsibility and the question whether a constitutional violation occurred").  The fact that a police officer is protected by qualified immunity for a constitutional violation that they committed does not preclude *Monell* liability for the municipality that employs the police officer.  *See Joyce v. Town of Tewksbury*, 112 F.3d 19, 23 (1st Cir. 1997) ("Municipal liability under section 1983 is not vicarious and municipalities do not enjoy qualified immunity. Consequently, it is not impossible for a municipality to be held liable for the actions of lower-level officers who are themselves entitled to qualified immunity." (citations omitted)).

---

[30]  Although the Defendants have argued that the Plaintiffs waived their *Monell* claims by not mentioning them in their response to the Defendants' Renewed Motion for Summary Judgment, I elect not to treat the claims as waived based in part on my colloquy with Plaintiffs' counsel at the October 21, 2022, hearing.

As to the first element, if there is no underlying constitutional violation, there can be no municipal liability. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curiam) ("[N]either [*Monell*] nor any other of our cases authorizes the award of damages against a municipal corporation based on the actions of one of its officers when in fact . . . the officer inflicted no constitutional harm."); *Evans v. Avery*, 100 F.3d 1033, 1040 (1st Cir. 1996) ("[W]e follow *Heller*'s clear rule and hold that the City cannot be held liable absent a constitutional violation by its officers."); *see also Young*, 404 F.3d at 26. As I described above, a jury could conclude that Officer Dexter violated the Plaintiffs' constitutional rights, so this element is satisfied. Municipal liability, then, depends on the second *Monell* factor: whether the Plaintiffs have shown that the City of Biddeford can be held responsible for Officer Dexter's constitutional violation.

A municipality is not responsible for the torts of its agents and employees based on *respondeat superior*. *Young*, 404 F.3d at 25. "Instead, it is only when the governmental employees' 'execution of a government's policy or custom . . . inflicts the injury' and is the 'moving force' behind the constitutional violation that a municipality can be held liable." *Id.* (alteration in original) (citing *Monell*, 436 U.S. at 694). "In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983" if "deliberate indifference" by the municipality is shown. *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

"A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of [a] failure to train" claim.  *Id.* at 62.  However, "'in a narrow range of circumstances,' a pattern of similar violations might not be necessary to show deliberate indifference," and a single incident can suffice.  *Id.* at 63 (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 409 (1997)).  Such single-incident liability can occur only when "the need for more or different training is so obvious and the inadequacy [is] so likely to result in the violation of constitutional rights."  *Hill v. Walsh*, 884 F.3d 16, 24 (1st Cir. 2018) (alteration in original) (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)); *see also Sadulsky v. Town of Winslow*, No. 1:14-cv-01-GZS, 2015 WL 5542521, at *9 (D. Me. Sept. 17, 2015) ("A single constitutional violation supports a claim for failure to train only where the violation of constitutional rights is a 'highly predictable consequence' of that failure." (citing *Connick*, 563 U.S. at 64)).

Here, the Plaintiffs have not identified any facts, disputed or not, that would show that Officer Dexter's actions were consistent with a pattern of similar constitutional violations by other municipal employees.  At oral argument, the Plaintiffs acknowledged this weakness in their case, arguing instead that Officer Dexter's conduct was, standing alone, sufficiently egregious to permit the Court to infer deliberate indifference based on the single incident at issue here.

The Plaintiffs' argument is unavailing.  Despite the tragic circumstances of this case, it is not "obvious" that Officer Dexter's conduct was so egregious that it resulted from a lack of training or that a violation of constitutional rights was a highly predictable consequence of whatever training he had received.  *See Hill*, 884 F.3d at

24; *Sadulsky*, 2015 WL 5542521, at *9. This conclusion accords with the rule that the Court "must adhere to a 'stringent standard of fault,' lest municipal liability under § 1983 collapse into *respondeat superior*." *Connick*, 563 U.S. at 70 (quoting *Bryan Cnty.*, 520 U.S. at 410).

Accordingly, the Plaintiffs have failed to show that there is a material dispute of fact as to whether the City of Biddeford can be held liable under the *Monell* doctrine. The Defendants are entitled to summary judgment on this issue.

### 2.      Chief of Police

The Plaintiffs bring claims against Chief Roger P. Beaupre both in his individual and official capacities.

With respect to the official-capacity claim against Chief Beaupre, the Defendants are entitled to summary judgment. "[O]fficial-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent." *Brandon v. Holt*, 469 U.S. 464, 472 n.21 (1985) (quoting *Monell*, 436 U.S. at 690 n.55). As explained above, the City of Biddeford, the entity of which Chief Beaupre is an agent, cannot be held liable under the *Monell* doctrine. Consequently, Chief Beaupre cannot be held liable in his official capacity. *See Wood v. Hancock Cnty. Sheriff's Dep't*, 354 F.3d 57, 58 n.1 (1st Cir. 2003) (concluding that the liability imposed on county officials acting in their official capacities is "indistinguishable from the county's" liability).

As to the claims brought against Chief Beaupre in his individual capacity, I conclude that I need not reach those claims for two reasons. First, in *Welch*, the First Circuit remanded only the *Monell* claims against Chief Beaupre and not the claims

brought against him in his individual capacity. *See* 12 F.4th at 78 ("We vacate the grant of summary judgment as to the § 1983 and Maine Civil Rights Act claims against Officer Dexter and the *Monell* claims against Police Chief Beaupre and remand for further consideration in light of this opinion and *Irish II*."). Second, I conclude that the Plaintiffs have waived their individual capacity claims against Chief Beaupre by failing to assert them in their written or oral submissions since the remand.

Consequently, Chief Beaupre is entitled to summary judgment on both claims brought against him.

### 3.     Official Capacity Claims Against Officer Dexter

The First Circuit also remanded the claims that the Plaintiffs brought against Officer Dexter in his official capacity. *Id.* at 77. The Defendants are entitled to summary judgment on these claims because, as explained above, a *Monell* claim cannot be maintained against the City of Biddeford, and Officer Dexter's official-capacity liability is indistinguishable from the City's liability. *See Wood*, 354 F.3d at 58 n.1.

## C.     Welch's Claim Under the Maine Civil Rights Act

Finally, I address Welch's claim,[31] brought under the Maine Civil Rights Act, 5 M.R.S.A. § 4682(1-A), that the Defendants violated her rights under the United States Constitution and the Maine Constitution.[32]

---

[31] Johnson does not assert any claims under the Maine Civil Rights Act.

[32] The First Circuit has noted that "[t]he disposition of a 42 U.S.C. § 1983 claim also controls a claim under the [Maine Civil Rights Act]." *Berube v. Conley*, 506 F.3d 79, 85 (1st Cir. 2007) (citing *Dimmitt*

Section 4682(1-A) provides:

> Whenever any person, whether or not acting under color of law, *intentionally interferes or attempts to intentionally interfere by physical force or violence against a person, damage or destruction of property or trespass on property or by the threat of [these actions]* with the exercise or enjoyment by any other person of rights secured by the United States Constitution or the laws of the United States or of rights secured by the Constitution of Maine or laws of the State . . . the person whose exercise or enjoyment of these rights has been interfered with, or attempted to be interfered with, may initiate and prosecute in that person's own name and on that person's own behalf a civil action for legal or equitable relief.

(Emphasis added).  Here, the undisputed material facts show that Officer Dexter did not "intentionally interfere[] or attempt[] to intentionally interfere," *id.,* with Welch's rights by the use or threat of violence, damage or destruction of property, or trespass. Instead, it is undisputed that it was Pak's use of violence that caused the deprivation of rights.  As such, Welch cannot maintain a Maine Civil Rights Act claim against Officer Dexter.  *See Clifford v. MaineGeneral Med. Ctr.*, 2014 ME 60, ¶ 74 n.22, 91 A.3d 567 ("To prevail on the [Maine Civil Rights Act] claims, Clifford must prove, among other things, that Kemmerer used or threatened physical force or violence when he deprived her of a constitutional or statutory right."); *Bagley v. Raymond Sch. Dep't*, 1999 ME 60, ¶ 10 n.5, 728 A.2d 127 ("The Maine Civil Rights Act is inapplicable to the claims presented.  It applies when there has been the use or threat of 'physical force or violence' in an effort to interfere with the exercise of a constitutional right. No claim of violence, real or threatened has been presented by the parents." (citation

---

*v. Ockenfels*, 220 F.R.D. 116, 123 (D. Me. 2004)).  I do not find this statement entirely controlling here, however.  Although the disposition of a section 1983 claim undoubtedly controls a claim under the Maine Civil Rights Act that a plaintiff's federal constitutional rights were violated, it does not necessarily control a plaintiff's claims under the Maine Civil Rights Act that her rights under the Maine Constitution were violated because state constitutional claims cannot be brought under section 1983.  *See Grenier*, 748 F. Supp. at 913; *see also Ahern*, 109 F.3d at 815.

omitted)).  Even if I were to conclude otherwise, the Defendants would still be entitled to summary judgment on Welch's Maine Civil Rights Act claim for two reasons.

First, as to Welch's argument that her rights under the Maine Constitution were violated, Welch has not developed this argument and has focused her briefing entirely on her substantive due process rights under the federal constitution.  As such, I consider this argument waived.  *See Vázquez Robles v. CommoLoCo, Inc.*, 252 F. Supp. 3d 111, 114 (D.P.R. 2017); *White v. Meador*, 215 F. Supp. 2d 215, 228 (D. Me. 2002).

Second, "[t]he same qualified immunity analysis applies under the Maine Civil Rights Act as under § 1983."  *Hegarty v. Somerset Cnty.*, 848 F. Supp. 257, 269 (D. Me. 1994) (citing *Jenness v. Nickerson*, 637 A.2d 1152, 1155 (Me. 1994)).  Accordingly, Officer Dexter would be entitled to qualified immunity on the Maine Civil Rights Act claim for the same reasons that he is entitled to qualified immunity on the section 1983 claims.

Consequently, the Defendants are entitled to summary judgment on Welch's Maine Civil Rights Act claim.

## V. CONCLUSION

The events associated with the deaths of Derrick Thompson and Alivia Welch, and the injuries to Susan Johnson, on December 29, 2012, at the hands of James Pak are undeniably horrific.  After careful reflection, I conclude that the events that evening represented a novel situation in which the "breathing room" afforded to police officers by the qualified immunity doctrine applies.  *Est. of Rahim*, 51 F.4th at 410 (quoting *Conlogue v. Hamilton*, 906 F.3d 150, 155 (1st Cir. 2018)).  For the reasons

set out in this decision, the Defendants' Renewed Motion for Summary Judgment

(ECF No. 113) is **GRANTED**.

**SO ORDERED.**

**Dated this the 30th day of March, 2023.**


                              _____/s/ JON D. LEVY_____
                              **CHIEF U.S. DISTRICT JUDGE**